Slip Op. No. 21-8

## UNITED STATES COURT OF INTERNATIONAL TRADE

PRIMESOURCE BUILDING
PRODUCTS, INC.,

                Plaintiff,

      v.

UNITED STATES, et al.,

                Defendants.

**Before: Timothy C. Stanceu, Chief Judge**
        **Jennifer Choe-Groves, Judge**
        **M. Miller Baker, Judge**

**Court No. 20-00032**

## OPINION AND ORDER

[Granting defendants' motion to dismiss plaintiff's amended complaint as it pertains to all claims therein except the claim stated as Count 2; denying the motion to dismiss as to the claim in Count 2 but also denying plaintiff's motion for summary judgment as to that remaining claim. In a separate opinion, Judge Baker concurs in the dismissal of Counts 1, 3, 4, and 5 and dissents from the denial of defendants' motion to dismiss Count 2.]

Dated: January 27, 2021

*Jeffrey S. Grimson*, Mowry & Grimson, PLLC, of Washington, D.C., for plaintiff. With him on the brief were *Kristin H. Mowry*, *Jill A. Cramer*, *Sarah M. Wyss*, *James C. Beaty*, *Bryan P. Cenko*, and *Wenhui Ji*.

*Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendants. With her on the brief were *Tara K. Hogan*, Assistant Director, *Stephen C. Tosini*, Senior Trial Counsel, and *Meen Geu Oh* and *Kyle S. Beckrich*, Trial Attorneys.

Stanceu, Chief Judge:  Plaintiff PrimeSource Building Products, Inc. ("PrimeSource"), a U.S. importer of steel nails, challenges on various grounds a proclamation issued by the President of the United States ("Proclamation 9980") that imposed 25% tariffs on, *inter alia*, various imported products made of steel (identified in the proclamation as "derivatives" of steel products), including steel nails.  Arguing that plaintiff's complaint does not state a claim on which relief can be granted, defendants move to dismiss this action according to USCIT Rule 12(b)(6).  Plaintiff opposes defendants' motion to dismiss and moves for summary judgment, urging us to declare Proclamation 9980 invalid and order the refund of any duties that previously may have been collected on its affected entries.  In moving to dismiss and in their response to PrimeSource's summary judgment motion, defendants argue that the President's action was within the authority delegated by Congress and must be upheld.

We grant defendants' motion to dismiss as to four of plaintiff's claims, which are set forth as Counts 1, 3, 4, and 5 of the Amended Complaint, and deny it as to Count 2, in which plaintiff claims that Proclamation 9980 is invalid because it was issued after the authority delegated to the President by the governing statute had expired.  Because plaintiff has not shown "that there is no genuine dispute as to any material fact," USCIT R. 56(a), we deny plaintiff's summary judgment motion as to the remaining claim.

## I. Background

### A. The Challenged Presidential Proclamation

On January 24, 2020, President Trump issued Proclamation 9980, *Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5,281 (Exec. Office of the President Jan. 29, 2020) ("*Proclamation 9980*"). Proclamation 9980 imposed a duty of 25% *ad valorem* on various imported products made of aluminum and of steel, including steel nails and other steel fasteners as well as "bumper stampings of steel" for motor vehicles and "body stampings of steel" for agricultural tractors. *Id.* at 5,291, 5,293.

The 25% duties imposed by Proclamation 9980 went into effect on February 8, 2020. *Id.* at 5,290. As authority for the President's action, Proclamation 9980 cited Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862 ("Section 232"),[1] and certain previous proclamations of the President that also invoked Section 232, including Proclamations 9704, *Adjusting Imports of Aluminum Into the United States*, 83 Fed. Reg. 11,619 (Exec. Office of the President Mar. 15, 2018) ("*Proclamation 9704*"), and 9705, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Exec. Office of the President Mar. 15, 2018) ("*Proclamation 9705*"). *Proclamation 9980* ¶¶ 9–10, 85 Fed. Reg. at 5,283.

---

[1] All citations to the United States Code are to the 2012 edition.

Proclamation 9705 imposed 25% duties on various steel products in basic and semi-finished form but did not impose duties on the products that were the subject of Proclamation 9980,[2] which Proclamation 9980 described as "Derivatives of Steel Products."[3]

───────────────

[2] The products affected by Proclamation 9705 are certain iron and steel products classified within chapters 72 and 73 of the Harmonized Tariff Schedule of the United States ("HTSUS"), as follows:

(1) *Flat-rolled products* provided for in HTSUS headings 7208 (of iron or nonalloy steel, 600 mm or more in width, hot-rolled, not clad, plated or coated), 7209 (of iron or nonalloy steel, 600 mm or more in width, cold-rolled, not clad, plated or coated), 7210 (of iron or nonalloy steel, 600 mm or more in width, clad, plated or coated), 7211 (of iron or non-alloy steel, less than 600 mm in width, not clad, plated or coated), 7212 (of iron or non-alloy steel, less than 600 mm in width, clad, plated or coated), 7225 (of alloy steel other than stainless, 600 mm or more in width) or 7226 (of alloy steel other than stainless, less than 600 mm in width);

(2) *Bars and rods* provided for in HTSUS headings 7213 (hot-rolled, in irregularly wound coils, of iron or nonalloy steel), 7214 (other, of iron or nonalloy steel, not further worked than forged, hot-rolled, hot-drawn or hot-extruded, but including those twisted after rolling), 7215 (other, of iron or nonalloy steel), 7227 (hot-rolled, in irregularly wound coils, of alloy steel other than stainless), or 7228 (other bars and rods of alloy steel other than stainless; angles, shapes and sections, of alloy steel other than stainless; hollow drill bars and rods, of alloy or nonalloy steel); *angles, shapes and sections* of HTSUS heading 7216 (angles, shapes and sections of iron or nonalloy steel) except products not further worked than cold-formed or cold-finished, of subheadings 7216.61.00, 7216.69.00, or 7216.91.00; *wire* provided for in HTSUS headings 7217 (wire of iron or nonalloy steel) or 7229 (wire of alloy steel other than stainless); *sheet piling* provided for in HTSUS subheading 7301.10.00; *rails* provided for in HTSUS subheading 7302.10 (rail and tramway track construction material of iron or steel: rails); *fish-plates and sole plates* provided for in HTSUS subheading 7302.40.00 (rail and tramway track construction material of iron

(continued . . .)

(. . . continued)

or steel: fish plates and sole plates); and other products of iron or steel provided for in HTSUS subheading 7302.90.00 (other railway or tramway track construction material of iron or steel, other than switch blades, crossing frogs, point rods and other crossing pieces, fish plates and sole plates);

(3) *Tubes, pipes, and hollow profiles* provided for in HTSUS headings 7304 (seamless, of iron (other than cast iron) or steel), or 7306 (other (for example, open seamed or welded, riveted or similarly closed), of iron or steel); *tubes and pipes* provided for in HTSUS heading 7305 (other tubes and pipes (for example, welded, riveted or similarly closed), having circular cross sections, the external diameter of which exceeds 406.4 mm, of iron or steel);

(4) *Ingots, other primary forms and semi-finished products* provided for in HTSUS heading 7206 (iron and nonalloy steel in ingots or other primary forms (excluding certain iron in lumps, pellets or similar forms, of heading 7203)), 7207 (semi-finished products of iron or nonalloy steel) or 7224 (alloy steel other than stainless in ingots or other primary forms; semi-finished products of alloy steel other than stainless); and

(5) *Products of stainless steel* provided for in HTSUS heading 7218 (stainless steel in ingots or other primary forms; semi-finished products of stainless steel), 7219 (flat-rolled products of stainless steel, 600 mm or more in width), 7220 (flat-rolled products of stainless steel, less than 600 mm in width), 7221 (bars and rods, hot-rolled, in irregularly wound coils, of stainless steel), 7222 (other bars and rods of stainless steel; angles, shapes and sections of stainless steel), or 7223 (wire of stainless steel).

Proclamation 9705, *Adjusting Imports of Steel Into the United States*, Annex ("To Modify Chapter 99 of the Harmonized Tariff Schedule of the United States"), 83 Fed. Reg. 11,625, 11,629 (Exec. Office of the President Mar. 15, 2018).

[3] Proclamation 9980 imposed 25% tariffs on four categories of products that it described as "Derivatives of Steel Articles." The four categories of products are as follows:

(1) *Threaded steel fasteners suitable for use in powder-actuated handtools*, classified in subheading 7317.00.30, HTSUS (nails, tacks (other than thumb tacks),

(continued . . .)

## B. Proceedings Before the Court of International Trade

Plaintiff commenced this action on February 4, 2020, naming as defendants the

United States, the U.S. Department of Commerce, U.S. Customs and Border Protection,

and various officers of the United States in their official capacities (the President of the

---

(. . . continued)

drawing pins, corrugated nails, staples (other than staples in strips of HTSUS heading 8305) and similar articles, of iron or steel, whether or not with heads of other material, but excluding such articles with heads of copper;

(2) *Certain other steel fasteners: nails, tacks* (other than thumb tacks), *drawing pins, corrugated nails, staples* (other than staples in strips of HTSUS heading 8305) *and similar articles*, of iron or steel, of one piece construction, made of round wire (other than certain collated roofing nails), classified in HTSUS statistical subheadings 7317.00.5503 (collated, assembled in a wire coil, not galvanized), -5505 (collated, assembled in a plastic strip, galvanized), -5507 (collated, assembled in a plastic strip, not galvanized), -5560 (not collated, coated, plated, or painted), -5580 (vinyl, resin or cement coated), and other steel fasteners of one-piece construction (other than thumb tacks), not made of round wire, and other than cut, classified in HTSUS statistical subheading 7317.00.6560;

(3) *Bumper stampings of steel for motor vehicles* (classified in HTSUS subheading 8708.10.30 (parts and accessories of the motor vehicles of HTSUS headings 8701 to 8705: bumpers); and

(4) *Body stampings of steel for tractors suitable for agricultural use*, classified in HTSUS subheading 8708.29.21 (parts and accessories of the motor vehicles of headings 8701 to 8705: other parts and accessories of bodies (including cabs): other: body stampings: for tractors suitable for agricultural use).

Proclamation 9980, *Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, Annex II ("Derivatives of Steel Articles"), 85 Fed. Reg. 5,281, 5,290 (Exec. Office of the President Jan. 29, 2020).

United States, the Secretary of Commerce, and the Acting Commissioner of Customs

and Border Protection).  Summons, ECF No. 1; Compl., ECF Nos. 8 (conf.), 9 (public).

Plaintiff amended its complaint on February 11, 2020.  First Am. Compl., ECF

Nos. 21 (conf.), 22 (public) ("Am. Compl.").  Defendants filed their Rule 12(b)(6) motion

to dismiss the amended complaint on March 20, 2020.  Defs.' Mot. to Dismiss for Failure

to State a Claim, ECF No. 60 ("Defs.' Mot.").  On April 14, 2020, plaintiff opposed

defendants' motion to dismiss and moved for summary judgment.  Rule 56 Mot. for

Summ. J., Pl. PrimeSource Bldg. Prods. Inc.'s Mem. of Points and Authorities in Supp.

of Mot. for Summ. J. and Resp. to Defs.' Mot. to Dismiss for Failure to State a Claim,

ECF No. 73-1 ("Pl.'s Br.").  Defendants replied in support of their motion to dismiss and

responded to plaintiff's summary judgment motion on May 12, 2020.  Defs.' Reply in

Supp. of their Mot. to Dismiss and Resp. to Pl.'s Mot. for Summ. J., ECF No. 78 ("Defs.'

Reply").  Plaintiff replied in support of its summary judgment motion on June 9, 2020.

Pl. PrimeSource Bldg. Prods. Inc.'s Reply Br. in Supp. of its Mot. for Summ. J., ECF

No. 91 ("Pl.'s Reply").

## II. DISCUSSION

### A. Subject Matter Jurisdiction

We exercise subject matter jurisdiction according to section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(i)(2), (i)(4).  Paragraph (i)(2) of § 1581 grants this

Court jurisdiction of a civil action "that arises out of any law of the United States

providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise

for reasons other than the raising of revenue." *Id.* § 1581(i)(2).  Paragraph (i)(4) grants

this Court jurisdiction of a civil action arising "out of any law of the United States

providing for . . . administration and enforcement with respect to the matters referred to

in paragraphs (1)–(3) of this subsection." *Id.* § 1581(i)(4).

### B. Standards of Review

A court reviewing a challenge to Presidential action taken pursuant to authority

delegated by statute does so according to a standard of review that is highly deferential

to the President.  "For a court to interpose, there has to be a clear misconstruction of the

governing statute, a significant procedural violation, or action outside delegated

authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).  Review

of Proclamation 9980 according to the Administrative Procedure Act, 5 U.S.C. § 706

("APA"), is not available because the President is not an agency for purposes of the

APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992).  In an action such as this

one, where a statute commits a determination to the President's discretion, a reviewing

court lacks authority to review the President's factual determinations. *United States v.

George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940); *Silfab Solar, Inc. v. United States*, 892

F.3d 1340, 1349 (Fed. Cir. 2018) ("In particular, courts have repeatedly confirmed that,

where the statute authorizes a Presidential 'determination,' the courts have no authority

to look behind that determination to see if it is supported by the record." (citing *George*

*S. Bush & Co.*, 310 U.S. at 379)); *Maple Leaf Fish Co.*, 762 F.2d at 89 ("The President's

findings of fact and the motivations for his action are not subject to review." (citing

*Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984))).

To avoid dismissal for failure to state a claim on which relief can be granted, a

complaint must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief." USCIT R. 8(a)(2). A court will grant a motion to dismiss if

the complaint fails to allege "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court will grant a motion for summary judgment "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." USCIT R. 56(a).

### C. Defendants' Motion to Dismiss

Plaintiff raises five claims in its complaint. Am. Compl. In its first claim

("Count 1"), *id.* ¶¶ 62–69, PrimeSource alleges that the Secretary of Commerce violated

the Commerce Department's regulations, 15 C.F.R. § 705, and the Administrative

Procedure Act in various ways when providing the "assessments" on which the

President based Proclamation 9980. PrimeSource alleges, *inter alia*, that the Secretary

failed to initiate an investigation, failed to notify the Secretary of Defense of an initiation

of an investigation, failed to publish an Executive Summary in the Federal Register, and

failed to provide for public hearings, as required by its regulation, *id.* ¶¶ 66–67, and

violated the APA when he "failed to provide interested parties with sufficient notice

and an opportunity to comment" on the imposition of the duties on derivatives, *id.* ¶ 68,

and when he failed to provide a reasoned explanation for its assessments, *id.* ¶ 69.

PrimeSource's second claim ("Count 2") is that Proclamation 9980 was issued in

violation of the time limits specified in Section 232. *Id.* ¶¶ 70–73.  Specifically, plaintiff

alleges: (1) noncompliance with Section 232(c)(1)(A), 19 U.S.C. § 1862(c)(1)(A), which

directs the President to make a determination on a report submitted by the Commerce

Secretary under 19 U.S.C. § 1862(b)(3)(A) within 90 days of receiving such report, and

(2) noncompliance with 19 U.S.C. § 1862(c)(1)(B), which directs the President to

implement any determination the President makes to adjust tariffs on an article and its

derivatives within 15 days after the President makes such a determination.  *Id.*

Maintaining that the relevant report issued under § 1862(b)(3)(A) was the report the

President received on January 11, 2018, which resulted in Proclamation 9705, a

Presidential action that imposed 25% duties on steel products other than the derivatives

affected by Proclamation 9980, PrimeSource alleges that "[i]n issuing Proclamation 9980

a full 653 days since the 90-day window closed for the President to determine what

action must be taken and 638 days after the 15-day window to implement such action,

the President failed to follow the mandated procedures set forth in Section 232." *Id.*

¶ 73.

In Count 3, *id.* ¶¶ 74–78, plaintiff asserts that it has a property interest in its

imports of steel derivative products, *id.* ¶ 76, and that "[b]y failing to provide parties

with notice and an opportunity to comment before issuing Proclamation 9980 imposing

Section 232 tariffs on steel and aluminum derivative products, the President violated

PrimeSource's due process rights protected under the Fifth Amendment," *id.* ¶ 78.

Count 4, *id.* ¶¶ 79–80, alleges that "Section 232 is unconstitutional and not in

accordance with the law because it represents an over-delegation by Congress to the

President of its legislative powers by failing to set forth an intelligible principle for the

President to follow when implementing Section 232," *id.* ¶ 80.

Finally, Count 5, *id.* ¶¶ 81–82, asserts that "[t]he Secretary of Commerce violated

Section 232 by making 'assessments', 'determinations' and providing other

'information' to the President without following any of the statutory procedures for

new action and by doing so outside the statutory time periods applicable to the 2017-18

investigation conducted by the Secretary of Commerce that resulted in Proclamation

9705," *id.* ¶ 82.

### 1. Plaintiff's First, Third, Fourth, and Fifth Claims Must Be Dismissed

Plaintiff's first claim (Count 1), in challenging the "assessments" of the Secretary

of Commerce addressing steel and aluminum derivatives, alleges various violations of

the Commerce Department's regulations, 15 C.F.R. § 705, and the APA.  The

assessments by the Commerce Secretary merely provided facts and recommendations

for potential action by the President rather than impose duties under the authority of

Section 232.  These actions had no direct or independent effect on PrimeSource.  They

were, therefore, not final actions PrimeSource could challenge in a cause of action

brought under the APA.  *See* 5 U.S.C. § 704 ("final agency action for which there is no

other adequate remedy in a court are subject to judicial review"); *Motion Sys. Corp. v.*

*Bush*, 437 F.3d 1356, 1362 (Fed. Cir. 2006) (*en banc*) (citing *Franklin*, 505 U.S. at 798); *DRG*

*Funding Corp. v. Sec'y of HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (citing 5 U.S.C. § 704).

PrimeSource argues that the Commerce Secretary's actions should be deemed

"final," and therefore judicially reviewable, because the Secretary's actions "represent

the consummation of the Secretary's decision-making process that have direct legal

consequences on importers of derivative steel products like PrimeSource, and,

therefore, are reviewable under the APA."  Pl.'s Br. 26 (citing *Bennett v. Spear*, 520 U.S.

154, 177–78 (1997) (agency action held final where it marks consummation of agency's

decision-making process and is one that either determines rights or obligations or is one

from which legal consequences flow)).  Here, however, the legal consequence, which is

the imposition of tariffs on imported steel "derivatives," resulted from an exercise of the

President's broad discretion, not from the actions of the Commerce Secretary.

For its "finality" argument, PrimeSource relies, erroneously, on *Corus Group PLC v. U.S. Int'l Trade Comm'n*, 352 F.3d 1351 (Fed. Cir. 2003). Pl.'s Br. 28–32. *Corus Group* considered whether a "serious injury" determination of the U.S. International Trade Commission ("ITC") in an "escape clause" investigation involving the U.S. steel industry under Section 201 of the Trade Act of 1974 could be challenged in this Court as a final agency action. 352 F.3d at 1358. Under the statutory scheme, an affirmative determination of serious injury to a U.S. domestic industry is a statutory prerequisite to the exercise of the President's discretion to impose temporary tariff protection. *Id.* at 1359. If the ITC commissioners were equally divided on the question of serious injury (as occurred in that case, in which the vote on injury was a three-to-three tie), the President could consider the decision agreed upon by either group of commissioners as the determination of the ITC. The President considered the decision of the three commissioners voting affirmatively to be the ITC determination and, on that basis, imposed safeguard duties on certain steel imports. In the situation presented, and under the unique statutory scheme, the ITC vote, which itself was challenged in the litigation, had legal consequence and therefore could be contested in the Court of International Trade. *Id*. The Court of Appeals for the Federal Circuit (the "Court of Appeals") distinguished *Corus Group* in *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335 (Fed. Cir. 2010), a case more closely analogous to this case. In *Michael Simon*, the Court of Appeals held that ITC recommendations to the President for modifications

to the Harmonized Tariff Schedule of the United States could not be subjected to

judicial challenge because, lacking any binding legal effect, they did not constitute

"final agency action" within the meaning of 5 U.S.C. § 704.  609 F.3d at 1339–40.

In further support of the claim in Count 1, PrimeSource argues that the

Commerce Secretary's assessments regarding steel and aluminum derivatives are the

product of "rulemaking" that, under the APA, 5 U.S.C. § 553(b)–(c), required the

Secretary to provide the public notice and an opportunity for comment.  Pl.'s Br. 34–38.

This argument lacks merit.  The Secretary's assessments did not themselves impose the

tariffs on derivatives or implement any other measure.  They did not "implement,

interpret, or prescribe law or policy" within the meaning of the APA, 5 U.S.C. § 551(4).

Because the claim stated as Count 1 does not assert a valid cause of action, it

must be dismissed.

Plaintiff's third claim, alleging a due process violation stemming from the

President's failure to provide parties with notice and the opportunity to comment

before issuing Proclamation 9980, also must be dismissed.  The Due Process Clause of

the Fifth Amendment did not require the President, in order to avoid a deprivation of

due process, to provide notice or the opportunity to comment before imposing duties

on imported merchandise under delegated legislative authority, and neither Section 232

nor any other statute required such a procedure.  Moreover, PrimeSource fails to

identify any authority for its theory that, on the facts it has pled, it had a protected

property interest in maintaining the tariff treatment applicable to its imported

merchandise that existed prior to Proclamation 9980.  Plaintiff relies on *NEC Corp. v.*

*United States*, 151 F.3d 1361 (Fed. Cir. 1998) in support of that theory, Pl.'s Br. 41, but

*NEC Corp.* is not on point, having arisen from an action brought (unsuccessfully) to

enjoin the conducting of an antidumping duty investigation based on alleged

"prejudgment" on the part of the Commerce Department.  PrimeSource also relies upon

*Schaeffler Grp. USA, Inc. v. United States*, 786 F.3d 1354 (Fed. Cir. 2015), Pl.'s Br. 41, but

that case also is inapposite.  Rejecting a claim that the petition support requirement of

the Continued Dumping and Subsidy Offset Act of 2000 (the "CDSOA") was

impermissibly retroactive according to the Due Process Clause, the Court of Appeals

"assume[d] without deciding, for purposes of our analysis, that Schaeffler had a

protected property interest implicating the Due Process Clause."  786 F.3d at 1361.  The

property interest claimed by plaintiff Schaeffler Group USA, Inc. was not pre-existing

tariff treatment but a claimed right that arose "because, when it checked the box to

oppose a petition, it believed that it would not be subjecting itself to competitive harm

through the aggrandizement of its competitors."  *Id.*  Reasoning that the CDSOA was

not impermissibly retroactive, the appellate court chose not to reach the question of

whether there was a vested property right "because we find that Congress had a

rational basis for the retroactive effect of the petition support requirement."  *Id.*

PrimeSource's fourth claim, that Section 232 is impermissible under the U.S.

Constitution as an impermissibly broad delegation of legislative authority from

Congress to the Executive Branch, is foreclosed by the decision of the U.S. Supreme

Court in *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976).  Therefore, it

too must be dismissed.

The fifth count in PrimeSource's complaint contains only one substantive

paragraph, as follows:

> The Secretary of Commerce violated Section 232 by making
> "assessments", "determinations" and providing other "information" to
> the President without following any of the statutory procedures for new
> action and by doing so outside the statutory time periods applicable to the
> 2017-18 investigation conducted by the Secretary of Commerce that
> resulted in Proclamation 9705.

Am. Compl. ¶ 82.  This claim, which is similar to the claim in Count 1 but grounded in

alleged violations of Section 232 instead of alleged violations of the Commerce

Department regulations or the APA, also must be dismissed.  Section 232 does not

provide for judicial review of any action taken thereunder.  Accordingly, for

PrimeSource's fifth count to be cognizable, judicial review must exist under the APA.

But as with Count 1, this claim cannot be brought under the APA, which "limits

nonstatutory judicial review to 'final' agency actions."  *DRG Funding Corp.*, 76 F.3d at

1214 (citing 5 U.S.C. § 704); *see Motion Sys. Corp.*, 437 F.3d at 1362.

We address below plaintiff's remaining claim, which is set forth as Count 2.

**2. Defendants' Motion to Dismiss the Claim in Count 2 Must Be Denied**

Section 232, 19 U.S.C. § 1862, grants the President broad authority to "adjust the imports of the article and its derivatives" that threaten to impair the national security, *id.* § 1862(c)(1)(A).  Congress conditioned the delegation of this authority upon the President's receipt of a report by the Secretary of Commerce on the findings of an investigation "to determine the effects on the national security of imports" of an article that is the subject of a request for such an investigation by "the head of any department or agency" or that is the subject of an investigation initiated upon the Commerce Secretary's "own motion."  *Id.* § 1862(b)(1)(A).  In conducting the investigation, the Commerce Secretary must consult with the Secretary of Defense "regarding the methodological and policy questions raised" in the investigation and seek "information and advice from, and consult with, appropriate officers of the United States."  *Id.* § 1862(b)(2)(A)(i), (ii).  The statute further provides that "if it is appropriate and after reasonable notice," the Commerce Secretary shall "hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation."  *Id.* § 1862(b)(2)(A)(iii).  The Secretary of Commerce is directed to submit the report of the investigation to the President within 270 days after the investigation is initiated.  *Id.* § 1862(b)(3)(A).  The statute lists numerous non-exclusive

factors the Commerce Secretary and the President are to consider in making their determinations. *Id.* § 1862(d).

Plaintiff's claim in Count 2 is that Proclamation 9980 is invalid as untimely because the President's authority to adjust imports of a new set of products made of steel (i.e., the "derivatives") had expired.[4]   PrimeSource argues that Section 232 expressly limited, according to the time periods set forth in 19 U.S.C. § 1862(c)(1), any action the President could take to adjust imports of such products, including steel nails. Under PrimeSource's interpretation of Section 232, the action effected by Proclamation 9980 could have been valid only had it been implemented within 105 days (i.e., the 90 days allowed by § 1862(c)(1)(A)[5] plus the 15 days allowed by § 1862(c)(1)(B)[6]) of the

---

[4] Although plaintiff has named the President (among other officers of the United States) in his official capacity as a defendant in this action, we do not construe the claim in Count 2 as a claim against the President.  The claim is directed against Proclamation 9980 itself, not the President, against whom no remedy is sought.

[5] The provision setting forth the 90-day time period reads as follows:

Within 90 days after receiving a report submitted under subsection (b)(3)(A) of this section [19 U.S.C. § 1862(b)(3)(A)] in which the Secretary [of Commerce] finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall—(i) determine whether the President concurs with the finding of the Secretary, and (ii) if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.

(continued . . .)

receipt of a report of the Commerce Secretary submitted under § 1862(b)(3)(A).  *See* Am.

Compl. ¶¶ 70–73.  According to PrimeSource, Proclamation 9980 was issued 638 days

after the transmittal of that report to the President and is, therefore, null and void.  *Id.*

¶ 73.

Plaintiff's Count 2 claim rests upon a "plain meaning" interpretation of Section

232(c)(1), 19 U.S.C. § 1862(c)(1).  This provision, in subparagraph (A), requires the

President to make certain determinations within 90 days of receiving the Commerce

Secretary's report under Section 232(b)(3)(A).  In subparagraph (B), it directs the

President, if determining to take action "to adjust imports of an article and its

derivatives," to implement that action within 15 days of making that determination.

The Secretary of Commerce, following an investigation initiated under Section

232, submitted a report to the President under 19 U.S.C. § 1862(b)(3)(A) (the "Steel

---

(. . . continued)

19 U.S.C. § 1862(c)(1)(A).

[6] The provision setting forth the 15-day time period reads as follows:

If the President determines under subparagraph (A) [19 U.S.C.
§ 1862(c)(1)(A)] to take action to adjust imports of an article and its
derivatives, the President shall implement that action by no later than the
date that is 15 days after the day on which the President determines to
take action under subparagraph (A).

19 U.S.C. § 1862(c)(1)(B).

Report")[7] on January 11, 2018.  Defs.' Mot. 5–6; Pl.'s Br. 3–4; *see Proclamation 9980* ¶ 1,

85 Fed. Reg. at 5,281.  That report was the basis for Proclamation 9705.  Proclamation

9980 states that the President, based on certain "assessments" of the Secretary of

Commerce, concluded that it was "necessary and appropriate in light of our national

security interests to adjust the tariffs imposed by previous proclamations to apply to the

derivatives of aluminum articles and steel articles described in Annex I and Annex II to

this proclamation."  *Proclamation 9980* ¶ 9, 85 Fed. Reg. at 5,283.  While mentioning

these "assessments" of the Commerce Secretary, Proclamation 9980 does not state that

the President was taking action pursuant to any report the Commerce Secretary issued

under Section 232(b)(3)(A), 19 U.S.C. § 1862(b)(3)(A), subsequent to the January 2018

Steel Report.

        Defendants do not dispute that the 2018 Steel Report is, for purposes of Section

232(c), 19 U.S.C. § 1862(c), the report issued according to Section 232(b)(3)(A), 19 U.S.C.

§ 1862(b)(3)(A), upon which the President based his adjustment to imports of steel

derivatives, including steel nails.  *See* Defs.' Mot. 24–29.  Instead, they offer a different

interpretation of Section 232(c)(1) (19 U.S.C. § 1862(c)(1)) than does plaintiff, arguing

that in issuing Proclamation 9980, the President remained free to adjust imports of

─────────────

        [7] The Secretary's Report was published in the Federal Register earlier this year.
*Publication of a Report on the Effect of Imports of Steel on the National Security: An
Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*,
85 Fed. Reg. 40,202 (Dep't of Commerce July 6, 2020).  We take judicial notice of this
published document.

articles not addressed in Proclamation 9705 that the President designates as

"derivatives" of those articles, despite the time limitation of Section 232(c)(1), including,

specifically, the 15-day window of § 1862(c)(1)(B).  *See id.*

Defendants advance two arguments in support of their statutory interpretation.

Their first argument holds that the President complied with the time limits in Section

232(c)(1) when, in 2018, he issued Proclamation 9705 within 105 days of the President's

receipt of the Steel Report.  Their theory is that Proclamation 9980, rather than being an

"action," or an implementation, separate from Proclamation 9705, was permissible

under Section 232(c)(1) as a "modification" of that earlier action.  Def.'s Mot. 25–34.

Their second argument is in the alternative.  The gist of this second argument is that

even if the issuance of Proclamation 9980 was not in compliance with the time

limitations of Section 232(c)(1), the court still should sustain Proclamation 9980 because

the time limitations are merely "directory" and therefore did not preclude the President

from adjusting imports of the products named therein.  *Id.* at 34–36.

Defendants' first argument is, essentially, that Proclamation 9980 was timely

according to Section 232(c)(1) because Proclamation 9705, of which Proclamation 9980

was a permissible modification, was timely.  Further to this argument, defendants

maintain that "section 232 delegates broad authority to the President to make

adjustments to actions taken pursuant to the statute."  *Id.* at 25.  They direct our

attention, specifically, to the words "nature and duration" in Section 232(c)(1)(A)(ii),

19 U.S.C. § 1862(c)(1)(A)(ii), arguing that "[i]f the Secretary's report recommends that

action be taken to protect the national security, and if the President concurs, the

President 'must determine the *nature and duration of the action* that, *in the judgment of the*

*President*, must be taken to adjust the imports of the article and its derivatives so that

such imports will not threaten to impair the national security.'"  *Id*. at 25 (quoting

19 U.S.C. § 1862(c)(1)(A)(ii)) (emphasis in original).  Defendants characterize the terms

"nature and duration" as "necessarily flexible and broad."  *Id.*  They also argue that the

word "implement" appearing in Section 232(c)(1)(B), 19 U.S.C § 1862(c)(1)(B), "should

not be read with the finality that PrimeSource appears to ascribe to it."  *Id.* at 26.  They

urge that we interpret Section 232(c)(1) to mean that "[t]he statute contemplates

continued monitoring and adjustments to section 232(c) actions, as circumstances

change."  *Id.*  While acknowledging that amendments made to Section 232 by the

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100–418, Title I, 102 Stat.

1107, Title I, §§ 1501(a), (b)(1) (the "1988 amendments") imposed the time limits in

current Section 232(c)(1), they argue that the President's authority to modify actions

previously taken predated those amendments, which they view as having preserved,

rather than having curtailed, that modification authority.  *Id.* at 29–32.

Although defendants would define the issue before us in broad and general

terms, we conclude that the precise question is not whether, or to what extent, Section

232 provides general authority for "monitoring and adjustments" of an action

previously taken.  We conclude, instead, that the question before us is a narrower one: whether the President's having characterized the articles affected by Proclamation 9980 as "derivatives" of the steel products affected by Proclamation 9705 is, by itself, sufficient for us to conclude that Proclamation 9980 was timely according to Section 232(c)(1).[8]  In considering this question, we conclude that Section 232(c)(1) would have empowered the President, upon a timely issuance of Proclamation 9705 in 2018, to include an adjustment to imports of, in addition to the specific articles identified by the Commerce Secretary in the Steel Report, "derivatives" of those articles.  Section 232(c) allows the President the discretion to do so regardless of whether derivative products were identified and recommended to him in a report the Secretary submits under Section 232(b)(3)(A).  Further, we presume that had the President done so, he would have acted within his discretion in characterizing the products affected by Proclamation 9980 as derivatives of the articles affected by Proclamation 9705.  We note that Section 232 does not confine the President's discretion by defining the term "derivatives," and, in any event, we do not construe plaintiff's claim as contesting this characterization.

---

[8] Because Proclamation 9980 imposed tariffs on a new set of articles ("derivatives" of previously affected articles) rather than raise the tariff on an article already the subject of a Presidential action taken under Section 232, this case presents a different factual circumstance than the one this Court addressed in *Transpacific LLC v. United States, et al.*, 43 CIT __, 415 F. Supp. 3d 1267 (2019) and *Transpacific Steel LLC v. United States*, *et al.*, 44 CIT __, 466 F. Supp. 3d 1246 (2020).

Two provisions in Section 232—the only provisions in the statute that mention

"derivatives"—bear on the question before us.  Section 232(c)(1)(A) directs the President

to make two determinations "[w]ithin 90 days after receiving a report submitted under

subsection (b)(3)(A) of this section [19 U.S.C. § 1862(b)(3)(A)] in which the Secretary [of

Commerce] finds that *an article* is being imported into the United States in such

quantities or under such circumstances as to threaten to impair the national security."

19 U.S.C. § 1862(c)(1)(A) (emphasis added).  Subparagraph (i) of Section 232(c)(1)(A)

provides that the President must determine whether he concurs with the affirmative

finding of the Commerce Secretary in the report submitted under Section 232(b)(3)(A).

Subparagraph (ii), the first of the two statutory provisions addressing derivatives,

provides that the President, if concurring, "shall . . . determine the nature and duration

of the action that, in the judgment of the President, must be taken to adjust the imports

of the article *and its derivatives* so that such imports will not threaten to impair the

national security."  *Id*. § 1862(c)(1)(A)(ii) (emphasis added).  Section 232(c)(1)(B), the

second of the two statutory provisions mentioning derivatives, directs that, if

determining "under subparagraph (A) [19 U.S.C. § 1862(c)(1)(A)] to take action to adjust

imports of an article *and its derivatives*, the President shall implement that action by no

later than the date that is 15 days after the day on which the President determines to

take action under subparagraph (A)."  *Id*. § 1862(c)(1)(B) (emphasis added).

A predecessor to the current Section 232, Section 7 of the Trade Agreements Extension Act of 1955,[9] did not contain the current reference to "derivatives."  In pertinent part, Section 7 provided as follows:

> In order to further the policy and purpose of this section, whenever the Director of the Office of Defense Mobilization has reason to believe that any article is being imported into the United States in such quantities as to threaten to impair the national security, he shall so advise the President, and if the President agrees that there is reason for such belief, the President shall cause an immediate investigation to be made to determine the facts.  If, on the basis of such investigation, and the report to him of the findings and recommendations made in connection therewith, the President finds that the article is being imported into the United States in such quantities as to threaten to impair the national security, he shall take such action as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security.

Trade Agreements Extension Act of 1955, Pub. L. No. 86–169, § 7, 69 Stat. 162, 166.  As defendants point out, Defs.' Mot. 27, the conference report on this legislation stated that "[i]t is the understanding of all the conferees that the authority granted to the President under this provision is a continuing authority." H.R. Rep. No. 84–745 at 7 (1955).

In renewing trade agreement authority in the Trade Agreements Extension Act of 1958, Congress made numerous changes to the national security provisions.  Among

---

[9] The immediate predecessor of this provision, enacted as Section 2 of the Trade Agreements Extension Act of 1954, contained a very brief national security provision: "No action shall be taken pursuant to such section 350 [negotiating authority] to decrease the duty on any article if the President finds that such reduction would threaten domestic production needed for projected national defense requirements." Pub. L. No. 83–464, 68 Stat. 360 (1954).  This provision remains in current law as Section 232(a), 19 U.S.C. § 1862(a).

the changes was a lengthy new subsection describing the factors to be considered when

determining the effects of imports on national security; this provision is continued in

current law as current Section 232(d), 19 U.S.C. § 1862(d).  The Trade Agreements

Extension Act of 1958, in § 8(a), streamlined the existing national security investigative

procedure by eliminating the requirement that the President initiate an investigation

and placing that responsibility instead upon the Director of the Office of Defense and

Civilian Mobilization.  Most pertinent to this case is that Congress also granted the

President, if advised by the Director that imports of an "article" threaten to impair the

national security, the authority to adjust the imports of "such article and its

derivatives":

> Upon request of the head of any Department or Agency, upon application
> of an interested party, or upon his own motion, the Director of the Office
> of Defense and Civilian Mobilization (hereinafter in this section referred
> to as the "Director") shall immediately make an appropriate investigation,
> in the course of which he shall seek information and advice from other
> appropriate Departments and Agencies, to determine the effects on the
> national security of imports of the article which is the subject of such
> request, application, or motion.  If, as a result of such investigation, the
> Director is of the opinion that the *said article* is being imported into the
> United States in such quantities or under such circumstances as to
> threaten to impair the national security, he shall promptly so advise the
> President, and, unless the President determines that the article is not being
> imported into the United States in such quantities or under such
> circumstances as to threaten to impair the national security as set forth in
> this section, he shall take such action, and for such time, as he deems
> necessary to adjust the imports of such article *and its derivatives* so that
> such imports will not so threaten to impair the national security.

Pub. L. No. 85–686, § 8(a), 72 Stat. 673, 678 (1958) (emphasis added).  This provision

authorized the President, on his own authority, to adjust the imports of derivatives of

the article that was investigated and reported to him.

The language on derivatives was added to the legislation (H.R. 12591, the "Trade

Agreements Extension Bill of 1958") by an amendment (Amendment No. 20) in the

Senate, to which the House receded.  Trade Agreements Extension Bill of 1958,

Conference Report [to accompany H.R. 12591], Rep. No. 2502, 85th Cong., 2d Sess., at 7

(1958).  The debate in the House on the Conference Report on H.R. 12591 indicates that

the purpose of Amendment No. 20 in the Senate was to ensure that the President could

address the possibility that derivatives of the investigated article would circumvent the

measures taken to adjust imports of the article itself.  104 Cong. Rec. 16,537, 16,542

(1958).  There was a specific concern involving derivatives of imports of crude oil and

other natural resources, but Amendment 20 effected a change that was without

limitation as to the type of product involved.[10]  *See id.*  Significantly, Proclamation 9980

---

[10] The floor statement of House Ways and Means Chairman Mills, 104 Cong. Rec.
16,537, 16,542 (1958), included the following:

The Senate further authorized the President that if he should take such
action as he deems necessary to adjust the imports of the particular article,
he may also adjust the imports of its derivatives.  The effect of the addition
of the language with respect to derivatives in the statute serves the same
purpose as the expression of intent on the part of the Committee on Ways
and Means which was elaborated in a colloquy between the gentleman
from Texas [Mr. IKARD] and myself on the floor of the House when the

(continued . . .)

identified "circumvention" of the tariffs on the steel products affected by Proclamation

9705 as a justification for the President's decision. *Proclamation 9980*, ¶ 8, 85 Fed. Reg. at

5,282.

    In enacting Section 232 of the Trade Expansion Act of 1962, Congress essentially

carried over the language of § 8(a) of the 1958 statute, reassigning the investigative

responsibility from the Director of the Office of Defense and Civilian Mobilization to the

_____

(. . . continued)
legislation was under consideration by the House. At that time, in
response to an inquiry from the gentleman from Texas, I observed that
prudent administration of this provision of the law would require that, if
action in the interest of national security is indicated with respect to the
imports of a particular article, it would follow that appropriate action with
respect to the derivatives of such article would also be in order if it has
been found that the imports of such derivatives would have the effect of
threatening to impair the national security.

The colloquy to which Chairman Mills referred included the following:

    Mr. IKARD. Is it intended that when the imports of a natural
resource are controlled under the provisions of the national security
section of the committee bill, and with particular reference to petroleum,
that such control should take into consideration the importation of
products, derivatives, or residues of petroleum so that these products and
derivatives could not be imported in a way that would circumvent the
control of the imports of the basic natural resource?

    Mr. MILLS. Yes. Clearly, when a decision is taken to restrict
imports in the interest of national security, it is our intention that the
decision be effective and not rendered ineffective by circumvention.

House debate on H.R. 12591, 104 Cong. Rec. 10,672, 10,750 (1958).

Director of the Office of Emergency Planning.[11]  Neither the 1958 version nor the 1962

version of the statute placed any time limits on the President's authority to adjust

imports of the investigated article or derivatives of that article, and in that respect the

authority delegated to the President by the 1962 statute could be described as

"continuing."

Congress again amended Section 232 in 1975.  The investigative responsibility

was transferred from the Director of the Office of Emergency Planning to the Secretary

---

[11] The new provision read as follows:

Upon request of the head of any department or agency, upon application
of an interested party, or upon his own motion, the Director of the Office
of Emergency Planning (hereinafter in this section referred to as the
"Director") shall immediately make an appropriate investigation, in the
course of which he shall seek information and advice from other
appropriate departments and agencies, to determine the effects on the
national security of imports of the article which is the subject of such
request, application, or motion.  If, as a result of such investigation, the
Director is of the opinion that the said article is being imported into the
United States in such quantities or under such circumstances as to
threaten to impair the national security, he shall promptly so advise the
President, and, unless the President determines that the article is not being
imported into the United States in such quantities or under such
circumstances as to threaten to impair the national security as set forth in
this section, he shall take such action, and for such time, as he deems
necessary to adjust the imports of such article and its derivatives so that
such imports will not so threaten to impair the national security.

Trade Expansion Act of 1962, Pub. L. No. 87–794, § 232(b), 76 Stat. 872, 877.

of the Treasury,[12] the current language on public participation was added, and, for the

first time, Congress placed a time limit on the investigation:

> The Secretary [of the Treasury] shall, if it is appropriate and after
> reasonable notice, hold public hearings or otherwise afford interested
> parties an opportunity to present information and advice relevant to such
> investigation.  The Secretary shall report the findings of his investigation
> under this subsection with respect to the effect of the importation of such
> article in such quantities or under such circumstances upon the national
> security and, based on such findings, his recommendation for action or
> inaction under this section to the President within one year after receiving
> an application from an interested party or otherwise beginning an
> investigation under this subsection.

Pub. L. No. 93–618, 88 Stat. 1978, 1993–94 (1975).  Congress placed no time limit on the

exercise of discretion by the President.

Congress next made major changes to Section 232 in the 1988 amendments,

which resulted in the current Section 232.[13]  Among a number of new procedural

requirements, including requirements for reporting to the Congress on actions taken or

declined to be taken, the 1988 amendments imposed, for the first time, time limits on

the exercise of discretion by the President.  These were the aforementioned 90-day time

period in which the President is to "determine the nature and duration of the action

---

[12] Along with certain other responsibilities pertaining to international trade, this
responsibility was transferred to the Secretary of Commerce by *Reorganization Plan No. 3
of 1979*, § 5(a)(1)(B), eff. Jan. 2, 1980, 44 Fed. Reg. 69,273, 69,274, 93 Stat. 1381, 1383.

[13] An intervening amendment in 1980 added current Section 232(f), which
provided that Congress could invalidate Presidential action to adjust imports of
petroleum or petroleum products upon a "disapproval resolution."  Crude Oil Windfall
Profit Tax Act of 1980, Pub. L. No. 96–223, Title IV, § 402, 94 Stat. 229.

that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives . . . ,'" 19 U.S.C. § 1862(c)(1)(A)(ii), and the 15-day time period in which the President, if determining "to take action to adjust imports of an article and its derivatives," is directed to "implement that action," *id.* § 1862(c)(1)(B).

Defendants maintain that "[n]othing in the 1988 amendments' text or legislative history . . . suggests that Congress intended to alter, let alone withdraw, its long-standing delegation of authority to take continuing action" and that "[t]he circumstances leading to passage of the 1988 amendments make clear Congress' desire to prevent *inaction*, not to curtail further action." Defs.' Mot. 29–30. Turning first to the text of the 1988 amendments, we are unconvinced by defendants' argument that these amendments maintained, unchanged, the "continuing" authority of the President.

As amended, the statute expressly requires the President, "[w]ithin *90 days* after receiving a report submitted under subsection (b)(3)(A)," (i.e., the report the Commerce Secretary is to issue within 270 days of the initiation of an investigation under 19 U.S.C. § 1862(b)) to "determine the nature and duration of *the action* that, in the judgment of the President, must be taken to adjust the imports of the article *and its derivatives* . . . ." *Id.* § 1862(c)(1)(A)(ii) (emphasis added). Section 232(c)(1)(B) provides that "[i]f the President determines . . . to take *action* to adjust imports of an article *and its derivatives*, the President *shall implement that action* by *no later* than the date that is *15 days* after the day on which the President determines to take action . . . ." *Id.* § 1862(c)(1)(B) (emphasis

added).  Contrary to defendants' urging that we read Section 232(c)(1) broadly and flexibly, we find no ambiguity in the time limitations it imposes.  Nor do we find the provision ambiguous in its application of those time limits to an action taken to adjust imports of "derivatives."  In short, there is no "flexible" reading of this provision under which the express time limitations on a Presidential "action," and implementation thereof, do not apply.  And we find no indication anywhere in the text of the statute as amended by the Omnibus Trade and Competitiveness Act that the President retained authority to adjust imports of articles identified in the Secretary's report and then, after an extended period of time, adjust imports of derivatives of those articles without complying with the detailed procedures of Section 232(b) and (c).  To the contrary, the 90- and 15-day time limitations in Section 232(c)(1) expressly confine the exercise of the President's discretion *regardless* of whether the President determines to adjust imports only of the "article" named in the Secretary's report or, instead, to adjust imports of the "article and its derivatives."  *See* 19 U.S.C. § 1862(c)(1).  No other provision in Section 232 provides to the contrary or, for that matter, addresses in any way the authority to adjust imports of derivatives.  Had Congress intended, in the 1988 amendments, to preserve Presidential authority to adjust imports of derivatives after the close of the 105-day period, presumably it would have created an exception to the general time limitation it imposed in Section 232(c)(1).  But we see no indication of such an intent in the plain meaning of the statute and find indications to the contrary.

Defendants' "flexible" reading of Section 232(c)(1) would require us to interpret the "action" taken by Proclamation 9980 and that taken by Proclamation 9705 as parts of the same "action." This presents several interpretive problems. For one, it is contrary to the plain and ordinary meaning of the words "action" and "implement" as used in Section 232(c)(1). There can be no question, as a factual matter, that the two, separately-published proclamations stemmed from two separate Presidential determinations and were directed at two different sets of products. Each necessarily required its own implementation. *See* 19 U.S.C. § 1862(c)(1)(B) ("[T]he President *shall implement that action* by no later than the date that is 15 days after the day on which the President determines to take *action* under subparagraph A"). The President "implemented" the "action" he determined to take following his receipt of the Steel Report when he issued Proclamation 9705 in 2018. In enacting Section 232(c)(1) as part of the 1988 amendments, Congress placed time limits on the exercise of the President's discretion for the first time in the history of the statute. The straightforward language by which Congress did so did not leave room for an interpretation that the President retained, indefinitely, discretion to adjust imports of derivatives of an article affected by an earlier action and implementation. Despite the express time limitation Congress imposed, defendants insist that the President may resume his "implementation" indefinitely—presumably even repeatedly through subsequent measures, and even many years later—and thereby sidestep the express time limitations Congress imposed.

        Additionally, defendants' interpretation of Section 232 would require us to

ascribe a different meaning to the word "action" as used in Section 232(c)(1) than that

indicated by the use of that term in another provision added to the statute by the 1988

amendments, Section 232(c)(3) (19 U.S.C. § 1862(c)(3)).  In Section 232(c)(3), Congress

created an exception to the time limitations in Section 232(c)(1), and an alternate

procedure, to apply when the "action" the President chooses to take under Section

232(c)(1) is to pursue a trade agreement "which limits or restricts the importation into,

or the exportation to, the United States of the article that threatens to impair national

security."  19 U.S.C. § 1862(c)(3)(A)(i).  Under this alternate procedure, if, after 180 days,

no agreement is reached or if an agreement "is ineffective in eliminating the threat to

the national security posed by imports of such article," the President may "take such

other *actions* as the President deems necessary to adjust the imports of such article so

that such imports will not threaten to impair the national security."

*Id.* § 1862(c)(3)(A)(ii) (emphasis added).  Section 232(c)(1) uses the singular term

"action"—which Section 232(c)(3) also uses to refer to the determination taken under

Section 232(c)(1)—and then distinguishes that term by using the term "*other* actions"

(also identified as "*additional* actions"), 19 U.S.C. § 1862(c)(3)(B)(ii) (emphasis added),

that the President is authorized to take under Section 232(c)(3) in the event the Section

232(c)(1) "action," i.e., any trade agreement, or attempt to obtain one, is deemed by the

President to be insufficient to eliminate the threat from imports of the article.  Thus,

defendants' reading of the word "action" as used in Section 232(c)(1) to encompass, broadly, a series of continuing measures to adjust imports, as opposed to a discrete action that may be implemented, cannot be reconciled with the use of that term in Section 232(c)(3). We disfavor an interpretation that ascribes different meanings to the same term as used in different provisions of the same statute. *See Brown v. Gardner*, 513 U.S. 115, 118 (1995) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute.").

Although placing no express time limits on the "other actions" in Section 232(c)(3), as it did in Section 232(c)(1), Congress limited these "additional actions" to those that adjust imports of the article that was, or would have been, affected by the trade agreement. *Id*. § 1862(c)(3)(A) (confining the additional actions to actions "to adjust the imports of *such article*" (emphasis added)). In substance, Proclamation 9980 concludes that the previously-imposed tariffs on steel articles were (in the words of 19 U.S.C. § 1862(c)(3)) "ineffective in eliminating the threat to the national security." But Proclamation 9980 differs from an "additional action" taken under Section 232(c)(3) in two critical respects: it did not follow a determination to enter into a trade agreement (a determination of which the President must give timely notification to Congress under Section 232(c)(2)), and even if it had, it would not have conformed to the procedure thereunder because the "additional action" was not directed to the same article as was the original action.

Where a statute creates an exception to a general rule (as Section 232(c)(3) does in creating an exception to the time limitations of Section 232(c)(1)), such exception is to be read narrowly and not interpreted to apply where Congress did not expressly provide for it. *Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.") (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.")).  When we read the statute as a whole, we see the detailed, specialized procedure Congress set forth as Section 232(c)(3) as another indication that Proclamation 9980 must be viewed as untimely under Section 232(c)(1) if considered to be an action that was taken based solely on the Steel Report.

Defendants' argument referring to the words "nature and duration" in Section 232(c)(1)(A)(ii) also fails to convince us that the President retains authority, indefinitely, to take additional steps to adjust imports of articles not addressed in his original action. Because different products were affected, the "nature" of the action the President took in 2020 differed from the nature of the action he took in 2018.

Defendants argue that specific factors set forth in Section 232(d), 19 U.S.C. § 1862(d), that the President is to consider in exercising his authority under Section 232

signify that "[t]he statute contemplates continued monitoring and adjustments to

section 232(c) actions, as circumstances change." Defs.' Mot. 26. According to

defendants, "[m]any of these factors, including the 'domestic production needed for

projected national defense requirements,' the 'capacity of domestic industries to meet

such requirements,' and 'the impact of foreign competition on the economic welfare of

individual domestic industries,' are dynamic by nature and invite ongoing evaluation

and, as necessary, course correction." *Id.* (quoting 19 U.S.C. § 1862(d)). This argument,

too, is unpersuasive, confusing the non-exclusive list of factors the President is to

consider in his determination of what action is needed with the time periods in which

he must make and implement that determination. As we discussed above, the list of

non-exclusive factors set forth in current Section 232(d) were added by Trade

Agreements Extension Act of 1958. We find nothing in the text of Section 232(d) that

creates an exception to the time limits Congress imposed, as Section 232(c)(1), thirty

years later.

    In support of their motion to dismiss, defendants argue, additionally, that "[i]t is

no defect that the Secretary's investigation covered steel articles and not derivatives of

steel articles, such as nails." Defs.' Mot. 37 (citing Compl. ¶¶ 41–42); Defs.' Reply 2

(arguing that "Commerce plays no statutory role with respect to derivative articles.").

According to defendants, "the President is authorized to adjust imports of derivatives

of articles, even when the Secretary's investigation and report addressed only the article

itself." Defs.' Mot. 37 (quoting 19 U.S.C. § 1862(c)(1)(A)(ii) ("if the President concurs,

determine the nature and duration of the action that, in the judgment of the President,

must be taken to adjust the imports of the article *and its derivatives* . . . .")).  As we

discussed above, the President is empowered to adjust imports of derivatives of the

investigated article regardless of whether the investigation, and the Commerce

Secretary's Section 232(b)(3)(A) report, included them.  Defendants' argument does not

confront the question of timeliness: PrimeSource challenges the timeliness of the

President's action on the ground that the time limitations of Section 232(c)(1) apply

regardless of whether or not the President's action is directed to derivatives of an article

affected by an earlier action.

        In support of their argument that nothing in the legislative history of the 1988

amendments evinces congressional intent to limit the Presidents' discretion as to

modifications of earlier actions, defendants cite congressional testimony showing, they

argue, that the 1988 amendments were motivated by frustration on the part of certain

members of Congress with President Reagan's delay in taking actions under Section

232, in particular with respect to machine tools.  *Id.* at 30–31 (citing Hearings Before the

Comm. on Ways & Means on H.R. 3 Trade and International Economic Policy Other

Proposals Reform Act, 100th Cong. (1987); Hearings Before the Subcomm. on Trade of

H. Comm. On Ways & Means, 99th Cong., 2d Sess. 1282 (1986)).

A Senate report on the legislation, while noting that then-current law imposed a one-year requirement for the investigation (shortened to 270 days by the 1988 amendments), also noted that under current law "[t]here is no time limit for the President's decision."  Report of the Committee on Finance on S. 490, S. Rep. 100-71, at 135 (1987).  "The basic need for the amendment arises from the lengthy period provided by present law—one year for investigations and no time limit for decisions by the President—before actions to remove a threat posed by imports of particular products to the national security are taken.  For example, in the machine tools case, the President waited over 2½ years before taking any action to assist the domestic industry."  *Id.*  "The Committee [on Finance] believes that if the national security is being affected or threatened, this should be determined and acted upon as quickly as possible."  *Id.*

At least arguably, the legislative history defendants cite, and the quoted Senate report, are consistent with a view that Congress could have intended that the President retain "modification" authority such as defendants posit, so long as he imposes an initial measure within the time limits.  But Section 232(c)(1) as effected by the 1988 amendments unambiguously placed time limits on the President's authority to adjust imports of derivatives as well as the imports of the investigated article.  Were there intent to retain the authority to impose subsequent measures to adjust imports of derivatives after the expiration of the 105-day period, we would expect to see at least some indication of that intent in the legislative history.  However, we find nothing in

the legislative history to indicate that Congress intended to do so.  Such indications as

we are able to find are to the contrary.  The conference agreement on the Omnibus

Trade and Competitiveness Act of 1988 summarizes the amendment to Section 232 as

follows:

> A.  Amends section 232 of the Trade Expansion Act of 1962 to require the
> Secretary of Commerce to report to the President within 270 days of
> initiating an investigation.
>
> B.  Requires the Secretary of Commerce to consult with the Secretary of
> Defense regarding the methodological and policy questions raised by
> the investigation; and requires the Secretary of Defense, upon request
> of the Commerce Secretary, to provide defense requirements with
> respect to the article under investigation.
>
> C.  Requires the President to decide, within 90 days of receiving the
> Commerce Secretary's report, on whether to take action and if so to
> proclaim such action within 15 days.
>
> D.  Requires the President to report to Congress within 30 days on the
> action taken and reasons for such action.
>
> E.  Authorizes the enforcement of the quantitative restrictions negotiated
> with respect to machine tool imports.

*Summary of the Conference Agreement on H.R. 3, The Omnibus Trade and Competitiveness*

*Act of 1988* at 15–16 (Comm. Print 1988).  The use of the words "proclaim such action" in

paragraph C, above, casts further doubt on defendants' expansive and flexible

interpretation of the word "implement" as used in 19 U.S.C. § 1862(c)(1)(B).  "Proclaim"

is the verb form of the noun "proclamation," and "proclaim *such action*" is inconsistent

with an interpretation under which Congress intended the President to have authority

to proclaim additional "actions" indefinitely (through subsequent proclamations), after the time period had passed.

In summary, we view defendants' argument on legislative history as confusing an apparent motivation with the specific statutory means Congress chose to achieve its objective, which is reflected in the plain meaning of the language of the amendments. The solution Congress adopted was to require, generally, that the President implement an import adjustment (whether on the investigated article or on that article and its derivatives) within the 105-day time period following receipt of the report the Secretary submits under Section 232(b)(3)(A) (with the limited "trade agreement" exception discussed previously). The statute did not provide general authority for the President to take, or implement, another "action" (or actions) on derivatives after that time period elapsed.

According to defendants, "[t]hat the statute also involves foreign affairs and national security cautions against an inflexible reading" of the provisions governing the exercise of the President's Section 232 authority. Defs.' Mot. 33. In support of this argument, they cite *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996), *Florsheim*, 744 F.2d at 793, and *American Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1248 (Fed. Cir. 1985). While the statutory interpretation principle defendants identify is a valid one, it does not serve the arguments they make in favor of their particular interpretation of Section 232. As we

have explained, there is no "flexible" reading of Section 232(c)(1) that suffices to allow

the President to adjust, through new tariffs, imports of derivatives of previously-

affected articles outside of the time limits Congress imposed, and the appellate

decisions on which defendants rely do not lend support to any such reading.

In *B-West Imports* and in *Florsheim Shoe Co.*, the Court of Appeals addressed

interpretations of statutes conferring Presidential authority in matters involving import

regulation. Each of these cases rejected an appellant's statutory interpretation that was

plainly unreasonable. *B-West Imports* held that a provision in the Arms Export Control

Act, 22 U.S.C. § 2778, which granted the President authority to "control" arms imports,

encompassed the authority to revoke previously-issued permits for importations of

munitions from the People's Republic of China. The Court of Appeals rejected the

interpretation of § 2778 advanced by appellants, who conceded that the term "'control'

is broad enough to allow the President to ban imports by denying licenses or permits

for future imports." 75 F.3d at 635. The opinion states that "if the term 'control'

includes the power to prohibit, as appellants concede that it does, we are unable to

discern any basis for construing the statute to convey the power to deny permits and

licenses in advance, but to withhold the power to revoke them once they have been

issued." *Id*. at 636. The case did not involve an attempt to invoke *delegated* authority to

adjust imports that was claimed to have expired. *Florsheim Shoe Co.* rejected an

importer's challenge to an action by the President that withdrew duty-free treatment

provided under the Generalized System of Preferences ("GSP") program for certain

leather articles from India.  The Court of Appeals, upon interpreting statutory language

providing that "[t]he President may withdraw, suspend, or limit the application of the

duty-free treatment accorded under section 2461 of this title with respect to any article

or with respect to any country . . . ," 19 U.S.C. § 2464 (1982) (amended to 19 U.S.C.

§ 2463(c)(1) (1996)), rejected appellant's argument that "the President may only limit

duty-free treatment for a particular article from all countries or for all articles from a

particular country" and therefore lacked authority to withdraw duty-free treatment

from a specific article from a particular beneficiary country.  744 F.2d at 794.  The Court

of Appeals viewed appellant's argument as based on an "over-emphasis on the word

'or'" in § 2464 that was at odds with the overall provision.  In the instant case, plaintiff

advocates a "plain meaning" construction of Section 232(c)(1), rather than one such as

that advocated in *Florsheim Shoe Co.*, which was a strained interpretation of a provision

delegating tariff authority to the President that failed to recognize that the greater

power the provision granted must be read to include the lesser.

The third decision defendants cite, *American Ass'n of Exporters & Importers-Textile*

*& Apparel Grp.*, adjudicated, and rejected, claims that an administrative agency, the

Committee on the Implementation of Textile Agreements, "failed to abide by its

statutory authority," "acted arbitrarily," and violated "the statutory and constitutional

rights" of members of plaintiff's organization "to have notice of the proposed actions

and an opportunity to be heard." 751 F.2d at 1246. In disposing of appellant's

"statutory authority" claim, the Court of Appeals disagreed with a narrow construction

of section 204 of the Agricultural Act of 1956, under which the President negotiated

agreements on importations of textiles and textile products. The Court of Appeals

rejected the argument that Congress, in authorizing the President "to issue regulations

governing the entry or withdrawal from warehouse of any such commodity, product,

textiles, or textile products to carry out such agreements," 7 U.S.C. § 1854 (1982),

"intended to incorporate the terms of any agreements concluded pursuant to section

204 into that statute itself." 751 F.2d at 1241, 1247 (footnote omitted). The Court

reasoned that the statutory phrase "to carry out" as used in § 1854 "does not imply that

Congress restricted the President's discretion in this regard by requiring him to

implement the agreements in the particular manner seen by appellant" but rather "is a

broad grant of authority to the President in the international field in which

congressional delegations are normally given a broad construction." *Id.* This case, in

contrast, does not involve delegated authority to promulgate implementing regulations,

and there is no "broad construction" of the express time limitations in Section 232(c)(1)

that plausibly supports defendants' argument.

In summary, the action taken by Proclamation 9980 to adjust imports of

derivatives was not implemented during the 105-day time period set forth in

§ 1862(c)(1), if that time period is considered to have commenced upon the President's

receipt of the Steel Report.  The President's having characterized the articles affected by

Proclamation 9980 as "derivatives" of the steel products affected by Proclamation 9705

is, therefore, insufficient by itself to support a conclusion that Proclamation 9980 was

timely according to Section 232(c)(1).

        We turn next to defendants' second argument, which is that the statutory

deadlines in Section 232(c)(1) are directory, not mandatory, an argument apparently in

the alternative to their argument that the President complied with all procedural

requirements.  Defs.' Mot. 35.  They maintain that where Congress did not expressly

state the consequences of failures to meet deadlines, the deadlines ordinarily should not

be construed as mandatory, and the court should so construe them here.  But as we

pointed out above, accepting this logic would require us to conclude that Congress

established the time limitations, which were central to the 1988 amendments and

related to other procedural requirements imposed by those amendments, while at the

same time intending that these limitations would have no binding effect on the exercise

of the President's discretion.  It also would require us to conclude that the President

could take virtually any action he chose, even one adjusting imports of products that

are not derivatives of those affected by an earlier action, despite the express time

limitations in Section 232(c)(1).  Such an interpretation essentially renders Section

232(c)(1), as added by the 1988 amendments, a nullity.  As the court has explained, the

plain meaning and structure of Section 232 are to the contrary.

The aforementioned Section 232(c)(3), another provision added by the 1988

amendments, also is inconsistent with an interpretation that the Section 232(c)(1) time

limitations are merely directory.  As the court has discussed, this alternate procedure

applies when the President determines that the appropriate "action" is to seek a trade

agreement limiting or restricting the importation into, or exportation to, the United

States of "the article that threatens to impair national security."  19 U.S.C.

§ 1862(c)(3)(A)(i).  But it is axiomatic that when interpreting a statute, a court is to give

effect to every word and every provision.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001)

("It is our duty 'to give effect, if possible, to every clause and word of a statute.'") (citing

*United States v. Menasche*, 348 U.S. 528, 538–39 (1955)); *see also Williams v. Taylor*, 529 U.S.

362, 404 (2000) (describing the above rule as the "cardinal principle of statutory

construction").  The procedure Congress spelled out in detail in Section 232(c)(3) would

appear to be rendered superfluous if the time limitations in Section 232(c)(1) were

interpreted to have no binding effect.  In summary, defendants' conception of a

"flexible" statutory scheme under which the Section 232(c)(1) time limits are merely

directory is inconsistent with the elaborate procedural mechanisms Congress included

to ensure oversight generally, and to provide, specifically, for the special situation

arising from the President's negotiation of a trade agreement.

In support of their argument that the time limitations in Section 232(c)(1) are

merely directory, defendants cite *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003)

(citing *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993)), *Hitachi Home Elecs., Inc. v. United States*, 661 F.3d 1343, 1345–46 (Fed. Cir. 2011), *Gilda Industries, Inc. v. United States*, 622 F.3d 1358, 1365 (Fed. Cir. 2010), and *Canadian Fur Trappers Corp. v. United States*, 884 F.2d 563, 566 (Fed. Cir. 1989).  Defs.' Mot. 35.  These cases are inapposite.  They did not involve an express limitation Congress imposed on the delegation to the Executive Branch of a legislative power the Constitution vested in the Congress.  See U.S. CONST. art. I, § 8, cl. 1 (conferring the power to lay and collect Duties) & cl. 3 (conferring the power to regulate commerce with foreign nations).  In each, the Supreme Court or the Court of Appeals, using established methods of statutory interpretation, concluded that Congress intended for the time limitation at issue to be merely directory.  We approach the issue in this case not by applying a blanket presumption as to whether a deadline is directory or mandatory, as defendants would have us do, but by examining the statute as a whole, giving effect to "every clause and word," *Duncan*, 533 U.S. at 174, to discern congressional intent as to the statutory time limits in question.  Here, the nature of the delegation (a delegation of a legislative power reserved by the Constitution to the Congress), the plain meaning of Section 232(c)(1), and the indicia of congressional intent appearing elsewhere in Section 232 preclude us from concluding that the time limits are merely directory.

*Barnhart v. Peabody Coal Co.* arose from a statutory requirement in the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9706(a) ("Coal Act"), that the

Secretary of Labor assign, before October 1, 1993, retired coal miners whose former employers were no longer in business to extant "signatory operators," who would assume the annual premium obligations for those retirees' benefits. After the Department of Labor was unable to complete the lengthy assignment process by the statutory due date, it proceeded to assign some 10,000 previously-unassigned beneficiaries to signatory operators. 537 U.S. at 155–56. The issue in the case was whether those assignments were valid regardless of the untimeliness of the Department's actions. From a comprehensive examination of the Coal Act, including the legislative purpose of requiring the assignments and the consequence of holding assignments made after the deadline to be invalid, which the Court considered to be contrary to the overall intent of the statute, the Court held that the statutory date for the assignments did not invalidate the subsequent assignments. *Id*. at 172 ("The way to reach the congressional objective, however, is to read the statutory date as a spur to prompt action, not as a bar to tardy completion of the business of ensuring that benefits are funded, as much as possible, by those identified by Congress as principally responsible."). The case at bar does not present an analogous situation. Rather than spur agency action to complete a complex administrative task such as that required by the Coal Act, Congress endeavored in the 1988 amendments to Section 232 to impose new controls, through time limitations and reporting requirements, on the exercise of Presidential discretion.

*Hitachi Home Elecs., Inc.* involved the requirement in Section 515(a) of the Tariff

Act that Customs and Border Protection act on a protest within two years.  Rejecting the

plaintiff's argument that a protest not acted upon within the two-year period is

"deemed allowed," the Court of Appeals noted that a protestant desiring to obtain

expeditious allowance or denial, or alternatively judicial review, may seek accelerated

disposition under Section 515(b).  661 F.3d at 1348–49.  Nothing in the Tariff Act even

suggested congressional intent that a protest not acted upon during the two-year period

should be deemed to have been allowed, and the provision for accelerated disposition is

contrary to such an intent.

*Gilda Industries, Inc.* held that a failure of the U.S. Trade Representative to make a

notification required by 19 U.S.C. § 2417(c)(2) to be made to domestic parties of the

impending termination of a retaliatory trade action occurring by operation of

§ 2417(c)(1) four years after its imposition, in the absence of a written request from a

domestic party for continuation, did not nullify the statutorily-required termination.

Under the reasoning of the Court of Appeals, the termination of the retaliatory trade

action on the four-year anniversary date, absent a continuation request by a party

already on notice of the termination, was unaffected by the absence of the notification

required by § 2417(c)(2).  622 F.3d at 1365.

*Canadian Fur Trappers Corp.* involved a previous version of Section 504(d) of the

Tariff Act, which directed the Customs Service to liquidate an entry within 90 days of

removal of a suspension of liquidation but did not provide a consequence for a failure

by the Customs Service to do so.  The Court of Appeals rejected the importers'

argument that such failure resulted in a deemed liquidation at the entered duty rate, a

highly consequential result for which the statute did not then provide.  884 F.2d at 566.

In summary, we are not convinced by either of the two arguments defendants

put forth to support their motion to dismiss plaintiff's Count 2 claim.  The President's

characterization of the articles affected by Proclamation 9980 as derivatives of the

articles affected by Proclamation 9705 is insufficient, by itself, to support a conclusion

that the challenged decision satisfied the time limitations in Section 232(c)(1), and

Congress did not intend for those time limits to be merely directory.  Count 2 of

plaintiff's complaint states "a claim to relief that is plausible on its face," *Twombly*, 550

U.S. at 570, and we decline to dismiss it at this stage of the proceedings.

### D. Plaintiff's Motion for Summary Judgment

PrimeSource characterizes its motion as a USCIT Rule 56 motion for summary

judgment, Pl.'s Br. 1 (moving pursuant to USCIT Rule 56 "because there is no genuine

dispute as to any material fact and PrimeSource is entitled to judgment as a matter of

law").  Nevertheless, it appears that plaintiff also is moving for relief under USCIT Rule

56.1 ("Judgment on an Agency Record for an Action Other Than That Described in

28 U.S.C. § 1581(c)(1)").  Plaintiff refers to its motion as a "Motion for Judgment on the

Agency Record," Pl.'s Br. 50, and in this way identifies its motion as one brought under

USCIT Rule 56.1.  To date, neither plaintiff nor defendants have raised the question of

whether an administrative agency record will be relevant to this litigation.

Rule 56.1 applies when "a party believes that the determination of the court is to

be made solely on the basis of the record made before an agency."  USCIT R. 56.1(a).

Certain of the claims we have dismissed in this litigation were APA claims, which we

dismissed for the reason discussed above, which is that there is no final agency action

that may be contested under the APA.  The remaining claim, that of Count 2, is not an

APA claim as it contests an action of the President, not an agency action.  Therefore, we

consider plaintiff's motion as a Rule 56 motion for summary judgment, not a motion

under Rule 56.1.  But it does not necessarily follow that an agency record will be

irrelevant to this proceeding or that individualized procedures similar to those specified

under Rule 56.1 will not be useful as this litigation proceeds.

Under USCIT Rule 56(a), the burden is on the moving party to show "that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  At this pleading stage of the litigation, we cannot conclude that plaintiff

has met this burden.  To declare Proclamation 9980 invalid, and on that basis enter

summary judgment in plaintiff's favor, we must find "a clear misconstruction of the

governing statute, a significant procedural violation, or action outside delegated

authority."  *Maple Leaf Fish Co.*, 762 F.2d at 89.  As we discussed previously, defendants

conceded that Proclamation 9980 was not based on a report, other than the Steel Report,

that was designated as a report issued pursuant to Section 232(b)(3)(A). This concession was relevant to our conclusion that Proclamation 9980 was not issued within the time period imposed by Section 232(c)(1), if that time period is deemed to have begun with the President's receipt of the Steel Report. But at this stage of the litigation, we cannot conclude that the time period imposed by Section 232(c)(1) necessarily began on January 11, 2018, the date the Steel Report was received by the President. Therefore, we are not now able to determine whether or not the claim in Count 2 is validly based on a "significant procedural violation," *Maple Leaf Fish Co.*, 762 F.2d at 89.

Although Proclamation 9980 was issued long after the 105-day period beginning with the receipt of the Steel Report, it also was issued pursuant to what Proclamation 9980 describes as an "assessment" (or "assessments") of the Commerce Secretary. Proclamation 9980 states that "[i]t is the Secretary's *assessment* that foreign producers of these derivative articles have increased shipments of such articles to the United States to circumvent the duties on aluminum articles and steel articles imposed in Proclamation 9704 and Proclamation 9705, and that imports of these derivative articles threaten to undermine the actions taken to address the risk to the national security . . . ." *Proclamation 9980* ¶ 8, 85 Fed. Reg. at 5,282 (emphasis added). It further states that "[t]he Secretary has *assessed* that reducing imports of the derivative articles . . . would reduce circumvention" and identifies the reduction of those imports as a measure to address the threatened impairment of the national security. *Id*. (emphasis added). The

Proclamation states that the adjustment of the tariffs on the derivative articles is being taken "[b]ased on the Secretary's assessments." *Id.* ¶ 9, 85 Fed. Reg. at 5,283 ("Based on the Secretary's *assessments*, I have concluded that it is necessary and appropriate in light of our national security interests to adjust the tariffs imposed by previous proclamations to apply to the derivatives of aluminum articles and steel articles described in Annex I and Annex II to this proclamation.") (emphasis added).

The Secretary of Commerce is the official Section 232 identifies as having the responsibility of conducting a Section 232(b) investigation and preparing a Section 232(b)(3)(A) report. Proclamation 9980 did not characterize as a "report" submitted under Section 232(b)(3)(A) the communication or communications by which the Secretary of Commerce transmitted his recommendation to the President to adjust tariffs on the aluminum and steel products Proclamation 9980 identified. Nevertheless, it is clear from the text of Proclamation 9980 that the Secretary of Commerce undertook certain preparations prior to the President's action and also that the Secretary made a recommendation relating to the subject matter of Section 232(b)(3)(A) ("If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report.").

Even though the Secretary's communications to the President on derivative articles were not designated in Proclamation 9980 as having been made pursuant to

Section 232(b)(3)(A), we are not in a position to ascertain the extent to which these

communications nevertheless met the fundamental requirements of Section

232(b)(3)(A), for the straightforward reason that those communications, and any related

records, are not before us.  Although concluding that Proclamation 9980 was untimely

under Section 232(c)(1) when viewed solely as an action taken in response to the Steel

Report, we also conclude that there are genuine issues of material fact that bear on the

extent to which the subsequent "assessment" or "assessments" of the Commerce

Secretary identified in Proclamation 9980 validly could be held to have served a

function analogous to that of a Section 232(b)(3)(A) report.  Nor do we know what form

of inquiry or investigation, if any, the Commerce Secretary conducted prior to his

submission of these communications to the President and whether, or to what extent,

any such inquiry or investigation satisfied the essential requirements of Section

232(b)(2)(A), 19 U.S.C. § 1862(b)(2)(A).

        We do not imply that the Secretary's actions are judicially reviewable in this case.

We conclude instead that factual information pertaining to the Secretary's

communicating to the President on the derivative articles would be required in order

for us to examine whether, and to what extent, there was or was not compliance by the

President with the procedural requirements of Section 232 and whether any

noncompliance that occurred was a "significant procedural violation," *Maple Leaf Fish*

*Co.*, 762 F.2d at 89.  Moreover, at this early stage of the litigation, we lack a basis to

presume that these unresolved factual issues are unrelated to the issue of whether the President clearly misconstrued the statute or the issue of whether the President took action outside of his delegated authority.

In summary, there remain genuine issues of material fact precluding us from granting plaintiff's motion for summary judgment, and as a result plaintiff has not met the burden required to obtain a judgment in its favor on its Count 2 claim. It would appear that the filing of a complete administrative record could be a means of resolving, or helping to resolve, these factual issues, but rather than directing a specific procedure, we believe it advisable that the parties first consult on these matters and report to the court on a scheduling order that will govern the remainder of this litigation.

### III.  CONCLUSION AND ORDER

We grant the government's motion to dismiss as to Counts 1, 3, 4, and 5 of the amended complaint and deny it as to Count 2. We deny plaintiff's motion for summary judgment as to Count 2 because plaintiff has not met the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).  Therefore, upon consideration of all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the claims stated as Counts 1, 3, 4, and 5 of the amended complaint be, and hereby are, dismissed for failure to state a claim on which relief can be granted; it is further

**ORDERED** that plaintiff's motion for summary judgment be, and hereby is, denied with respect to the claim stated in Count 2 of the amended complaint; it is further

**ORDERED** that the parties shall consult and submit to the court, by February 26, 2021, a joint schedule to govern the remainder of this litigation; and it is further

**ORDERED** that if the parties are unable to agree upon a schedule, each shall submit a proposed schedule by February 26, 2021 that includes a justification for its position.

/s/ Timothy C. Stanceu
_____
Timothy C. Stanceu, Chief Judge

/s/ Jennifer Choe-Groves
_____
Jennifer Choe-Groves, Judge

Dated: January 27, 2021
    New York, New York

*Baker*, Judge, concurring in part and dissenting in part:

I respectfully dissent from my colleagues' parrying the question of whether we have subject-matter jurisdiction over claims against the President. In my view, both Federal Circuit precedent and the separation of powers compel that we *sua sponte* raise the question and then dismiss him from the case.

On the merits, I concur in my colleagues' decision to grant the government's motion to dismiss (and deny PrimeSource's cross-motion for summary judgment as to) Counts 1, 3, and 4 of the amended complaint and therefore join the majority opinion's discussion of those claims. I also concur in dismissing (and denying PrimeSource's cross-motion as to) Count 5 but write separately to explain my views on why that claim fails.

Finally, although I concur in my colleagues' denial of PrimeSource's cross-motion for summary judgment as to Count 2 of the amended complaint, my reasons differ, and I respectfully dissent from their denial of the government's motion to dismiss that claim, which alleges that the President violated Section 232 by imposing tariffs on steel derivative products after the statutory implementation deadline.

In my view, if the President timely implements Section 232 action to restrict imports—and there is no dispute that the President did so in the original Proclamation 9705 restricting steel *articles*—the statute also permits him to later modify such restrictions, and that modification power is coextensive with

the original power to act in the first instance. Because the President could have also acted as to steel *derivatives* when he initially restricted steel article imports in Proclamation 9705, Section 232 permitted him to later extend those restrictions to derivatives. I would therefore grant the government's motion to dismiss Count 2 for failure to state a claim.

## Statutory and Factual Background

### A.    Section 232

As its title indicates, Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to impose import restrictions to "[s]afeguard[] national security." 19 U.S.C. § 1862. In short, the statute directs that in various circumstances, the Secretary of Commerce is to investigate the national security effects of specified imports. *Id.* § 1862(b)(1)(A).

Once the Secretary initiates an investigation, the statute prescribes the following steps:

- The Secretary is to give the Secretary of Defense immediate notice of the investigation, *id.* § 1862(b)(1)(B), and is then to consult with him about "the methodological and policy questions raised in any investigation," *id.* § 1862(b)(2)(A)(i).

- The Secretary is to "seek information and advice from, and consult with, appropriate officers of the United States." *Id.* § 1862(b)(2)(A)(ii).

- "[I]f it is appropriate and after reasonable notice," the Secretary is to "hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation." *Id.* § 1862(b)(2)(A)(iii). In other words, hearings or other opportunity for comment are not mandatory.

- The Secretary may also ask the Secretary of Defense to assess "the defense requirements of any article that is the subject of an investigation." *Id.* § 1862(b)(2)(B).

Section 232 requires the Secretary to submit a report to the President by no later than the date that is 270 days after the date on which the investigation commenced. *Id.* § 1862(b)(3)(A).[1] The report is to discuss "the effect of the importation of such article in such quantities or under such circumstances upon the national security" and to set forth the Secretary's recommendations for action or inaction; in addition, if the Secretary believes the importation threatens "to impair the national security," the report must so state. *Id.*

If the Secretary finds a threat to national security, the President then has 90 days to determine whether he "concurs" with the Secretary's finding. *Id.* § 1862(c)(1)(A)(i). If he so concurs, the President must

---

[1] The statute directs that in executing their duties, the Secretary and the President are to keep in mind, among other things, various enumerated considerations bearing on national security. *See* 19 U.S.C. § 1862(d).

> determine the nature and duration of the action that, in the judg-
> ment of the President, must be taken to adjust the imports of the
> article and its derivatives so that such imports will not threaten to
> impair the national security.

*Id.* § 1862(c)(1)(A)(ii).[2]

The statute further directs that if the President determines to take ac-

tion to restrict imports to protect national security, he must "implement" that

action within 15 days of determining to do so. *Id.* § 1862(c)(1)(B). Taken to-

gether, the two deadlines (to "determine" and then to "implement") give the

President 105 days to act after receiving the Secretary's report.

If the President's action is to attempt to negotiate an agreement restrict-

ing the imports in question, the statute provides that if such an agreement is

not reached within 180 days of his decision, *id.* § 1862(c)(3)(A)(ii)(I), *or* if such

an agreement, having been reached, is "not being carried out or is ineffective,"

§ 1862(c)(3)(A)(ii)(II), the President may "take such other actions as [he] deems

necessary to adjust imports of such article so that they do not threaten national

security. *Id.* § 1862(c)(3)(A)(ii).[3]

---

[2] The statute also requires the President to submit a written statement to Congress within 30 days of his determination explaining his reasons for acting or declining to act on the Secretary's report. 19 U.S.C. § 1862(c)(2).

[3] The statute further requires that when there has been such a failure to conclude an agreement restricting imports or that such an agreement, if reached, was ineffective, the President must publish in the Federal Register notice of either (1) any such "additional actions" taken, *see* 19 U.S.C. § 1862(c)(3)(A)(ii), or (2) his determination not to take any such additional actions. *See id.* § 1862(c)(3)(A)(B).

Case 1:20-cv-00032-TCS-JCG-MMB    Document 100    Filed 01/27/21    Page 61 of 114

Ct. No. 20-32          Baker, J., concurring in part and dissenting in part          Page 61


## B.    Proclamation 9705's steel tariffs

Following a Section 232 investigation, the Secretary here issued a report finding that steel imports threatened national security.[4] Based on this report, in 2018 the President issued Proclamation 9705, which imposed 25 percent duties on imported raw steel. *See* Proclamation No. 9705 of March 8, 2018, *Adjusting Imports of Steel into the United States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018). The proclamation further directed the Secretary to monitor steel imports and their effect on national security and, after appropriate consultations with other Executive Branch officials, inform the President of "any circumstances that . . . might indicate" the need for further Section 232 duties or that "the increase in duty rate provided for in this proclamation is no longer necessary." *Id.* at 11,628.

## C.    Proclamation 9980's extension of tariffs to steel derivative products

On January 24, 2020, the President issued Proclamation 9980, which stated that the Secretary had informed him as follows:

> [I]mports of certain derivatives of steel articles have significantly increased since the imposition of the tariffs and quotas [in Proclamation 9705]. The net effect of the increase of imports of these derivatives has been to erode the customer base for U.S. producers of . . . steel and undermine the purpose of the proclamations

---

[4] *See generally* U.S. Dep't of Commerce, Bureau of Industry & Security, The Effect of Imports of Steel on the National Security (Jan. 11, 2018), https://www.bis.doc.gov/index.php/documents/steel/2224-the-effect-of-imports-of-steel-on-the-national-security-with-redactions-20180111/file, 85 Fed. Reg. 40,202 (Dep't Commerce July 6, 2020).

adjusting imports of . . . steel articles to remove the threatened impairment of the national security.

Proclamation No. 9980 of January 24, 2020, *Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5281, 5282 (Jan. 29, 2020). The President further explained that the Secretary had advised him that foreign producers of steel derivative products had "increased shipments of such articles to the United States to circumvent . . . Proclamation 9705." *Id.*

Based on that information and recommendation from the Secretary, the President extended Proclamation 9705's 25-percent duties to certain steel *derivative* products (e.g., steel nails) not previously addressed by the Secretary's report on steel article imports or by Proclamation 9705. *Id.* at 5283.[5] The government implicitly concedes that unlike Proclamation 9705, Proclamation 9980 was not preceded by a Section 232 investigation and report by the Secretary. *See* ECF 60, at 49 ("The Secretary was not required to conduct another investigation or to follow the procedures for an investigation . . . ."); ECF 78, at 37 (referring to PrimeSource's "incorrect belief that the President had to request an entirely separate investigation . . .").

---

[5] Proclamation 9980 also extended tariffs to certain aluminum article derivatives not at issue in this case.

### D.    This suit and the pending motions

Plaintiff PrimeSource Building Products, Inc., brought this suit challenging Proclamation 9980. ECF 1.[6] PrimeSource's amended complaint alleges that it is an importer of steel nails injured by duties imposed by Proclamation 9980. ECF 22, at 7–10.[7] An affidavit of a PrimeSource executive attached to its amended complaint provides evidentiary substantiation of these allegations. ECF 22-1, at 16–17.

PrimeSource's amended complaint names the United States, the President, the U.S. Department of Commerce, the Secretary of Commerce, U.S. Customs and Border Protection, and the Acting Commissioner of Customs as defendants. ECF 22, at 7.

PrimeSource asserts the following claims: Count 1—an Administrative Procedure Act claim based on the Secretary's alleged violations of Section 232's procedural requirements, *id*. at 19–21; Count 2—a nonstatutory review claim based on the President's alleged violation of Section 232's procedural

---

[6] Chief Judge Stanceu thereafter assigned this case to this three-judge panel. *See* 28 U.S.C. § 255(a) (authorizing the chief judge to designate a three-judge panel to hear and determine any civil action which "(1) raises an issue of the constitutionality of . . . a proclamation of the President . . .; or (2) has broad or significant implications in the administration or interpretation of the customs laws."). Chief Judge Stanceu concurrently assigned several other related cases challenging Proclamation 9980 to the same panel.

[7] In this opinion, pagination references in citations to the Court record are to the pagination found in the ECF header at the top of each page.

requirements, *id.* at 22; Count 3—a due process claim based on the President's alleged actions, *id.* at 22–23; Count 4—a constitutional claim based on Congress's alleged overdelegation of authority to the President in Section 232, *id.* at 23–24; and Count 5—a nonstatutory review claim based on the Secretary's alleged violations of Section 232's procedural requirements, *id.* at 24.

PrimeSource requests that the Court "[e]njoin Defendants from implementing or further enforcing Proclamation 9980," "declare Proclamation 9980 unlawful," and order a "[r]efund to PrimeSource [of] any duties that may be collected on its imported articles pursuant to Proclamation 9980." *Id.* at 25.

The government moves to dismiss for failure to state a claim, *see* USCIT R. 12(b)(6). ECF 60. PrimeSource opposes and cross-moves for summary judgment, *see* USCIT 56. ECF 73.[8]

## Analysis

### I.  We have no jurisdiction to enter relief directly against the President and should dismiss him from the case.

In my view, we should dismiss the President as a party for two separate and independent reasons.[9] First, the statute giving us jurisdiction to hear this

---

[8] The affidavit attached to the amended complaint establishes PrimeSource's constitutional standing for purposes of its cross-motion for summary judgment.

[9] My colleagues avoid the jurisdictional issue, stating "we do not construe the claim in Count 2 [the lone claim surviving today's decision] as a claim against the President. The claim is directed against Proclamation 9980 itself, not the President, against whom no remedy is sought." *Ante* at 18 n.4. Unfortunately, we cannot so easily wish this jurisdictional problem away. The *President*, not Proclamation 9980, is a

case does not confer jurisdiction over such claims. Second, even if our jurisdictional statute permitted us to award relief against the President, the separation of powers does not.

Although the government has not questioned our jurisdiction to enter relief against the President, our subject-matter jurisdiction, like standing, "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Jurisdiction must exist as to "each claim" a plaintiff "seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

Thus, we have an independent obligation to determine whether we have subject-matter jurisdiction to enter relief directly against the President, *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (federal courts have an independent duty to examine their jurisdiction), even though the practical

---

defendant in this litigation. Count 2, which alleges that Proclamation 9980 is invalid, is merely a legal claim asserted against the President and the other defendants. *See* ECF 22, at 22. As relief for this claim, PrimeSource requests that the Court issue a declaratory judgment and injunction against all defendants, including the President. *Id*. at 25. There is no plausible basis upon which to state that Count 2 is directed against every defendant except the President, or that—even if we withhold injunctive relief against the President—any declaratory relief that we might ultimately grant would merely apply against Proclamation 9980, as opposed to the defendants, including the President. Declaratory relief under 28 U.S.C. § 2201 binds parties, not things. *See Restatement (Second) of Judgments* § 33 (1982) ("A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to the matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.").

consequences of our decision may be the same because we can enjoin the President's subordinates from executing his unlawful orders in limited situations through nonstatutory review.[10] *Cf. McGirt v. Oklahoma*, 140 S. Ct. 2452, 2504 (2020) (Thomas, J., dissenting) ("The Court might think that, in the grand

---

[10] "Nonstatutory review" is "the type of review of administrative action which is available, not by virtue of those explicit review provisions contained in most modern statutes which create administrative agencies, but rather through the use of traditional common-law remedies—most notably, the writ of mandamus and the injunction—against the officer who is allegedly misapplying his statutory authority or exceeding his constitutional power." 33 Wright & Miller, *Federal Practice and Procedure* § 8304 (2d ed. 2020) (quoting Antonin Scalia, *Sovereign Immunity Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 Mich. L. Rev. 867, 870 (1969–70)).

  Federal courts entertain claims for nonstatutory review against the President's subordinates to enjoin them from enforcing allegedly unlawful Presidential orders. *See Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . . ."). The Supreme Court has assumed, but never directly recognized, the availability of such nonstatutory review for claims against Presidential subordinates based on the President's alleged violation of a statutory mandate. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) ("We may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA.").

  In the Federal Circuit, nonstatutory review claims against Presidential subordinates for the President's alleged violation of a statute are "only rarely available," *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018), and are limited to whether the President has violated "an explicit statutory mandate." *Id.* (quoting *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc)); *see also Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (federal court review of Presidential action under a statute is limited to situations involving "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority"). Thus, dismissal of the President from this suit would not preclude us from granting declaratory and injunctive relief against the President's subordinates based on his alleged violation of Section 232's procedural requirements in issuing Proclamation 9980.

scheme of things, this jurisdictional defect is fairly insignificant. After all, we were bound to resolve this . . . question sooner or later. But our desire . . . for . . . convenience and efficiency must yield to the overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere.") (cleaned up).

Our obligation to consider our jurisdiction is even more pronounced in this case because the Judiciary has the "responsibility to police the separation of powers in litigation involving the executive," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 402 (2004) (Ginsburg, J., dissenting) (cleaned up), even if, as here, the Executive Branch declines to defend its own constitutional prerogatives. The "separation of powers does not depend on the views of individual Presidents, *see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 879–80 (1991), nor on whether 'the encroached-upon branch approves the encroachment.' " *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)). The President "cannot . . . choose to bind his successors by diminishing their powers." *Id*. The government's failure to seek dismissal of the President does not relieve us of our obligations under the separation of powers.

### A.    Jurisdiction under 28 U.S.C. § 1581(i) does not encompass claims against the President.

PrimeSource invokes 28 U.S.C. § 1581(i) as the jurisdictional basis for this suit. ECF 22, at 4.[11] In 2003, the Federal Circuit held that § 1581(i) jurisdiction does not encompass claims against the President, noting that while "the President's *actions* are subject to judicial review, it does not necessarily follow that a claim for relief may be asserted against the President directly." *Corus Grp. PLC v. ITC*, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (emphasis added). The court recognized the principle that the APA does not authorize an action directly against the President[12] and then explained as follows:

> This reasoning seems equally applicable to actions under 28 U.S.C. § 1581(i), which refers only to actions "against the United States, its agencies, or its officers" and does not specifically include the President. We conclude that section 1581(i) does not authorize proceedings directly against the President.
>
> Since the complaint in this action relied solely on section 1581 as the basis of jurisdiction, the President should have been dismissed as a party.

*Corus Grp.*, 352 F.3d at 1359 (cleaned up).

---

[11] The statute provides in relevant part that our Court "shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," *inter alia*, "(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i).

[12] *See, e.g.*, *Franklin*, 505 U.S. at 801 ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.").

Six months later, a decision of this court held that *Corus Group* was wrongly decided because it misread an earlier Federal Circuit decision holding that § 1581(i) waived the sovereign immunity of the President and other officials. *See Motion Sys. Corp. v. Bush*, 342 F. Supp. 2d 1247, 1254–56 (CIT 2004) (discussing *Corus Group* and *Humane Society of the United States v. Clinton*, 236 F.3d 1320 (Fed. Cir. 2001)).

On appeal in *Motion Systems*, the Federal Circuit granted rehearing en banc to consider whether *Corus Group* should "be overruled *en banc* insofar as it holds that § 1581(i) does not authorize relief against the President." *Motion Sys. Corp. v. Bush*, 140 F. App'x 257, 258 (Fed. Cir. 2005) (en banc) (per curiam). Significantly, the later merits opinion never addressed this question, apparently because the en banc court found the President's actions not subject to judicial review. *See Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1359 (Fed. Cir. 2006) (en banc).[13]

---

[13] Because it did not directly address the question, *Motion Systems* cannot be read as implicitly endorsing the conclusion that the President can be sued under § 1581(i). The Supreme Court has "described such unrefined dispositions as 'drive-by jurisdictional rulings' that should be accorded 'no precedential effect' on the question whether the federal court had authority to adjudicate the claim in suit." *Arbaugh*, 546 U.S. at 511 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 91 (1998)); *cf. Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2100 (2019) (Gorsuch, J., concurring) (explaining that "drive-by jurisdiction" means that a court's failure to directly address issues such as standing or jurisdiction "cannot be mistaken as an endorsement of it").

In my view, *Corus Group* is binding on us, notwithstanding the earlier Federal Circuit decision in *Humane Society* allowing the President and other officers to be sued under § 1581(i).[14] First, the *Corus Group* court explained that *Humane Society* "dealt only with the general issue of the government's sovereign immunity and not with the applicability of § 1581(i) to the President individually." *Corus Grp.*, 352 F.3d at 1359 n.5. Thus, in the eyes of the Federal Circuit, the two cases do not conflict. If judicial hierarchy means anything, it must mean that the Federal Circuit's reading of its own cases binds this Court.

Because the *Corus Group* court distinguished *Humane Society*, we are bound to follow *Corus Group* and to dismiss the President as a party. *See Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008) ("A prior precedential decision on a point of law by a panel of this court is binding precedent and cannot be overruled *or avoided* unless or until the court sits *en banc*.") (emphasis added).

Second, even if *Corus Group*'s reading of *Humane Society* is not binding on us, my own reading of *Humane Society* is the same as *Corus Group*'s. As the *Humane Society* panel merely assumed that § 1581(i)'s jurisdictional grant includes claims against the President, that drive-by jurisdictional assumption is

---

[14] Where two Federal Circuit panel decisions *directly* conflict, the earlier opinion controls unless and until the en banc court rules otherwise. *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988).

not entitled to any weight, *see supra* note 13, and *Corus Group* controls that question.

**B.    The separation of powers prevents us from issuing injunctive or declaratory relief directly against the President in the performance of his official duties.**

For separation of powers purposes, "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982) ("Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.").

Because of these separation of powers considerations, any request for relief directly against the President "should . . . raise[] judicial eyebrows." *Franklin*, 505 U.S. at 802 (plurality opinion of O'Connor, J.). The *Franklin* plurality of four justices[15] observed that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.' " *Id.* at 802–03 (plurality opinion of O'Connor, J.) (quoting *Mississippi v. Johnson*, 4 Wall. 475, 501 (1867)). On this point, Justice Scalia agreed with the plurality and explained that "[t]he apparently unbroken historical tradition supports the view that . . . the President and the Congress (as opposed to their agents)—

---

[15] Chief Justice Rehnquist and Justices White and Thomas joined the relevant portion of Justice O'Connor's opinion in *Franklin*.

may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary." *See id*. at 827 (Scalia, J., concurring).[16]

If the Supreme Court cannot grant injunctive relief against the President in the performance of his official duties, as five justices of the Court agreed that it cannot do, then lower federal courts may not do so either.[17]

---

[16] Although the Supreme Court has recognized that the President is not totally immune to judicial process, *see, e.g.*, *Trump v. Vance*, 140 S. Ct. 2412, 2421–24 (2020) (tracing over 200 years of case law involving subpoenas directed to presidents), the critical distinction is that in those cases the President was to "provide information relevant to an ongoing criminal prosecution [or, in *Trump v. Vance*, a grand jury investigation], which is what any citizen might do; [the court orders] did not require him to exercise the 'executive Power' in a judicially prescribed fashion." *Franklin*, 505 U.S. at 826 (Scalia, J., concurring). In *Franklin*, the plurality also noted that "[w]e have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id*. at 802 (plurality opinion of O'Connor, J.); *see also id*. at 827 n.2 (Scalia, J. concurring) (making the same observation). The President's issuance of Proclamation 9980 plainly does not involve "ministerial" duties.

[17] *See, e.g.*, *In re Trump*, 958 F.3d 274, 297 (4th Cir. 2020) (en banc) (Wilkinson, J., dissenting) ("Over the course of this nation's entire existence, there has been an unbroken historical tradition implicit in the separation of powers that a President may not be ordered by the Judiciary to perform particular Executive acts.") (cleaned up), *vacated as moot*, No. 20-331 (U.S. Jan. 25, 2021); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.) ("Finally, the Government argues that the district court erred by issuing an injunction that runs against the President himself. This position of the government is well taken. Generally, we lack jurisdiction of a bill to enjoin the President in the performance of his official duties. . . . [T]he extraordinary remedy of enjoining the President is not appropriate here.") (cleaned up), *vacated on other grounds*, 138 S. Ct. 377 (2017) (mem.); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("The only apparent avenue of redress for plaintiffs' claimed injuries would be injunctive or declaratory relief against all possible President-elects and the President himself. But such relief is unavailable. . . . With regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief.") (cleaned up); *Anderson v. Obama*, 2010 WL 3000765, at *2 (D. Md. July 28, 2010) (denying motion for preliminary injunction seeking to prevent President Obama from signing or enforcing the Affordable Care Act "because the Court lacks power to grant the requested relief. The Court has no jurisdiction to issue an injunction against the

Nor may we issue even declaratory relief against the President. In at least two different contexts, the Supreme Court has recognized that because declaratory relief is functionally equivalent to injunctive relief, any bar on the latter also applies to the former. *See, e.g.*, *California v. Grace Brethren Church*, 457 U.S. 393, 407–08 (1982) (holding that "because there is little practical difference between injunctive and declaratory relief," the Tax Injunction Act bars federal court jurisdiction over suits seeking declaratory as well as injunctive relief to "enjoin, suspend or restrain the . . . collection of any tax under State law") (quoting 28 U.S.C. § 1341); *Samuels v. Mackell*, 401 U.S. 66, 73 (1971) (holding that because "the practical effect of the two forms of relief will be virtually identical," *Younger* abstention principles apply to declaratory relief as much as injunctive relief). Lower courts have applied this principle in additional contexts. *See, e.g.*, *Tex. Emps.' Ins. Ass'n v. Jackson*, 862 F.2d 491, 506 (5th Cir. 1988) ("If an injunction would be barred by [the Anti-Injunction Act, 28 U.S.C.] § 2283, this should also bar the issuance of a declaratory judgment

---

President in his official capacity and in the performance of non-ministerial actions."); *Willis v. U.S. Dep't of Health & Human Servs.*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014) (finding that suit attempting to enjoin President Obama from enforcing any part of the ACA "contravenes an extensive amount of well-settled law" and "raises serious separation of powers concerns" because "[l]ongstanding legal authority establishes that the judiciary does not possess the power to issue an injunction against the President or Congress").

that would have the same effect as an injunction.") (cleaned up and quoting Charles Alan Wright, *Federal Courts* § 47, at 285 (4th ed. 1983)).

Because declaratory relief is functionally equivalent to injunctive relief, the same structural separation of powers principles that counsel against enjoining the President necessarily also apply to issuing "a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring); *see also Newdow*, 603 F.3d at 1013 (D.C. Cir. 2010) (declaratory relief against the President is unavailable); *In re Trump*, 958 F.3d at 302 ("We have no more power to issue a declaratory judgment against the President regarding the performance of an official duty than we do an injunction.") (Wilkinson, J., dissenting).

In short, even if § 1581(i) permitted the assertion of claims against the President in our Court, in my view the statute would violate the separation of powers. We should dismiss all claims against the President for lack of jurisdiction. Our failure to do so only invites "more and more disgruntled plaintiffs [to] add his name to their complaints" in our Court and thereby produce "needless head-on confrontations between [us] and the Chief Executive." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring).

## II.    Count 5 fails because PrimeSource has abandoned any claim for nonstatutory review against the Secretary outside of the APA.

In Count 5, PrimeSource appears to assert a claim against the Secretary outside of the APA for alleged procedural violations of Section 232:

> The Secretary of Commerce violated Section 232 by making "assessments", "determinations" and providing other "information" to the President without following any of the statutory procedures for new action and by doing so outside the statutory time periods applicable to the 2017–18 investigation conducted by the Secretary of Commerce that resulted in Proclamation 9705.

ECF 22, at 24. According to my colleagues, "for PrimeSource's fifth count to be cognizable, judicial review must exist under the APA" because "Section 232 does not provide for judicial review of any action taken thereunder." *Ante* at 16. My colleagues therefore conclude that because PrimeSource's APA claim against the Secretary in Count 1 fails for lack of final agency action, then Count 5 necessarily fails as well.

My colleagues imply that absent a statutory cause of action in the statute under which official action is taken, which Wright and Miller refer to as "special statutory review," *see* 33 *Federal Practice & Procedure* § 8301 (2d ed. 2020), the only recourse that a person or entity injured by official action has is an action under the APA, which Wright and Miller denominate as "general statutory review." *Id*. My colleagues overlook a third possible avenue for judicial relief against official agency action, nonstatutory review.

Courts have recognized that a person threatened with injury by actions of Executive Branch officials may sometimes seek declaratory and injunctive relief against such officials even though the underlying statute provides no cause of action and no relief is available under the APA. Such actions are known as "nonstatutory review." *Id.*; *see also supra* note 10 (explaining nonstatutory review in the context of challenges to agency enforcement of *Presidential* actions); 33 *Federal Practice & Procedure* § 8304 (2d ed. 2020). "It does not matter . . . whether traditional APA review is foreclosed" because nonstatutory review is available "when an agency is charged with acting beyond its authority." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172 (D.C. Cir. 2003) (quoting *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988)).

Nevertheless, nonstatutory review is available in only very limited circumstances. "Non-statutory review is a doctrine of last resort, 'intended to be of extremely limited scope' and applicable only to preserve judicial review when an agency acts 'in excess of its delegated powers.' " *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007) (quoting *Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)); *see also* Kathryn E. Kovacs, *Revealing Redundancy: The Tension Between Federal Sovereign Immunity and Nonstatutory Review*, 54 Drake L. Rev. 77, 107 (2005) (to state a claim for nonstatutory review challenging agency action, "[a] plaintiff must allege more than that an

agency acted illegally or even interfered with his rights; he must allege that the agency did so in a manner that exceeded its statutory or constitutional authority"). In short, nonstatutory review relief against an agency official is roughly analogous to mandamus relief against a district court or our Court—strong medicine that is only rarely available. *Cf. Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes' " such as when the district court has departed from "the lawful exercise of its prescribed jurisdiction") (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)).

Given these principles, I read Count 5 of PrimeSource's complaint as asserting a nonstatutory review claim based on the *Secretary's* alleged violations of Section 232's procedural requirements, just as Count 2 is a nonstatutory review claim based on the *President's* alleged violations of Section 232's procedural requirements.

Nevertheless, PrimeSource has effectively abandoned Count 5 by tethering it to its APA claim in Count 1. *See* ECF 73-1, at 7 n.1 (characterizing "both Counts 1 and 5 from PrimeSource's amended complaint" as involving whether the Secretary, "in failing to follow the procedures set forth in Section 232 . . . violated the *Administrative Procedure[] Act*") (emphasis added). Because I agree with my colleagues that PrimeSource's APA claim under Count 1 fails

for lack of final agency action, *see ante* at 11–14, PrimeSource's linkage of Count 5 to Count 1 dooms the former.

## III.    Proclamation 9980 did not violate Section 232.

PrimeSource contends that Proclamation 9980 violated Section 232 by imposing tariffs on steel derivative products outside of the statutory deadlines for implementing such action. Although not expressly framed as such, PrimeSource appears to assert two alternative theories (even as it repeatedly blurs the two theories together).

First, citing the Court's decision in *Transpacific Steel LLC v. United States*, 415 F. Supp. 3d 1267 (CIT 2019) (*Transpacific I*),[18] PrimeSource argues that after the President timely implements Section 232 import restrictions, he cannot later *modify* such restrictions outside of the 105-day period for taking action upon receiving a report from the Secretary.[19] *See* ECF 73-1, at 20

---

[18] In *Transpacific I*, a different three-judge panel of the Court held—in the context of denying the government's Rule 12(b)(6) motion to dismiss—that the President's modification of Proclamation 9705 to increase duties on Turkish steel imports violated Section 232 because the statute does not permit such modifications after the statutory implementation deadline has passed absent another formal investigation and report by the Secretary. *See* 415 F. Supp. 3d at 1273–76; *see also Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1253 (CIT 2020) (*Transpacific II*) (holding, in the context of summary judgment, that "nothing in the statute . . . support[s] . . . continuing authority to modify Proclamations outside of the stated timelines."), *appeal docketed*, No. 20-2157 (Fed. Cir. Aug. 17, 2020).

[19] The "105-day period" reflects the initial 90-day period for the President to determine whether he concurs in the Secretary of Commerce's finding and, if so, to determine the nature and duration of the action he deems necessary, plus the subsequent 15-day period for him to "implement that action." *See* 19 U.S.C. § 1862(c)(1)(A)–(B).

(invoking *Transpacific I* against the government's argument that Section 232 "provide[s] the President with flexibility to modify his actions" outside of the statutory deadline for acting).

Although my colleagues distinguish the *Transpacific* litigation on its facts, *see ante* at 23 n.8 (noting that case involved a modification to the *means* of Section 232 import restrictions rather than—as here—the *products* covered by such restrictions), in denying the government's motion to dismiss Count 2 my colleagues nonetheless appear to tacitly embrace the *Transpacific* opinions' rationale, which reads the 1988 amendments as barring modifications to Section 232 action after the statutory implementation deadline has passed. *See ante* at 31 ("[W]e are unconvinced by defendants' argument that the[] [1988] amendments maintained, unchanged, the 'continuing authority' of the President."); *ante* at 32 ("[T]here is no 'flexible' reading of [Section 232] under which the express time limitations on a Presidential 'action,' and implementation thereof, do not apply."); *ante* at 39 ("Section 232(c)(1) . . . unambiguously placed time limits on the President's authority to adjust imports of derivatives as well as the imports of the investigated article."). Thus, notwithstanding my colleagues' distinguishing of the *Transpacific* case on its facts, their rationale would—like *Transpacific*'s—bar modifications of Section 232 import restrictions after the statutory deadline for implementation even as to the means of such restrictions.

PrimeSource also appears to argue in the alternative that even if Section 232 permits such modifications of import restrictions outside of the statutory deadlines for taking new action, Proclamation 9980's tariffs on steel derivative products nevertheless constituted entirely new Section 232 action subject to the statute's procedural requirements, rather than a permissible modification, because Proclamation 9705 was limited to steel *articles* and did not include steel derivatives. *See* ECF 73-1, at 30 (contending that Proclamation 9980 "was not "a *permissible* modification of Proclamation 9705") (emphasis added); *id.* at 31 ("The instant case goes one step beyond *TransPacific* because here the untimely additional duties are being extended to types of products *that were never even previously investigated*.") (emphasis added); *id*. at 53 ("Given that the Secretary determined a hearing was appropriate in the initial investigation, he cannot now issue additional recommendations to the President on *new* products that were not subject to initial investigation.") (emphasis added).

My colleagues also appear to embrace this alternative theory as a basis for denying the government's motion to Count 2. *See ante* at 33 (stating that Proclamation 9705 and 9980 "stemmed from two separate Presidential determinations and were directed at two different sets of products. Each necessarily required its own implementation.").

I disagree with both of PrimeSource's alternative theories, and for that reason would grant the government's motion to dismiss Count 2. I begin with

the *Transpacific* theory—namely, that the 1988 amendments to the statute bar the President from modifying Section 232 import restrictions after the statutory deadline for implementing those restrictions has passed.

**A.    Section 232 permits the President to modify import restrictions after the statutory implementation deadline has passed.**

In my view, Section 232 permits the President to modify import restrictions without repeating the formal procedures necessary for initial action. As explained below, (1) the original statute that Congress enacted in 1955 and later reenacted as Section 232 permitted the President to modify import restrictions; (2) the 1988 amendments to Section 232 did not withdraw the President's preexisting authority to modify such restrictions; and (3) given that Section 232 import restrictions can last for decades, it would be both incongruous and unworkable to read the statute as precluding later modifications of such restrictions.

**1.    The pre-1988 statutory language permitted the President to modify import restrictions.**

**a.    The word "action" in the original 1955 statute gave the President continuing authority to modify import restrictions.**

Section 232 originated in the Trade Agreements Extension Act of 1955, Pub. L. No. 86–169, § 7, 69 Stat. 162, 166. That statute required the Director of the Office of Defense Mobilization to notify the President whenever the

Director had "reason to believe that any article is being imported into the United States in such quantities as to threaten to impair the national security." *Id.* If the President agreed, the statute required him to order the Director to investigate the matter and report back. If, in turn, the investigation and the subsequent report led the President to conclude that imports of the article threatened national security, the statute required that he "take *such action* as he deems necessary to adjust the imports of such article to a level that will not threaten to impair the national security." *Id.* (emphasis added).[20]

In 1975, Attorney General William Saxbe examined this statutory language and opined[21] that the words "such action" implied a continuing course of conduct that could include modifications:

> The normal meaning of the phrase "such action," in a context such as this, is not a single act but rather a continuing course of action, with respect to which the initial investigation and finding would satisfy the statutory requirement. This interpretation is amply supported by the legislative history of the provision, which clearly contemplates a continuing process of monitoring and modifying the import restrictions, as their limitations become apparent and their effects change.

*Restriction of Oil Imports*, 43 Op. Att'y Gen. No. 20, at 3–4 (Jan. 14, 1975).[22]

---

[20] The original 1955 statute did not include the words "and its derivatives" following the words "imports of such article."

[21] Although issued in the name of Attorney General Saxbe, the Justice Department official responsible for this memorandum presumably was then–Assistant Attorney General Antonin Scalia, who headed the Office of Legal Counsel from 1974 until 1977.

[22] Attorney General Saxbe noted a statement by Congressman Cooper, floor manager for the legislation, that "having taken an action, [the President] would retain

Attorney General Saxbe opined that for both modification or continuation of restrictions, the statute presumed that the appropriate agency would monitor the factual situation and the effectiveness of any restrictions and advise the President to act accordingly. 43 Op. Att'y Gen. No. 20, at 3–4. This continued monitoring did "not have to comply with the formal investigation and finding requirements applicable to the original imposition of the restriction." *Id*. at 4.

### b.   The 1958 amendments enhanced the President's power.

In the Trade Agreements Extension Act of 1958, Congress amended the statute while retaining the key language—"such action"—authorizing modifications of import restrictions. As amended, the statute provided:

> (b) Upon request of the head of any Department or Agency, upon application of an interested party, or upon his own motion, the Director of the Office of Defense Mobilization (hereinafter in this section referred to as the "Director") shall immediately make an appropriate investigation, in the course of which he shall seek information and advice from other appropriate Departments and Agencies, to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion. If, as a result of such investigation, the Director is of the opinion that the said article is being imported into the United States in such quantities or under such circumstances as to threaten to

---

flexibility with respect to the continuation, modification, or suspension of any decision that had been made." 43 Op. Att'y Gen. No. 20, at 3 (quoting 101 Cong. Rec. 8160–61 (1955)). The Attorney General further referenced the Conference Report for the bill, which stated that "it is . . . the understanding of all the conferees that the authority granted to the President under this provision is a continuing authority." *Id*. (quoting H.R. Rep. 84-745, at 7 (1955)).

> impair the national security, he shall promptly so advise the President, and unless the President determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security as set forth in this section, *he shall take such action*, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not so threaten to impair the national security.

Pub. L. No. 85–686, § 8(a), 72 Stat. 673, 678 (emphasis added).

These amendments enhanced the President's power under the statute in at least three ways. First, Congress eliminated the wasteful requirement that the relevant agency first seek the President's approval to undertake the investigation, thereby allowing a more streamlined process for initiating action in the first instance. Second, Congress made clear that the President's discretion regarding "action" also included the "time" that action would last. Third, Congress gave the President the power to act with respect to *derivatives* of products identified in the agency's report, even if the report itself did not address such derivatives.

As my colleagues observe, the legislative history of these 1958 amendments reflects that Congress authorized the President to act as to derivatives of an investigated article out of concern that such imports might allow circumvention of restrictions on that article. *See ante* at 26–27.

### c.    Congress made technical changes between 1962 and 1988.

In 1962, Congress reenacted the provision as Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87–794, 76 Stat. 872, 877. This reenactment and codification did not materially change the statute. *See* S. Rep. 87-2059, 1962 USCCAN 3118.

In the ensuing quarter century after the 1962 reenactment, Congress made various technical changes to the statute, but none of them materially changed the President's powers under the statute conferred by the original 1955 legislation and enhanced by the 1958 amendments.[23] Thus, on the eve of Congress's 1988 amendments, Section 232 provided in relevant part:

> Upon request of the head of any department or agency, upon application of an interested party, or upon his own motion, the Secretary of the Treasury (hereinafter referred to as the "Secretary") shall immediately make an appropriate investigation . . . to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion.
>
> The Secretary shall, if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation. The Secretary shall report the findings of his investigation under this subsection with respect to the effect of the

---

[23] In 1975, Congress amended the statute for the primary purpose of reassigning duties to different subordinate officials. *See* Trade Act of 1974, § 127(d)(3), Pub. L. No. 93–618, 88 Stat. 1978, 1993 (1975). In 1980, Congress amended Section 232 to establish a procedure whereby Congress could invalidate Presidential action to adjust imports of petroleum or petroleum products upon the enactment of a disapproval resolution. *See* Crude Oil Windfall Profit Tax Act of 1980, § 402, Pub. L. No. 96–223, 94 Stat. 229, 301.

importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, his recommendation for action or inaction under this section to the President within one year after receiving an application from an interested party or otherwise beginning an investigation under this subsection.

If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, he shall so advise the President and the President *shall take such action*, and for such time, as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security, unless the President determines that the article is not being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security.

19 U.S.C. § 1862(b) (1980) (emphasis added).[24]

> ### d.  Presidents repeatedly modified Section 232 import restrictions in the three decades prior to the 1988 amendments.

In 1959, President Eisenhower invoked Section 232 after a formal agency

investigation and report found that crude oil and derivatives thereof were "be

ing imported in such quantities and under such circumstances as to threaten

to impair the national security." Proclamation No. 3729 of March 10, 1959, *Ad

justing Imports of Petroleum and Petroleum Products into the United States*,

24 Fed. Reg. 1781 (Mar. 12, 1959). President Eisenhower imposed import quo

tas on "crude oil, unfinished oils, and finished products." *Id.* He also directed

---

[24] To enhance readability, the block quotation above separates Section 232(b) into separate paragraphs.

the relevant officials to advise him "of any circumstances which . . . might indicate the need for further Presidential action" under the statute. *Id.* at 1784 § 6(a).[25]

President Eisenhower and his successors thereafter modified Proclamation 3279 at least 26 times between 1959 and the end of 1974, and none of those amendments involved a further investigation or report even though some involved significant alterations to the means of restricting petroleum imports. *See* 43 Op. Att'y Gen. No. 20, at 3. No new investigation was conducted, and no new report was issued, until 1975.[26]

Reviewing this history in 1975, Attorney General Saxbe emphasized that Congress had acquiesced in this interpretation of Section 232: "The interpretation here proposed, whereby import restrictions once imposed can be modified without an additional investigation and finding, has been sanctioned by the Congress' failure to object to the President's proceeding on that basis

---

[25] The quoted language is strikingly similar to the instruction in Proclamation 9705 directing the Secretary of Commerce to continue to monitor steel imports. *See* 83 Fed. Reg. at 11,628 ¶ (5)(b).

[26] Despite General Saxbe's advice that there was no need to do so, the Secretary of the Treasury decided to go through the investigation-and-report process in the leadup to President Ford issuing Proclamation 4341, which amended Proclamation 3279 and provided for a long-term system of license fees. *See* Proclamation No. 4341 of January 23, 1975*, Modifying Proclamation 3279, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees*, 40 Fed. Reg. 3965 (Jan. 27, 1975) (referring to the Secretary of the Treasury's investigation and report).

repeatedly during the past 15 years." 43 Op. Att'y Gen. No. 20, at 5. After Attorney General Saxbe issued his opinion in 1975, this practice continued. By my count, Presidents modified prior Section 232 action without repeating the statute's formal investigation and report procedures over a dozen times between 1975 and the 1988 amendments. *See* Addendum.

This unbroken "statutory history" of administrative practice and interpretation "form[s] part of the context of the statute, and . . . can properly be presumed to have been before all the members of [Congress] when they voted" on the 1988 amendments to Section 232. Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012); *cf. Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1440–43 (Fed. Cir. 1998) (tracing a statute's evolution over time to ascertain a word's meaning); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267–68 (1992) (interpreting a statute by tracing the history of another provision upon which the one at issue was modeled and noting that "we can only assume [Congress] intended them to have the same meaning that courts had already given them").

### 2. The 1988 amendments did not withdraw the President's preexisting modification power.

#### a. The 1988 amendments retained the statutory language authorizing modifications.

In 1988, Congress amended Section 232. *See* Omnibus Trade and Competitiveness Act of 1988, § 1501(a), Pub. L. No. 100–418, 102 Stat. 1107, 1258.

Some of the amendments were clearly stylistic—the amended version, for example, avoids the masculine pronouns "he" and "his" when referring to the President and cabinet officials in favor of gender-neutral terminology (for example, "as he deems necessary" versus "in the judgment of the President"). Some of the changes were of a structural nature—the old statute contained lengthy paragraphs and the amendments broke those down into shorter, more readable pieces with multiple subparagraphs.

One of those structural changes entailed moving the provisions conferring authority upon the President to subsection (c)(1), which as discussed below also imposed a 105-day deadline for the President to exercise that authority.[27] As so amended, subsection (c)(1) provides:

> (c)(1) (A) Within 90 days after receiving a report submitted under subsection (b)(3)(A) in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall—
>
>> (i) determine whether the President concurs with the finding of the Secretary, and
>>
>> (ii) if the President concurs, *determine the nature and duration of the action* that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.

---

[27] The 1988 amendments also imposed a 270-day deadline for the Secretary to issue a report upon initiating an investigation. *See* 19 U.S.C. § 1862(b)(3)(A).

> (B) If the President determines under subparagraph (A) to *take action* to adjust imports of an article and its derivatives, the President *shall implement that action* by no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A).

19 U.S.C. § 1862(c)(1) (emphasis added).

Critically for present purposes, subsection (c)(1) retained the statutory language noted by Attorney General Saxbe granting the President's continuing authority to modify Section 232 action previously taken—the words "the action," "take action," and "that action." *See* 43 Op. Att'y Gen. No. 20, at 3–4. Under the prior-construction canon of statutory construction, Congress's reenactment of the same statutory language implicitly ratified Attorney General Saxbe's interpretation and the prior administrative practice of the preceding three decades. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *see also* Scalia & Garner, *supra*, at 324 (explaining that "when a term . . . has been authoritatively interpreted by a high court, or has been given uniform interpretation by the lower courts or the responsible agency . . . [t]he term has acquired . . . a technical sense . . . that should be given effect in the construction of later-enacted statutes").

My colleagues contend that reading "action" as investing the President with continuing authority is "contrary to [its] plain and ordinary meaning." *Ante* at 33. But they do not proffer any definition of action to support this contention.

Even if their reading of the word "action" were correct, however, my disagreement with my colleagues is that they read the statute as if Congress wrote the 1988 legislation on a blank slate. But 1988 is not Year One for our purposes. The 1988 legislation amended a statute with a preexisting 30-year history of administrative interpretation and practice under which the word "action" invests the President with continuing authority. As Congress is presumed to have been aware of that history when it amended the statute and retained the word "action," this is one of those contexts in which "[t]he past is never dead. It's not even past." William Faulkner, *Requiem for a Nun* 73 (Knopf Doubleday Publishing Group 2011).

In *Transpacific II*, the court acknowledged this history of Presidential modifications to Section 232 import restrictions, but reasoned that the 1988 amendments removed this authority by deleting "language that could be read to give the President the power to continually modify Proclamations." 466 F. Supp. 3d at 1253. The 1988 amendments changed "the President *shall take such action, and for such time*, as he deems necessary," 19 U.S.C. § 1862(b) (1980), to the President shall "*determine the nature and duration of the action*

that, in the judgment of the President, must be taken . . . ." 19 U.S.C.
§ 1862(c)(1)(A)(ii) (emphasis added). The *Transpacific II* court noted that the
1988 amendments "omit[ted] the clause 'and for such time.' " 466 F. Supp. 3d
at 1253.

In my view, *Transpacific II* erred in ascribing significance to this change.
First, the President's modification authority under the pre-1988 version of the
statute stemmed from the words "such action," *not* "for such time." *See* 43 Op.
Att'y Gen. No. 20, at 2 ("The normal meaning of the phrase '*such action*,' in a
context such as this, is not a single act but rather a continuing course of ac-
tion.") (emphasis added).

Second, even if "for such time" in the pre-1988 statute were the source of
the President's modification authority, that clause means the same thing as
"the . . . duration" in the current statute: "[T]he length of time something lasts."
Duration, *Black's Law Dictionary* (11th ed. 2019). Thus, the change from "for
such time" to "the duration" was purely stylistic.

The legislative history bears out this reading. For example, the House
Committee report included the following side-by-side comparison summaries
of the then-existing statutory language and the meaning of the proposed
changes. The key elements of the then-existing law and proposed amendments
are underscored; notably, there is no underscoring of either "for such time" in
the then-existing law or "the . . . duration" in the proposed amendments:

MISCELLANEOUS TRADE LAW PROVISIONS

| Item | Present Law | Subcommittee Proposal |
|------|-------------|----------------------|
| 1. National security relief | Section 232 of the Trade Expansion Act of 1962, requires the Secretary of Commerce to investigate, upon request or own motion, the effects of imports of an article on national security and report his findings and recommendations to the President within one year. If he finds "an article is being imported in such quantities or under such circumstances as to threaten to impair the national security," the President, if he concurs with the finding, must take such action for such time as he deems necessary to "adjust" the imports. There is no time limit for the President's decision. | Reduces the period for investigation by Commerce to 9 months. Imposes a 90-day time limit for the President to determine whether he concurs with the Secretary's advice and, if so, the nature and duration of action. Requires proclamation of any action within 15 days. |

Staff of H. Comm. on Ways and Means, 100th Cong., Amendments to H.R. 3, Comprehensive Trade Policy Reform Legislation, As Reported by the Subcomm. on Trade, Explanation and Comparison with Present Law 92 (Comm. Print 1987).

\* \* \*

If I am correct and Congress's retention of the word "action" presumptively carried forward the meaning reflected in the preceding three decades of administrative interpretation and practice, the question then becomes whether other language in the 1988 amendments rebuts that presumption by effectively repealing the President's modification authority in the word "action." I now turn to that question.

> **b.    The 1988 amendments' insertion of a dead-line for the President to implement his ac-tion did not impliedly repeal the Presi-dent's continuing authority to modify ac-tion once taken.**

According to PrimeSource, the statute's 15-day deadline to "implement" Section 232 action bars later modification of such action. ECF 73-1, at 30. The plain meaning of the word "implement," however, does not foreclose future modifications to action—rather, the word "implement," in its relevant sense, merely means to "put (a decision or plan) into effect." 1 *Shorter Oxford English Dictionary* 1330 (5th ed. 2002);[28] *see also The American Heritage Dictionary of the English Language* 660 (1981) (defining "implement" as "[t]o provide a defi-nite plan or procedure to ensure the fulfillment of"). Although my colleagues invoke the plain meaning of "implement" to hold that it repealed the Presi-dent's preexisting modification authority, *see ante* at 33–34, they do not proffer any competing definition.

As amended in 1988, all the statute requires is that the President "im-plement" the action within the 15 days of determining to act, that is, to put the plan of action into effect. It does not contain any language limiting the Presi-dent's preexisting statutory authority to modify that action later as necessary to protect the national security. Put differently, Section 232 does not prohibit

_____

[28] The other definitions of "implement" as a transitive verb are of a sort that cannot be relevant in the Section 232 context.

the President from "implementing" a plan of continuing action that says, in essence, "We'll try *x*, but if our ongoing monitoring reveals that *x* doesn't work or that the relevant facts have changed, then we'll adjust it as necessary."

Consistent with the practice of his predecessors, that's what the President did here. In Proclamation 9705, he "implemented" a system of tariffs intended to address steel imports on an ongoing basis. Under that action, he directed the Secretary to monitor the effectiveness of the restrictions taken. *See* 83 Fed. Reg. at 11,628. After the Secretary advised the President that further action was necessary because steel derivative imports circumvented Proclamation 9705, the President issued Proclamation 9980.

To read Section 232 as granting the President ongoing authority to modify his actions, as past presidents did, does not—contrary to *Transpacific I*—read the deadlines out of the statute. *See Transpacific I*, 415 F. Supp. 3d at 1275 n.13 ("If the President has the power to continue to act, to modify his actions, beyond these deadlines, then these deadlines are meaningless."). The new deadlines inserted by the 1988 amendments require prompt *implementation*, i.e., putting a plan of action into effect, without which the President has no authority to act at all assuming those deadlines are mandatory,[29] but those

---

[29] For present purposes, I assume that the statute's deadlines are mandatory. I do not reach, and therefore express no view on, the government's alternative argument that that the statute's deadlines are directory rather than mandatory. *See* ECF 60, at 45–47.

deadlines do not apply to modifications of action that was otherwise timely implemented in the first instance. Thus, as amended in 1988, the statute requires the President to decide on his plan within 90 days of receiving the Secretary's report and put that plan into place within 15 days of so deciding, but so long as he does so, it does not prohibit him from later modifying that plan.

Because the 1988 amendments' insertion of deadlines for the President to "implement action" can peacefully coexist with Congress's retention of the President's modification authority in the word "action" from the pre-1988 statute, those deadlines cannot be read as impliedly repealing the latter. "Repeal by implication is invoked only when an enactment *is irreconcilable* with an earlier statute, or the enactment so comprehensively covers the subject matter of the earlier statute that it must have been intended as a substitute. In either case, Congress' intention to repeal the earlier law must be 'clear and manifest.' " *Todd v. Merit Sys. Prot. Bd.*, 55 F.3d 1574, 1577 (Fed. Cir. 1995) (cleaned up and emphasis added); *see also* 1A Sutherland Statutes and Statutory Construction § 22:34 (7th ed. 2020 update) ("[P]rovisions introduced by an amendatory act should be read together with provisions of the original section that were reenacted or left unchanged as if they had originally been enacted as one section. Effect is to be given to each part, and they are interpreted so they do not conflict."). Here, because the implementation deadline added by the 1988 amendments *is* reconcilable with the President's continuing authority to act in

the word "action," there is no clear and manifest intention on the part of Congress to repeal that preexisting authority.

The presumption against an implied repeal of the President's preexisting authority to modify Section 232 action is even stronger here because of the three decades of administrative practice and interpretation of Section 232 recognizing that authority prior to the 1988 amendments. If Congress removed the authority, we should expect to find a clear indication that Congress affirmatively sought to make such a radical change. "Here, the applicable principle is that Congress does not enact substantive changes *sub silentio*." *United States v. O'Brien*, 560 U.S. 218, 231 (2010) (citing *Director of Revenue of Mo. v. CoBank ACB*, 531 U.S. 316, 323 (2001)); *see also CoBank ACB,* 531 U.S. at 324 (rejecting interpretation of statutory amendments "that Congress made a radical—but entirely implicit—change" that overruled a "50-year history"); *In re Cuozzo Speed Techs., Inc.*, 793 F.3d 1268, 1277 (Fed. Cir. 2015) (noting that Congress is assumed to recognize longstanding existing law and that it is improper to assume Congress alters that sort of thing *sub silentio*).

To appreciate just how radical a change PrimeSource's reading of the 1988 amendments represents, it's worth considering President Reagan's use of Section 232 authority in the runup to those amendments. In 1982, Muammar Kaddafi's Libya was a serious, lethal menace to U.S. national security

interests.[30] That year, without a formal Section 232 investigation and report, President Reagan modified the oil import restrictions of Proclamation 3729—issued by President Eisenhower in 1959—to exclude Libyan oil imports indefinitely. President Reagan explained he did so because the applicable cabinet officials had advised him that continued oil imports from Libya were "inimical to the United States national security." Proclamation No. 4907 of March 10, 1982, *Imports of Petroleum*, 47 Fed. Reg. 10,507 (Mar. 11, 1982).

Under the theory advanced by PrimeSource, Congress in 1988 outlawed President Reagan's restriction of Libyan oil imports because he failed to receive a formal Section 232 report before acting. This is purportedly so even though only two years earlier, in 1986, Libyan agents had executed a terrorist attack on American servicemembers in West Berlin, and President Reagan ordered military strikes on Libya in retaliation. Hayward, *supra* note 30, at 489–91. In view of this contemporaneous statutory history, PrimeSource's theory asks us to read the 1988 amendments as implicitly working a revolutionary change in the statute.

In short, because the 1988 amendments requiring the President to exercise Section 232 action within 105 days of receiving the Secretary's report do

---

[30] Among other things, in late 1981 "American intelligence picked up reports from multiple sources (including an intercepted phone call of Kaddafi himself) that Kaddafi was plotting to assassinate Reagan." Steven F. Hayward, *The Age of Reagan—The Conservative Counterrevolution 1980–1989* at 178 (Three Rivers Press 2009).

not clearly indicate that Congress *also* sought to curtail the "systematic, un-broken, executive practice, long pursued to the knowledge of the Congress and never before questioned," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring), of the type taken by President Reagan in 1982 as to Libyan oil imports, we should construe the statute as preserving that authority.

### c.    The President's continuing authority to act under subsection (c)(3) added by the 1988 amendments is consistent with the President's continuing authority to act retained in subsection (c)(1).

One of the substantive changes made by the 1988 amendments was to add a completely new provision broadening the scope of permissible Section 232 "action" to include seeking to negotiate an agreement restricting the imports of articles threatening national security. This provision was inserted as a new paragraph (3) in subsection (c), where it functions in tandem with the preexisting grant of Presidential authority to take "action" in paragraph (1). It provides:

> (3) (A) If—

> (i) the action taken by the President under paragraph (1) is the negotiation of an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security, and

> (ii) either—

(I) no such agreement is entered into before the date that is 180 days after the date on which the President makes the determination under paragraph (1)(A) to take such action, or

(II) such an agreement that has been entered into is not being carried out or is ineffective in eliminating the threat to the national security imposed by imports of such article,

*the President shall take such other actions* as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security. The President shall publish in the Federal Register notice of any additional actions being taken under this section by reason of this subparagraph.

(B) If—

(i) clauses (i) and (ii) of subparagraph (A) apply, and

(ii) the President determines not to take any additional actions under this subsection,

the President shall publish in the Federal Register such determination and the reasons on which such determination is based.

19 U.S.C. § 1862(c)(3) (emphasis added).

Subsection (c)(3) thus contains an alternative procedure, with different time periods, applicable when the President decides—as the "action" taken under (c)(1)—to negotiate an agreement restricting the importation of the article that threatens to impair national security. It provides that if either no agreement is reached within 180 days of the President's decision to negotiate *or* an agreement was reached but is not being carried out or is ineffective, "the President shall *take such other actions* as the President deems necessary to adjust the imports of such article so that imports will not threaten to impair the

national security." 19 U.S.C. § 1862(c)(3)(A) (emphasis added). Under subsection (c)(3), the President plainly has authority to take further action without first obtaining a new report and investigation from the Secretary.

Invoking *Transpacific I*, PrimeSource contends that subsection (c)(3)'s grant of modification authority implies that no similar authority exists under subsection (c)(1). *See* ECF 73-1, at 19 (citing *Transpacific I*, 415 F. Supp. 3d at 1276 n.15). The *Transpacific I* court reasoned that Section 232 did not permit the President to modify import restrictions by increasing them, in part because "[w]here Congress envisioned ongoing action by the President it provided for it." *Transpacific I*, 415 F. Supp. 3d at 1276 n.15 (citing 19 U.S.C. § 1862(c)(3)). My colleagues make essentially the same point. *See ante* at 34–35.

I disagree with this conclusion for several reasons. To begin with, it ignores that the 1988 amendments were only that—amendments to a preexisting statute that already permitted the President to modify import restrictions. As explained above, the 1988 amendments left intact the statutory language in subsection (c)(1) permitting such modifications—"action"—and under the prior-construction canon Congress is presumed to have incorporated that meaning into the amended Section 232.

Subsection (c)(3), on the other hand, represented an entirely *new* substantive grant of authority uncontemplated in the pre-1988 statute. It makes

clear that the "action" taken by the President under (c)(1) within the new deadlines now includes—in addition to the unilateral action by the President contemplated by the pre-1988 statute such as tariffs or import quotas—an attempt to negotiate import restrictions with foreign partners, i.e., *bilateral* action. Of course, such negotiations might fail, meaning that the President's bilateral action within the relevant deadline might be stillborn.

In specifying that the President can take "other actions" in such circumstances, Congress simply made the President's authority to take bilateral action under the new subsection (c)(3) symmetrical with the President's preexisting authority under subsection (c)(1) to make such modifications in the context of unilateral action. Far from implying that no such power exists under subsection (c)(1), Congress's provision of such authority in subsection (c)(3) simply provides further support that Congress did not repeal such preexisting authority in subsection (c)(1).

Finally, neither PrimeSource nor the *Transpacific* decisions have any answer to this question: Why would Congress *repeal* the President's preexisting authority to modify Section 232 action in the context of unilateral action, and yet in the same breath expressly *grant* that same authority solely in the limited context of unsuccessful attempts to restrict imports by agreement? It defies common sense that for no apparent reason Congress would take away

preexisting authority in every other context that it was simultaneously *conferring* in the new context of failed bilateral action.

When statutory interpretation yields such irrational results, it suggests that something is wrong with the interpretation. *See, e.g.*, *W. Air Lines, Inc. v. Bd. of Equalization of State of S.D.*, 480 U.S. 123, 133 (1987) (noting that where an interpretation yields illogical results, it "argue[s] strongly against the conclusion that Congress intended these results"); *Greenlaw v. United States*, 554 U.S. 237, 251 (2008) (citing the foregoing language from *Western Air Lines* to support the conclusion that "[w]e resist attributing to Congress an intention to render a statute so internally inconsistent"); *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1377–78 (Fed. Cir. 2003) (refusing to interpret statute in a way that yielded "an illogical result").[31]

### 3.  Interpreting Section 232 to bar modifications of import restrictions compromises the statute's effectiveness.

Section 232 import restrictions might last for years. Proclamation 3729 is a good example—President Eisenhower promulgated it in 1959 and it

---

[31] My colleagues imply that the President's authority under subsection (c)(3)—either as to action in the first instance or continuing authority—does not extend to derivatives because, unlike subsection (c)(1), subsection (c)(3) does not expressly encompass derivatives. *See ante* at 34–35. As this case does not involve action under (c)(3), we do not have to resolve that issue today, but I note that (c)(3) cross-references action taken under (c)(1), and therefore (c)(3)'s grant of authority may extend to derivatives as well.

remained in effect, with a substantial number of modifications, until President Reagan eventually revoked it in 1983. *See* Proclamation No. 5141 of December 22, 1983, *Imports of Petroleum and Petroleum Products*, 48 Fed. Reg. 56,929, 56,929, 98 Stat. 3543, 3544, § 1 (Dec. 27, 1983) ("Proclamation No. 3279, as amended, is revoked."). In effect, Section 232 authorizes the President to establish an ongoing regulatory *program* as to imports of an article and its derivatives.

It is precisely because Section 232 allows the President to establish a regulatory program that it is essential and appropriate for the President to be able to quickly adjust the program after the cumbersome initial machinery of the formal investigative and reporting process has already determined the existence of a national security threat. As General Saxbe noted in 1975, "facts constantly change." 43 Op. Att'y Gen. No. 20, at 6.

To read the statute as restricting the President's authority to make adjustments in real time to respond to evolving threats violates the canon of effectiveness, under which "[a] textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Scalia & Garner, *supra*, at 63. "This canon follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness." *Id*.

By precluding the President from using Section 232 to establish an ongoing regulatory program to adjust imports, PrimeSource's theory compromises the effectiveness of the statute as a tool for "[s]afeguarding national security." 19 U.S.C. § 1862; *cf.* 2A *Sutherland Statutory Construction* § 45:12 (7th ed. 2019 update) ("[A] statute should not be read in an atmosphere of sterility, but in the context of what actually happens when humans fulfill its purpose."). Even if PrimeSource's interpretation were textually permissible, it would be disfavored against another textually permissible interpretation that preserves, rather than diminishes, the statute's effectiveness.[32]

Finally, if there is any context where the canon of effectiveness must not be overlooked, it is in this realm of national security. The President's most solemn duty is to protect the nation in a perilous world, and to that end we should choose a textually permissible interpretation of the statute that allows the President to "anticipate distant danger, and meet the gathering storm[.]" A. Hamilton, *The Federalist No. 25*, at 161 (J. Cooke ed. 1961).[33]

---

[32] Indeed, the 1988 amendments were motivated by Congress's "frustration" with the President's failure to take timely Section 232 action once the Secretary had identified a national security threat. *See Transpacific II*, 466 F. Supp. 3d at 1252. It is incongruous that in moving to expedite action under the statute, Congress would have simultaneously enfeebled longstanding Presidential authority to adjust such action to respond to changing facts in real time.

[33] On this issue, my colleagues may eventually reach the same destination as I do, but they take a more circuitous route. They deny PrimeSource's motion for summary judgment as to Count 2, reasoning that there is a genuine issue of material fact in dispute as to whether the Secretary's "assessments" referenced in Proclamation 9980

### B.  Proclamation 9980's extension of import restrictions to steel derivatives was a permissible modification of Proclamation 9705 rather than new action.

PrimeSource appears to argue in the alternative, and my colleagues agree, that even if the President has the power to modify Section 232 action that was otherwise timely implemented, that power is limited to the specific universe of imported articles and derivatives addressed by the original proclamation and that any later action restricting derivatives not included in the original action requires a new Section 232 investigation and report. Specifically, my colleagues conclude that because Proclamation 9705's restrictions were limited to steel *articles*, Proclamation 9980's restrictions of steel *derivatives* "implemented" a new action for purposes of Section 232's procedural requirements. *Ante* at 33.

I disagree for two reasons. First, the President's power to act in the first instance extends to derivatives of articles that are the subject of an

---

might qualify as a Section 232 report, *see ante* at 50–55, notwithstanding the government's concession to the contrary. While my colleagues may be correct that we might ultimately be able to characterize Proclamation 9980 as a timely "new" Section 232 action by characterizing the Secretary's assessments as a "report," I would take the government at its word here rather than invite the President to characterize every recommendation by the Secretary as a Section 232 report authorizing new action. In effect, my colleagues' reading of the 1988 amendments as revoking the President's modification authority on the back end compels them to potentially water down the statute's procedural requirements on the front end to avoid compromising the statute's effectiveness as a national security tool. *Cf. Transpacific II*, 466 F. Supp. 3d at 1255 ("The President is not authorized to act under Section 232 based on any offhanded suggestion by the Secretary; the statute requires a formal investigation and report.").

investigation and report by the Secretary, even if such an investigation and report did not address derivatives. Second, if the President has the power to modify Section 232 action, that power is necessarily coextensive with his power to act in the first instance.

### 1.   The President's power to act in the first instance extends to an article and its derivatives.

Section 232 directs the Secretary to investigate, and report to the President about, the national security effects of imports of "the article." 19 U.S.C. §§ 1862(b)(1)(A), (b)(2)(B), (b)(3)(A), (c)(1)(A).[34] The statute directs the President, provided he concurs with the Secretary's findings, to take action to adjust the imports "of the article *and its derivatives*." *Id.* § 1862(c)(1)(A)(ii) (emphasis added); *see also id.* § 1862(c)(1)(B) (directing the President to "implement" his decision "to take action to adjust imports of an article *and its derivatives*") (emphasis added).

Thus, it is indisputable that the Secretary is to investigate imports of an article, but the President can then act as to the article *and its derivatives*, even if the Secretary's investigation and report did not address derivatives. PrimeSource complains that the Secretary's investigation and report were

---

[34] 19 U.S.C. § 1862(c)(1)(A) is focused on what actions the President is to take after receiving a report from the Secretary, but it begins by referring to the President's "receiving a report submitted under subsection (b)(3)(A) in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."

focused on "imports of steel" and "did not mention steel nails specifically, nor any derivative articles generally," and further complains that none of the public comments "put PrimeSource on notice that Commerce was considering" applying tariffs to imported steel nails. ECF 73-1, at 9. But had the President included steel nails—derivatives of the steel articles that were the subject of the Secretary's report and investigation—in Proclamation 9705, PrimeSource would have no valid objection because Section 232(c)(1)(A)(ii) and (B) allow the President to act to adjust imports of the "article *and its derivatives*." 19 U.S.C. § 1862(c)(1)(A)(ii), (c)(1)(B) (emphasis added). That the Secretary's investigation and report did not address derivatives of steel articles did not mean that the President's proclamation could not do so.

### 2.    The President's power to modify import restrictions is coextensive with his power to act in the first instance.

*If* the President has the power to modify Section 232 action without another formal investigation and report by the Secretary—and as discussed above at length, I believe that he does—I see nothing in the statute suggesting that the President's modification power is narrower than his power to act in the first instance. The statute—not the President's original Section 232 action—sets the boundaries on the scope of the President's power to modify such action, and the statute permits the President to take action—both initial action within the 105 days after the Secretary's report *and* thereafter continuing

action under the pre-1988 interpretation ratified by the 1988 amendments—as to an "article *and its derivatives*." 19 U.S.C. § 1862(c)(1)(A)(ii), (c)(1)(B) (emphasis added). In short, the President's statutory power to modify is necessarily coextensive with the original power to act in the first instance absent any statutory restriction to the contrary.

Thus, that Proclamation 9705's import restrictions on steel articles did not encompass steel derivatives did not mean that the President could not later extend those restrictions to such derivatives absent another formal investigation and report. To read the statute otherwise—that is, as prohibiting the President from extending Section 232 import restrictions to derivatives unless the Secretary has first formally investigated and reported on those derivatives—makes no sense when the statute permits the President to act as to derivatives in the first instance without any such formal investigation and report by the Secretary *as to derivatives*. What is the point of requiring a formal investigation and report as to derivatives at the modification stage when no such investigation and report (as to derivatives) is even necessary at the implementation stage?

As Attorney General Saxbe opined in 1975, the statute presumes that the relevant officials will advise the President in real time of changes in underlying facts that warrant adjusting Section 232 action. 43 Op. Att'y Gen. No. 20, at 3–4. And there is no question here that the Secretary did just that

by timely advising the President that steel article derivative imports were undermining Proclamation 9705 and therefore required prompt remedial action. *See* 85 Fed. Reg. at 5282.

To read the statute as nevertheless demanding that the President defer acting on such advice until the Secretary conducts a formal investigation and report as to the continued existence of a national security threat is to exalt supposed form over actual substance and reintroduces into the statute wasteful inefficiency akin to that which Congress eliminated in 1958. *See supra* at 81–83 (discussing pre-1958 version of the statute that permitted the Secretary to initiate an investigation only after first receiving direction from the President to do so, even though the Secretary had already advised the President of the need for action). Such a reading also violates the canon of effectiveness previously discussed. *See* Scalia & Garner, *supra*, at 63.

Finally, I note that the historical record confirms my reading of the statute. That record shows that Presidents repeatedly modified Proclamation 3279—President Eisenhower's Section 232 import restrictions on petroleum products that lasted almost a quarter century—to add derivative products not encompassed by the original proclamation. *See, e.g.*, Proclamation No. 3509 of November 30, 1962, *Modifying Proclamation 3279 Adjusting Imports of Petroleum and Petroleum Products*, 27 Fed. Reg. 11,985, 11,985–87, 77 Stat. 963 (Dec. 5, 1962) (adding natural gas); Proclamation No. 3823 of January 29, 1968,

*Modifying Proclamation 3279 Adjusting Imports of Petroleum and Petroleum Products*, 33 Fed. Reg. 1171, 1171–73, 82 Stat. 1603 (Jan. 30, 1968) (adding liquids derived from tar sands); Proclamation No. 4178 of January 17, 1973, *Modifying Proclamation No. 3279, Relating to Imports of Petroleum and Petroleum Products*, 38 Fed. Reg. 1719, 1719–21, 87 Stat. 1150 (Jan. 18, 1973) (adding liquid hydrocarbons produced from gilsonite and oil shale).

As discussed above, this history of administrative interpretation and practice forms part of the statutory history that "can properly be presumed to have been before all the members of the legislature when they voted" on the 1988 amendments. Scalia & Garner, *supra*, at 256. If the 1988 amendments retained the President's power to modify Section 232 action without another formal investigation and report—and, as explained above, my view is that they did—those amendments *also* necessarily retained the President's power to modify Section 232 action by extending import restrictions to derivatives of an article encompassed by an original action. *See Bragdon*, 524 U.S. at 645 ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new

statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").[35]

## Conclusion

For the reasons set forth above, I respectfully dissent from my colleagues' decision to avoid confronting the question of whether we have subject-matter jurisdiction over claims against the President. I concur in their decision to grant the government's motion to dismiss Counts 1, 3, 4, and 5 of the amended complaint for failure to state a claim, as well as in their decision to deny PrimeSource's cross-motion for summary judgment as to those same counts. I join their opinion as to Counts 1, 3, and 4. Finally, although I concur in their decision to deny PrimeSource's cross-motion for summary judgment as to Count 2, I respectfully dissent from their decision to deny the government's motion to dismiss that count for failure to state a claim.

/s/ *M. Miller Baker*
M. Miller Baker, Judge

---

[35] This case does not present, and therefore I express no view on, the issue of whether the President's Section 232 modification authority extends to *articles* that were not the subject of any investigation and report by the Secretary.

## Presidential Modifications of Section 232 Actions Without New Formal Investigations and Reports Between 1975 and 1988

1.    Proclamation No. 4355 of March 4, 1975, *Modifying Proclamation 3279, as Amended, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees*, 40 Fed. Reg. 10,437, 89 Stat. 1248 (Mar. 6, 1975).

2.    Proclamation No. 4377 of May 27, 1975, *Modifying Proclamation No. 3279, as Amended, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees*, 40 Fed. Reg. 23,429, 89 Stat. 1275 (May 30, 1975).

3.    Proclamation No. 4412 of January 3, 1976, *Modifying Proclamation No. 3279, as Amended, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum Products Through a System of License Fees*, 41 Fed. Reg. 1037, 90 Stat. 3073 (Jan. 6, 1976).

4.    Proclamation No. 4543 of December 27, 1977, *Modifying Proclamation No. 3279, as Amended, Relating to Imports of Petroleum and Petroleum Products, and Providing for the Long-Term Control of Imports of Petroleum and Petroleum Products Through a System of License Fees*, 42 Fed. Reg. 64,849, 92 Stat. 3907 (Dec. 29, 1977).

5.    Proclamation No. 4629 of December 8, 1978, *Imports of Petroleum and Petroleum Products*, 43 Fed. Reg. 58,077, 93 Stat. 1476 (Dec. 12, 1978).

6.    Proclamation No. 4655 of April 6, 1979, *Imports of Petroleum and Petroleum Products*, 44 Fed. Reg. 21,243, 93 Stat. 1508 (Apr. 10, 1979).

7.    Proclamation No. 4702 of November 12, 1979, *Imports of Petroleum and Petroleum Products*, 44 Fed. Reg. 65,581, 93 Stat. 1554 (Nov. 14, 1979).

8.    Proclamation No. 4748 of April 11, 1980, *Technical Amendments to Proclamation 4744*, 45 Fed. Reg. 25,371, 94 Stat. 3747 (Apr. 15, 1980).

9.    Proclamation No. 4751 of April 23, 1980, *Amendment to Proclamation 4744*, 45 Fed. Reg. 27,905, 94 Stat. 3750 (Apr. 25, 1980).

10.    Proclamation No. 4762 of June 6, 1980, *Petroleum Import Licensing Requirements*, 45 Fed. Reg. 39,237, 94 Stat. 3760 (June 10, 1980).

11.  Proclamation No. 4766 of June 19, 1980, *Imports of Petroleum and Petroleum Products*, 45 Fed. Reg. 41,899, 94 Stat. 3763 (June 23, 1980).

12.  Proclamation No. 4907 of March 10, 1982, *Imports of Petroleum*, 47 Fed. Reg. 10,507, 96 Stat. 2709 (Mar. 11, 1982).

13.  Proclamation No. 5141 of December 22, 1983, *Imports of Petroleum and Petroleum Products*, 48 Fed. Reg. 56,929, 98 Stat. 3543 (Dec. 27, 1983).