## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, M. MILLER BAKER, JUDGES; THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| **PRIMESOURCE BUILDING PRODUCTS, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Ct. No. 20-00032 |
| | ) | |
| **UNITED STATES, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Pursuant to Plaintiff PrimeSource Building Products, Inc.'s Motion for Partial Stay of the Enforcement of Judgment Pending Appeal, it is hereby

ORDERED that the motion is granted; and it is further

ORDERED that effectuation of this Court's judgment in slip op. 23-101 (Dkt. No. 134) be, and hereby is, partially stayed pending the entry of a final and conclusive judgment by the U.S. Supreme Court; and it is further

ORDERED that the order of this Court in slip op. 23-101 to liquidate the entries subject to this litigation, be, and hereby is, stayed pending the resolution of PrimeSource's petition before the Supreme Court; and it is further

ORDERED that slip op. 21-94 (Dkt. No. 118) establishing that Plaintiff and Defendants shall reach agreement on PrimeSource's monitoring and continuous bound for entries of merchandise within the scope of Proclamation 9980 be, and hereby is, vacated and in its place PrimeSource shall pay cash deposits of Section 232 duties pursuant to Proclamation 9980 of January 24, 2020; Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020), on

entries filed by PrimeSource Building Products, Inc. on after 12:01am of the date of this Court's judgment in slip op 23-101;

ORDERED that the enforcement of this Court's judgment in slip op. 23-101 calling for payment of Section 232 duties and interest on PrimeSource's past imports entered, or withdrawn from warehouse for consumption, prior to the date of this Order is stayed pending resolution of PrimeSource's petition before the Supreme Court.

SO ORDERED.


Dated:  _____
          New York, NY
                                        _____

                                        JENNIFER CHOE-GROVES, JUDGE


                                        _____

                                        M. MILLER BAKER, JUDGE


                                        _____

                                        TIMOTHY C. STANCEU, JUDGE

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, M. MILLER BAKER,**
**JUDGES; THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | | |
|---|---|---|
| **PRIMESOURCE BUILDING PRODUCTS, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Ct. No. 20-00032** |
| | ) | |
| **UNITED STATES, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF PRIMESOURCE BUILDING PRODUCTS, INC.'S MOTION FOR**
**PARTIAL STAY OF THE ENFORCEMENT OF JUDGMENT PENDING APPEAL**

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
trade@mowrygrimson.com

July 21, 2023

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 6

   I.    THE COURT HAS THE AUTHORITY TO GRANT A PARTIAL STAY .......................... 6

   II.    PRIMESOURCE MEETS THE REQUIREMENTS TO GRANT A PARTIAL STAY ... 8

      A.   PrimeSource Will Be Irreparably Harmed Absent a Stay ................................................ 9

      B.   PrimeSource's Petition Is Likely to Succeed on the Merits ........................................... 15

      C.   A Partial Stay of the Enforcement of this Court's Judgment Pending Appeal Will Not Substantially Injure the Government ................................................................................... 27

      D.   The Public Interest Favors a Partial Stay of the Enforcement of this Court's Judgment Pending Appeal ................................................................................................................... 29

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

718 Fifth Ave. Corp. v. United States,
    7 CIT 195 (1984).................................................................................................... 9

A.L.A. Schecter Poultry Corp. v. United States,
    295 U.S. 495 (1935)............................................................................................. 18

Ala. Assoc. of Realtors v. DHS,
    141 S. Ct. 2485 (2021)........................................................................................ 21

Am. Signature, Inc. v. United States,
    598 F.3d 816 (Fed. Cir. 2010) ...................................................................... 12, 29

Biden v. Nebraska,
    143 S. Ct. 2355 (2023)........................................................................................ 20

Chevron v. NRDC,
    467 U.S. 837 (1984)............................................................................................. 21

Comm. on the Judiciary v. McGahn,
    407 F. Supp. 3d 35 (D.C. Cir. 2019).................................................................. 18

Corus Group PLC v. Bush,
    26 CIT 937, 217 F. Supp. 2d 1347 (2022)............................................................ 9

E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.,
    835 F.2d 277 (Fed. Cir. 1987) ............................................................................ 15

Eurodif v. United States,
    slip op. 06-124 (Ct. Int'l Trade Aug. 3, 2006)...................................................... 7

Fed. Energy Admin. v. Algonquin SNG, Inc.,
    426 U.S. 548 (1976)............................................................................................. 19

FMC Corp. v. United States,
    3 F.3d 424 (Fed. Cir. 1993) ................................................................................ 16

Fundicao Tupy S.A. v. United States,
    __ CIT __, 696 F. Supp. 1525 (1988).................................................................. 16

Gundy v. United States,
 139 S. Ct. 2116 (2019) ........................................................................ 21

Hilton v. Braunskill,
 481 U.S. 770 (1987) .............................................................................. 8

in re Section 301 Cases,
 __ CIT __, 524 F. Supp. 3d 1355 (2021)........................................... passim

Kowalski v. Chi. Trib. Co.,
 854 F.2d 168 (7th Cir. 1988) .............................................................. 16

Loper Bright Enterprises v. Raimondo,
 45 F.4th 359 (D.C. Cir. 2022)............................................................. 21

Maple Leaf Fish Co. v. United States,
 762 F.2d 86 (Fed. Cir. 1985) .............................................................. 17

Munaf v. Geren,
 553 U.S. 674 (2008)............................................................................ 16

Nat'l Ass'n of Mfrs. v. United States Dep't of Treasury,
 2020 Ct. Intl. Trade LEXIS 68 (May 15, 2020) .............................. 16, 29

Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs and Border Prot.,
 30 CIT 1838, 465 F. Supp. 2d 1300 (2006)........................................ 9

Neo Solar Power Corp. v. United States,
 __ CIT __, slip op. 2016-58 (June 9, 2016) ...................................... 29

Nken v. Holder,
 556 U.S. 418 (2009)......................................................................... 6, 8

Oman Fasteners, LLC v. United States,
 __ CIT __, 520 F. Supp. 3d 1332 (2021)............................................. 4

Otter Prods., LLC v. United States,
 38 CIT 1931, 37 F. Supp. 3d 1306 (2014)........................................... 9

Paul v. United States,
 140 S. Ct. 342 (2019) .......................................................................... 21

iii

PrimeSource Bldg. Prods., Inc. v. United States,
   __ CIT __, 497 F. Supp.3d 1333 (2021)........................................................................ 3, 25, 26

PrimeSource Bldg. Prods., Inc. v. United States,
   __ CIT __, 505 F. Supp. 3d 1352 (2021)...................................................................... 4, 22, 24

PrimeSource Bldg. Prods., Inc. v. United States,
   __ CIT __, 535 F. Supp. 3d 1327 (2021)......................................................................4, 11, 28

PrimeSource Bldg. Prods., Inc. v. United States,
   59 F.4th 1255 (Fed. Cir. 2023) ............................................................................... passim

Qingdao Taifa Grp. Co. v. United States,
   581 F.3d 1375 (Fed. Cir. 2009) ................................................................................... 16

S.J. Stile Assocs. Ltd. v. Snyder,
   646 F.2d 522 (C.C.P.A. 1981) ....................................................................................... 9

Shinyei Corp. of Am. v. United States,
   355 F.3d 1297 (Fed. Circ. 2004) ................................................................................. 10

SKF USA, Inc. v. United States,
   512 F.3d 1326 (Fed. Cir. 2007) ................................................................................... 10

Sunpreme Inc. v. United States,
   2017 Ct. Int'l Trade LEXIS 1 (Jan. 5, 2017)........................................................... 10, 29

Touby v. United States,
   500 U.S. 160 (1991) ..................................................................................................... 19

Transpacific Steel LLC v. United States,
   4 F.4th 1306 (Fed. Cir. 2021) ............................................................................... passim

Ugine-Savoie Imphy v. United States,
   24 CIT 1246, 121 F. Supp. 2d 684 (2000).................................................................. 16

United States v. Eurodif S.A.,
   555 U.S. 305 (2009) ....................................................................................................... 6

Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
   559 F.2d 841 (D.C. Cir. 1977) .................................................................................... 18

West Virginia v. EPA,
   142 S. Ctr. 2587 (2022) ........................................................................... 18, 19, 20, 25

Winter v. NRDC, Inc.,
   555 U.S. 7 (2008) ............................................................................................... 8

Zenith Radio Corp. v. United States,
   710 F.2d 806 (Fed. Cir. 1983) ....................................................................... 9, 13

**Statutes**

19 U.S.C. § 1504 ..................................................................................................... 12

19 U.S.C. § 1862 ................................................................................. 1, 2, 19, 25

28 U.S.C. 1581(i) ...................................................................................................11

U.S. Const. art. I, §8 .............................................................................................. 18

**Other Authorities**

Proclamation 3279, 49 Fed. Reg. 1,781 (Mar. 12, 1959) .............................................. 20

Proclamation 4341, 40 Fed. Reg. 3,965 (Jan. 27, 1975) ............................................... 19

Proclamation 9980, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel
   Articles into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020) ...................... 3, 23, 24, 25

Proclamation No. 9705, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 11,625
   (Mar. 15, 2018).......................................................................................... 2, 23

U.S. DEP'T OF COMMERCE, BUREAU OF INDUS. & SEC., The Effect of Imports of Steel
   on the National Security (2018) ............................................................................ 2

**INTRODUCTION**

Pursuant to Rules 7 and 62 of the Rules of this Court, Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") respectfully moves that this Court partially stay the enforcement of its judgment in slip opinion 23-101 that entries affected by this litigation shall be liquidated in accordance with the decision of the U.S. Court of Appeals for the Federal Circuit pending PrimeSource's appeal to the U.S. Supreme Court.  See Judgment (July 13, 2023), ECF No. 134 ("July 13th Order").   As explained below, PrimeSource moves that this Court grant a partial stay of the enforcement of its judgment with respect to past imports where PrimeSource did not pay Section 232 duties during the pendency of this appeal.  Defendants the United States et al. (the "Government") was, and is, 100 percent secured for the full value of PrimeSource's Section 232 duties on its past imports through a series of bonds put into place in collaboration with the Government.   PrimeSource does not seek any continued relief against any payment obligation with respect to new imports made following the Court's July 13th Order.   The reason for this motion for partial stay of the enforcement of this Court's judgment pending appeal is to allow time for PrimeSource's petition for certiorari to be considered by the Supreme Court and to defer action on a large body of past imports while that petition is resolved to avoid the possibility of the Government and PrimeSource having to reverse the entire process.

On July 17, 2023, Meen-Geu Oh, Esq., counsel to the Government, indicated that the Government opposes the motion.

**BACKGROUND**

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, delegates to the President the power to "adjust the imports of {an} article and its derivatives" when imports of that article "threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii).

1

The statute provides for certain procedural protections that must be met before the President can adjust imports. The President can only act following receipt of a report from the Secretary of Commerce (the "Secretary") that summarizes the findings of the Secretary's investigation into the threat posed to national security by imports of a particular article and makes recommendations to the President for action or inaction. See id. § 1862(b)(3)(A). After receiving the Secretary's report, the President has 90 days to determine whether he will take any action to adjust imports and then 15 days to implement said action. See id. § 1862(c)(1)(A)-(B).

On January 11, 2018, the Secretary issued a Section 232 report finding that imports of steel threatened national security and recommended that President adjust the level of steel imports through quotas or tariffs. See U.S. DEP'T OF COMMERCE, BUREAU OF INDUS. & SEC., The Effect of Imports of Steel on the National Security (2018), PrimeSource Am. Compl. at Ex. 4 (Feb. 11, 2020), ECF No. 22. The Steel Report covered "steel mill products" but did not mention steel derivative articles.

On March 8, 2018, the President issued Proclamation 9705, which concurred with the Secretary's findings, and imposed tariffs of 25 percent on imports of steel articles. See Proclamation No. 9705, Adjusting Imports of Steel Into the United States, 83 Fed. Reg. 11,625 (Mar. 15, 2018). The President provided that the "global tariff . . . would enable domestic steel producers to use approximately 80 percent of existing domestic production capacity." Id. at 11,625. The annexes covered by that action did not list any steel derivative articles. See id. at 11,629. The President ordered that the Secretary continue to monitor imports of steel articles and "inform {him} of any circumstances that in the Secretary's opinion might indicate the need for further action." Id. at 11,628.

On January 24, 2020, nearly two years after Proclamation 9705, and well beyond the 105-day window for action provided in the statute, the President issued Proclamation 9980, imposing additional tariffs of 25 percent on certain steel derivative articles.  See Proclamation 9980, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020).  In the proclamation, the President stated that he imposed additional tariffs on imports of certain steel derivative articles because "domestic steel producers' utilization ha{d} not stabilized" at the 80 percent capacity utilization level. Id. at 5,281.

Following the issuance of Proclamation 9980, PrimeSource filed an appeal challenging the President's imposition of tariffs on imports of steel derivative articles.  See PrimeSource Bldg. Prods., Inc. v. United States, __ CIT __, __ 497 F. Supp.3d 1333, 1357 (2021) ("PrimeSource I"). This Court granted PrimeSource's motion for preliminary injunction.  See Order (Feb. 13, 2020), ECF No. 40 (Nonconfidential Version) ("Preliminary Injunction Order").   In granting PrimeSource's motion for preliminary injunction, this Court ordered that PrimeSource put in place a continuous bond to cover its Section 232 duties that PrimeSource anticipates it would otherwise have had to deposit and required that PrimeSource confer with the Government every six months and put in place a new continuous bond as necessary to cover its future Section 232 deposits for the next six-month period.  See id. at 2-3.  Pursuant to this Court's Preliminary Injunction Order, PrimeSource put in place a new continuous bond through the pendency of this litigation on numerous occasions.   See, e.g., Joint Status Report at 2 (Aug. 12, 2020), ECF No. 95 (Nonconfidential Version).

This Court awarded summary judgment to PrimeSource holding that the President committed a significant procedural violation of Section 232 by issuing Proclamation 9980 after the 105-day window for Presidential action.  See PrimeSource Bldg. Prods., Inc. v. United States,

__ CIT __, __ 505 F. Supp. 3d 1352, 1357 (2021) ("PrimeSource II").  The Government appealed this Court's judgment to the U.S. Court of Appeals for the Federal Circuit and the Government's appeal was consolidated with a related appeal in Oman Fasteners, LLC v. United States, __ CIT __, 520 F. Supp. 3d 1332 (2021).  See PrimeSource Bldg. Prods., Inc. v. United States, 59 F.4th 1255, 1257 (Fed. Cir. 2023) ("PrimeSource IV").

The preliminary injunction dissolved after this Court entered judgment in PrimeSource II. See PrimeSource Bldg. Prods., Inc. v. United States, __ CIT __, __, 535 F. Supp. 3d 1327, 1330 (2021) ("PrimeSource III").  This Court, however, granted the Government's motion for partial stay pending appeal at the Federal Circuit.  See id.  In suspending the liquidation of the entries affected by this litigation, this Court ordered that PrimeSource and the Government reach an agreement on a monitoring system to secure the Government's interest in any future duty payments that PrimeSource may owe.  See id.  PrimeSource and the Government came to an agreement to fully secure the Government's interest in any future duty payments from PrimeSource.  See Joint Notice Regarding Ct.'s Order Concerning Monitoring and Continuous Bonding at 2 (Oct. 25, 2021), ECF No. 128.

After this Court issued its judgement in PrimeSource II, the Federal Circuit held in a related case, Transpacific Steel LLC v. United States, 4 F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022) ("Transpacific II"), that the President did not violate Section 232 by increasing the 25 percent global tariff on steel articles to 50 percent for Turkey four months later.  See 4 F.4th at 1333.  The majority in Transpacific II deemed that action lawful, despite being taken after the 105-day window for Presidential action, because it was part of "a continuing course of action" that "modifi{ed} the initial implementing steps {of Proclamation 9705} in line with the announced plan of action."  Id. at 1319, 1324.  The majority held that its opinion was narrow and did "not

4

address other circumstances that would present other issues about presidential authority to adjust initially taken actions without securing a new report with a new threat finding from the Secretary." Id. at 1310.

Based on the holding in Transpacific II, the Federal Circuit reversed this Court's judgment and upheld Proclamation 9980.  See PrimeSource IV, 59 F.4th at 1257.  The Federal Circuit held that the steel derivative articles targeted by Proclamation 9980 fell within the prior "authorization of presidential action {initiated by Proclamation 9705} based on the Secretary's finding about imports of steel" and that "including derivatives helps achieve the specific, original national-security objective."  Id.  The Federal Circuit also concluded that there was "no staleness or other persuasive reason for overriding the President's judgment."  Id.

On June 22, 2023, the Federal Circuit denied PrimeSource's and Plaintiff-Appellees' Oman Fasteners, LLC's, Huttig Building Products, Inc.'s and Huttig, Inc.'s joint petition for rehearing en banc.  See Order, PrimeSource Bldg. Prods., Inc. v. United States, 59 F.4th 1255 (Fed. Cir. 2023) (Fed. Cir. No. 21-2066), ECF No. 98.  After denying PrimeSource's motion to stay the mandate, the Federal Circuit issued its mandate on July 6, 2023.  See Mandate, PrimeSource Bldg. Prods., Inc. v. United States, 59 F.4th 1255 (Fed. Cir. 2023) (Fed. Cir. No. 21-2066), ECF No. 101; see also Order, PrimeSource Bldg. Prods., Inc. v. United States, 59 F.4th 1255 (Fed. Cir. 2023) (Fed. Cir. No. 21-2066), ECF No. 100 (denying PrimeSource's motion to stay the mandate).

On July 13, 2023, this Court issued an order dismissing PrimeSource's claims without prejudice, denying PrimeSource's Rule 56 Motion for Summary Judgment, entering judgment for the Government, and ordering "that entries affected by this litigation shall be liquidated in accordance with the decision of the Court of Appeals in PrimeSource Building Products, Inc. v. United States, 59 F.4th 1255 (Fed. Cir. 2023)."  See July 13th Order at 1-2.

5

On July 21, 2023, PrimeSource filed its petition for a writ of certiorari of the Federal Circuit's judgment at the Supreme Court.  See Attachment 1.  PrimeSource respectfully requests that this Court partially stay the enforcement of its judgment regarding liquidation of past imports pending the resolution of PrimeSource's petition for certiorari before the Supreme Court.

## ARGUMENT

## I.   THE COURT HAS THE AUTHORITY TO GRANT A PARTIAL STAY

This Court has authority to grant PrimeSource's motion for a partial stay of the enforcement of this Court's judgment pending appeal based on a court's traditional enforcement powers and consistent with the Court's past practice and rules.  The Supreme Court has recognized that "{i}t takes time to decide a case on an appeal . . . and if the Court takes the time it needs, the court's decision may in some cases come too late for the party seeking review."  Nken v. Holder, 556 U.S. 418, 421 (2009).  To provide a court with the time it needs, "as part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal."  Id. (internal quotation and citation omitted).  Consistent with the authority to stay enforcement of judgment as recognized by the Supreme Court, the Court has previously delayed dismissing a case and entering judgment pending the resolution of petition for certiorari at the Supreme Court.  See Eurodif S.A. v. United States, CIT Ct. No. 02-219.  In Eurodif, the Plaintiffs filed a petition for certiorari that was later granted by the Supreme Court.  See Eurodif S.A. v. United States, CIT Ct. No. 02-219, ECF Nos. 233, 236.  The Supreme Court reversed and remanded the case back to the Federal Circuit.  See United States v. Eurodif S.A., 555 U.S. 305, 322 (2009).  Despite the Federal Circuit's mandate issuing in Eurodif, the Court nevertheless did not issue its final judgment until after the Federal Circuit remanded the case back to the Court following a reversal and remand to the Federal Circuit by the Supreme Court.  See Order at 2,

6

Eurodif v. United States, slip op. 06-124 (Ct. Int'l Trade Aug. 3, 2006) (CIT No. 02-219), ECF No. 251.  Beyond the Court's informal delay in issuing its judgment in Eurodif, this Court's own rules codify its inherent authority to stay the enforcement of a judgment pending appeal.  See Rule USCIT R. 62(b) and 62(d) (providing that a party may obtain a stay by bond or other security and an injunction pending appeal).  This Court, therefore, possesses the authority to partially stay the enforcement of its judgment pending appeal.

PrimeSource's motion does not encroach on the Federal Circuit's authority following the issuance of its mandate.  Again, in Eurodif, the Court delayed issuing its judgment following resolution of a petition for certiorari before the Supreme Court even though the Federal Circuit had issued its mandate.  See supra at 6.  Despite the prior recognition by the Court that it can delay its judgment following issuance of the mandate by the Federal Circuit, PrimeSource nonetheless has narrowly crafted the proposed relief requested in this motion to avoid any potential conflict with the Federal Circuit's mandate.   Specifically, PrimeSource requests this Court partially stay the enforcement of its judgment pending appeal as follows: 1) this Court stays its July 13th Order that entries affected by this litigation shall be liquidated in accordance with the decision of the Federal Circuit; 2) this Court vacate the requirement that PrimeSource and the Government reach an agreement on monitoring and continuous bonding as PrimeSource agrees to pay cash deposits of Section 232 duties on its entries going forward from the date of this Court's July 13th Order; 3) this Court order a stay of the enforcement of its judgment on the payment of Section 232 duties and interest on PrimeSource's past imports that remain fully secured by PrimeSource's continuous and supersedes bonds pending final disposition of PrimeSource's petition for writ of certiorari at the Supreme Court.  PrimeSource recognizes that the Federal Circuit denied its motion to stay the mandate. Nonetheless, PrimeSource respectfully maintains that these modifications distinguish

PrimeSource's request here from its motion to stay the mandate at the Federal Circuit. The requested relief in this motion allows for the Federal Circuit's mandate to go into effect for all of PrimeSource's future entries as opposed to PrimeSource's requested relief at the Federal Circuit that would have stayed payment on all of PrimeSource's entries. By allowing the mandate to go forward on PrimeSource's future entries, PrimeSource's proposed relief would not conflict with the Federal Circuit's mandate as it merely delays any potential payment by PrimeSource related to its past imports pending the resolution of its petition for certiorari at the Supreme Court.

In sum, this Court possess the authority to grant PrimeSource's motion for partial stay of the enforcement of this Court's judgment pending appeal and the narrow relief requested in this motion further ensures that a stay would not be in conflict with the Federal Circuit's mandate.

## II.   PRIMESOURCE MEETS THE REQUIREMENTS TO GRANT A PARTIAL STAY

To prevail on its motion for partial stay of the enforcement of this Court's judgment pending appeal, PrimeSource must establish that: (1) it "will be irreparably injured absent a stay," (2) it is "likely to succeed on the merits," (3) a stay will not "substantially injure the other parties interested in the proceeding," and (4) the public interest favors the stay. Nken, 556 U.S. at 434 (internal citation and quotation omitted); see also Hilton v. Braunskill, 481 U.S. 770, 776 (1987). "There is substantial overlap between these and the factors governing preliminary injunctions." Nken, 556 U.S. at 434 (citing Winter v. NRDC, Inc., 555 U.S. 7, 24 (2008)).[1] PrimeSource meets all these criteria, and a granting a partial stay of the enforcement of this Court's judgment pending appeal is warranted.

---

[1] Given the overlap between the factors governing a motion to stay judgment and a preliminary injunction, PrimeSource refers to case precedent concerning injunctions as persuasive authority throughout this motion.

**A.  PrimeSource Will Be Irreparably Harmed Absent a Stay**

There is "no bright line test for determining irreparable harm." Corus Group PLC v. Bush, 26 CIT 937, 943, 217 F. Supp. 2d 1347, 1354 (2022).   Courts have found that irreparable harm exists where there is a "viable threat of serious harm which cannot be undone." Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983) (emphasis removed) (quoting S.J. Stile Assocs. Ltd. v. Snyder, 646 F.2d 522, 525 (C.C.P.A. 1981); see also Otter Prods., LLC v. United States, 38 CIT 1931, 1938-39, 37 F. Supp. 3d 1306, 1315 (2014) (providing that harm cannot be reasonably redressed in a court of law when "no damages payment, however great, can address it" (quotation omitted)); Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs and Border Prot., 30 CIT 1838, 1848, 465 F. Supp. 2d 1300, 1310 (2006) (finding that irreparable harm exists where absent a stay, "some harm will result to {a party} that cannot be reasonably redressed in a court of law.'" (citation and quotation omitted)).   To a lesser degree than serious harm that cannot be undone by a Court order, the Court has previously also found that "{b}usiness disruption resulting from administrative delay could be sufficient to demonstrate irreparable harm." 718 Fifth Ave. Corp. v. United States, 7 CIT 195, 198 (1984); see also Corus Group, 26 CIT at 943, 217 F. Supp. 2d at 1354 (finding that a company would suffer irreparable harm if it was "required to fundamentally alter its business operations during litigation in order to comply with a challenged Government action"). Absent a partial stay of the enforcement of this Court's judgment pending appeal, PrimeSource will suffer from irreparable harm for the following reasons: 1) PrimeSource faces a viable threat of harm that cannot be undone by a court order because liquidation of its entries may moot any appeal before the Supreme Court, 2) PrimeSource will face significant business disruptions to pay back the cash deposits of Section 232 duties with interest on its past

imports even though payment may ultimately be unnecessary if the Supreme Court reverses the judgment of the Federal Circuit.

First, absent a partial stay of the enforcement of this Court's judgment pending appeal, PrimeSource will suffer irreparable harm that cannot be undone by a court order because the liquidation of its entries may moot any potential appeal to the Supreme Court.  "{O}nce liquidation occurs, a subsequent decision by {a court} . . . can have no effect on the dumping duties assessed." SKF USA, Inc. v. United States, 512 F.3d 1326, 1329 (Fed. Cir. 2007) (citation and quotation omitted); see also in re Section 301 Cases, __ CIT __, __, 524 F. Supp. 3d 1355, 1362 (2021) (holding that "the liquidation of Plaintiffs' entries constitutes irreparable harm in this case because it may foreclose Plaintiffs' ability to challenge the Government's imposition of duties paid or have those duties returned").  The liquidation of an entry renders "a court action moot" because the court is without remedy as "an importer's liability has been finalized." SKF, 512 F.3d at 1329; see also in re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1362 ("Liquidation, as the final computation of duties, will constitute irreparable harm unless an importer can obtain refunds or reliquidation because it cuts off judicial review and eliminates any chance of recovery of unlawful exactions."); Sunpreme Inc. v. United States, 2017 Ct. Int'l Trade LEXIS 1, *8 (Jan. 5, 2017) (finding that a defendant would be irreparably harmed if its entries subject to appeal liquidated).[2]

_____

[2] There is contrary court precedent that liquidation of an entry does not moot judicial review.  See, e.g., Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1312 (Fed. Circ. 2004) (holding that the finality of liquidation under 19 U.S.C. § 1514 does not "preclude judicial enforcement of court orders after liquidation"); see also in re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1364 ("One view of Shinyei would be that it confirmed the CIT's power to order money judgment in Section 1581 actions and to order reliquidation if necessary; however, subsequent cases suggest that the holding in Shinyei was a narrow one.").

The availability of refunds or reliquidation for PrimeSource's past imports if the Supreme Court grants certiorari and ultimately reverses the Federal Circuit's judgment is still very much an open question that the Government itself argued in this action in its motion for a partial stay to the maintain the status quo pending appeal at the Federal Circuit.  In its motion, the Government maintained that it would be irreparably harmed if this Court's judgment went into effect pending the Government's appeal at the Federal Circuit because "once {PrimeSource's} entries are liquidated, any claim as to the correct duties owed on PrimeSource's entries could become moot." Defs' Mot. for Partial Stay of J. to Maintain the Status Quo Pending Appeal at 9 (June 9, 2021), ECF No. 114.  The Government acknowledged that: "in three recent cases, the Government, relying on {Shinyei}, represented that reliquidation of otherwise final entries is available in appropriate circumstances in a case brought pursuant to 28 U.S.C. 1581(i)."  Id. at 10, n. 2.  But the Government stated that "{a}fter careful consideration, that is no longer the view of the Department of Justice."  Id.  In granting the Government's motion for a partial stay to maintain the status quo pending appeal, this Court found that the Government had otherwise demonstrated irreparable harm and, therefore, "{it} need not, and d{id} not, consider whether the finality of liquidation itself constitutes potential harm to the United States."  PrimeSource III, __ CIT at __, 535 F. Supp. 3d at 1334, n. 2.   The Court, however, did consider the availability of reliquidation in granting a preliminary injunction in a related case challenging the President's imposition of tariffs under Section 301 of the Trade Act of 1974.  See in re Section 301 Cases, __ CIT at__, 524 F. Supp. 3d at 1362.  In that case, the Court held that Plaintiffs demonstrated that they would be irreparably harmed if their entries liquidated because "there is sufficient uncertainty as to the availability of relief under {Shinyei}, to establish the likelihood that Plaintiffs will be unable to recover duties unlawfully paid should they be successful in their claim on the merits."  Id. (citing

Am. Signature, Inc. v. United States, 598 F.3d 816, 829 (Fed. Cir. 2010)); see also id. at 1364 (noting that the Federal Circuit "has explicitly and implicitly called the breath of {the Court's} statutory authority {to order the reliquidation of entries in a case brought under 28 U.S.C. 1581(i) jurisdiction} into question").[3]  This Court should find the holding of in re Section 301 Cases to be persuasive given the factual similarities with this appeal as both appeals fall under 28 U.S.C. § 1581 jurisdiction and concern the imposition of tariffs by the Executive branch.  Even if this Court disagrees with the reasoning of in re Section 301 Cases, the Government's current position indicates that there is uncertainty regarding the Court's inherent authority to order the reliquidation of entries and that the Government will likely proceed to liquidate PrimeSource's entries absent a stay.

If this Court does not partially stay the enforcement of its judgment pending appeal, PrimeSource's entries will likely liquidate before the Supreme Court decides PrimeSource's appeal.  If this Court does not stay the enforcement of its judgment regarding the current suspension of liquidation of PrimeSource's past imports, U.S. Customs and Border Protection ("CBP") must liquidate those entries within six months.  See 19 U.S.C. § 1504(d).  Otherwise, PrimeSource's entries will be deemed liquidated absent suspension for some other reason.  See id.  Whether by CBP action or inaction, PrimeSource's entries will liquidate absent a partial stay of the enforcement of this Court's judgment pending appeal.  PrimeSource filed its petition for certiorari before the Supreme Court on July 21, 2023.  Any other party will have 30 days to file a

---

[3] Chief Judge Barnett dissented stating that he "cannot find that there is likelihood of irreparable harm when my colleagues and I agree that any harm arising from liquidation would be reparable by the court by means of an order of reliquidation or a money judgment pursuant to 28 U.S.C. § 2643(a)(1)."  in re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1373 (C.J. Barnett, dissenting).

brief in opposition to PrimeSource's petition and this deadline is often extended.  See R. 15.1-15.3.

Factoring in the coming end to the current Supreme Court term, the Supreme Court will likely not

rule on PrimeSource's petition for certiorari until October 2023.  Barring a partial stay of the

enforcement of this Court's judgment, PrimeSource's entries will likely liquidate prior to the

Supreme Court even deciding whether to grant PrimeSource's petition for a writ of certiorari and

certainly prior to the Supreme Court deciding any appeal.  PrimeSource faces a "viable threat of

serious harm" if its entries liquidate thereby mooting any potential claim to the Supreme Court.

Zenith, 710 F.2d at 809 (citation and quotation omitted).  A partial stay of the enforcement of this

Court's judgment pending appeal will preserve the status quo while PrimeSource pursues its legal

rights.

PrimeSource will also suffer irreparable harm absent a partial stay of the enforcement of

this Court's judgment pending appeal because PrimeSource will suffer from significant "business

disruptions" associated with paying the applicable cash deposits of Section 232 duties with interest

on its past imports.  PrimeSource expects that the payment process will mirror the procedures that

CBP followed in Transpacific after the Court ordered that Plaintiffs "return to Defendants all

monies that were refunded to Plaintiffs by Defendants."  Order at 1, Transpacific Steel LLC v.

United States, 466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) (CIT No. 19-00009), ECF No. 94.  In a

status report before the Court, Plaintiffs explained that CBP had advised them of the "procedure

required to correct their entry summaries and repay the refunds."  Joint Status Report at 2,

Transpacific Steel LLC v. United States, 466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) (CIT No. 19-

00009), ECF No. 96.   Plaintiffs had to "reconcile" their own records with the list of entries

provided by CBP "for which repayment will be required."  Id.  As part of this process, CBP and

Plaintiffs had detailed e-mail exchanges, conference calls, and both parties worked with Plaintiffs'

broker to make sure that the process was understood.  See id.  In Transpacific, Plaintiffs owed the Government repayment on only a few months of entries compared to the years of entries subject to Section 232 tariffs under Proclamation 9980.  See Transpacific II, 4 F.4th at 1316 (explaining that the additional tariffs on imports of steel from Turkey "remained in place for just under nine months").  The burden on PrimeSource and CBP will likely be significantly larger than the Plaintiffs in Transpacific II as it is reasonable to assume that PrimeSource will have more entries for which it may owe duties consistent with the longer time-period when Section 232 duties were in place on steel derivative articles.  Counsel has been informed that PrimeSource estimates it has approximately eight thousand past imports affected by this litigation.

As it is likely that CBP will follow a repayment process similar to the steps that it employed in Transpacific II, PrimeSource will need to expend significant resources on the mechanics of paying the applicable cash deposits of Section 232 duties with interest on its many thousands of past imports.  PrimeSource expects that multiple consultations with CBP will be necessary to clarify the procedures for payment.  These consultations may be further complicated by the fact that some of PrimeSource's entries are currently suspended due to ongoing litigation in other matters.  Once PrimeSource and CBP clarify the procedures for payment, PrimeSource will then need to update its entry summaries as PrimeSource entered its past imports using a special code that exempted it from paying cash deposits of its estimated Section 232 duties.  Updating its entry summaries will require that PrimeSource work closely with its broker to ensure full compliance with the Government's payment process.  Further, PrimeSource will need to assign dedicated employees to carefully watch the ongoing payment process to ensure that PrimeSource properly pays the Government with interest.  In short, PrimeSource will face significant "business disruption{s}" without a stay of the enforcement of this Court's judgment pending appeal because

14

PrimeSource will need to dedicate its limited resources to ensuring proper payment to the Government. Such business disruptions may not even be necessary if the Supreme Court grants certiorari and then ultimately reverses the judgment of the Federal Circuit. In that instance, PrimeSource will have dedicated company resources to the payment process only to then be reimbursed by the Government. At this stage, any business disruption faced by PrimeSource, and any harm to the Government if it ultimately needs to expend resources to pay back PrimeSource, is easily avoidable by granting a partial stay of the enforcement of this Court's judgment pending appeal.

For these reasons, PrimeSource will be irreparably harmed absent a partial stay because it faces both a viable threat of serious harm that cannot be outdone by a court order and significant business disruptions that may ultimately be unnecessary if the Supreme Court grants certiorari and reverses the Federal Circuit's judgment.

### B. PrimeSource's Petition Is Likely to Succeed on the Merits

Court precedent illustrates that the threshold of "likelihood of success" is lower than would otherwise be indicated by the word the common usage of "likely." The Court of Appeals for the Federal Circuit has suggested that if the other three factors necessary to grant a stay weigh in favor of Plaintiffs, the existence of a substantial legal question is sufficient to meet the likelihood of success threshold to grant a motion for stay pending appeal. See E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987) ("In view of the substantial legal issues presented on appeal, the harm to Phillips, the harm to the public, and the comparative lack of harm to DuPont, the court will stay the injunction pending appeal"); see also in re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1362 (holding that "Plaintiffs' burden to demonstrate a likelihood of success on the merits is reduced {where it demonstrated irreparable harm}, and

Plaintiffs satisfy their reduced burden by raising sufficiently serious and substantial questions”);

Ugine-Savoie Imphy v. United States, 24 CIT 1246,  1251, 121 F. Supp. 2d 684, 689 (2000)

(“Where it is clear that the moving party will suffer substantially greater harm by the denial of the

preliminary injunction than the non-moving party would by its grant, it will ordinarily be sufficient

that the movant has raised ‘serious, substantial, difficult and doubtful’ questions that are the proper

subject of litigation.” (citation omitted)).   The Supreme Court, however, has held that a court

cannot rely on a substantial legal question alone to grant a preliminary injunction or stay pending

appeal without considering the likelihood of success on the merits.   See Munaf v. Geren, 553 U.S.

674, 690-91 (2008); see also Nat’l Ass’n of Mfrs. v. United States Dep’t of Treasury, 2020 Ct. Intl.

Trade LEXIS 68, *4 (May 15, 2020) (“Although a ‘substantial legal question,’ may be sufficient

to show a likelihood of success on the merits . . . the government must still make a strong showing

that a substantial legal question exists such that success on appeal is likely.” (internal citation

omitted)).   Court precedent, therefore, is contradictory whether the existence of a substantial

question is sufficient to grant a stay.

It is clear, however, that “the weakness of the showing regarding one factor may be

overborne by the strength of the others.”  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir.

1993); see also Fundicao Tupy S.A. v. United States, __ CIT __, __, 696 F. Supp. 1525, 1529

(1988) (holding that granting a stay pending appeal does not require the Court to “adhere to so

strict a standard as to require showing that plaintiffs’ position is likely to prevail on appeal”).

Indeed, “the more the balance of irreparable harm inclines in the plaintiff’s favor, the smaller the

likelihood of prevailing on the merits {plaintiffs} need show in order to get the injunction.”

Qingdao Taifa Grp. Co. v. United States, 581 F.3d 1375, 1378-79 (Fed. Cir. 2009) (quoting

Kowalski v. Chi. Trib. Co., 854 F.2d 168, 170 (7th Cir. 1988)).  Specifically, this Court has held

that Plaintiffs need only demonstrate "a fair chance on the merits" where "the factor of irreparable harm weighs sharply in favor of granting a preliminary injunction."  in re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1367.[4]

The questions presented in PrimeSource's petition for a writ of certiorari are as follows: First, whether separation-of-powers principles require courts to resolve ambiguity in the statutory limits on delegations of vast legislative power to the President in a way that constrains the delegation or, as the Federal Circuit held, courts must uphold the President's actions absent a "clear misconstruction of the governing statute."  PrimeSource IV, 59 F.4th at 1260 (quoting Maple Leaf Fish Co. v. United States, 762 F.2d 86, 89 (Fed. Cir. 1985)).  Second, under the proper standard of review, whether the Section 232 permitted the President to impose tariffs on steel derivatives without complying with the statute's procedural prerequisites.

Given the irreparable harm faced by PrimeSource without a partial stay of the enforcement of this Court's judgment pending appeal, PrimeSource easily meets the lower bar of demonstrating that its petition for certiorari is likely to succeed on the merits.  PrimeSource's petition for certiorari presents substantial questions concerning separation-of-powers principles that are central to the framework of our constitutional.  There is a "fair chance" that the Supreme Court will grant certiorari and reverse the Federal Circuit's judgment because the Federal Circuit ignored these bedrock separation-of-powers principles by resolving any ambiguities in Section 232 in favor of the President's view of the statute's limits on his own authority.  When the proper standard of review is applied, it is clear that the President acted unlawfully by imposing tariffs on steel

---

[4] Again, this Court should find the Court's holding and reasoning in in re Section 301 Cases to be persuasive because of the factual similarities between that case and this action.

derivative articles under Proclamation 9980 outside of the 105-day window for presidential action provided for in Section 232.

### i. PrimeSource's Petition for Certiorari Presents Substantial Questions for Review by the Supreme Court

A party raises a substantial question warranting a stay pending appeal when the question(s) are "serious, substantial, difficult{,} and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Comm. on the Judiciary v. McGahn, 407 F. Supp. 3d 35, 38 (D.C. Cir. 2019) (quoting Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)).  Taking into account the Supreme Court's recent interest in revisiting separation-of-powers principles, including the major questions doctrine, PrimeSource's petition for certiorari presents "serious, substantial difficult{,} and doubtful" questions for the Supreme Court to provide further guidance on the proper standard of review for resolving ambiguities in statutes delegating vast legislative power to the Executive Branch.

The Federal Circuit's holding in this case provides the President with near unbridled authority to regulate imports — a power reserved under the Constitution to Congress.  See U.S. Const. art. I, §8, cl. 1 & cl. 3.  The Supreme Court has developed a family of doctrines designed to protect separation-of-powers principles.  In the most extreme cases, a transfer of legislative power to the Executive may be so expansive and unguided that the courts are compelled to directly declare it an unconstitutional delegation.  See, e.g., A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495 (1935).  More recently, the Supreme Court has applied the "major questions" doctrine where "the history and the breadth of the authority that {the Executive} has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  West Virginia v. EPA, 142 S. Ctr. 2587, 2608 (2022)

(quotation and citation omitted).  In those "extraordinary cases," <u>id.</u> at 2609, the Executive's claim of power can prevail only if it can "point to 'clear congressional authorization.'"   <u>Id.</u> at 2614 (citation omitted).

Section 232 provides for very few limits on the President's authority to adjust imports because it provides for an expansive definition of a threat to national security and places no limits on the type of action that the President can take to adjust imports.   <u>See</u> 19 U.S.C. §§ 1862(c)(1)(A)(ii);1862(d).   Instead of substantive limitations, Section 232 places procedural limitations on the President's authority to act.  The President can only act following receipt of a report from the Secretary making an affirmative finding of threat.  <u>See id.</u> § 1862(b)(3)(A).  The President then has a 105-day window to decide on and implement a plan of action to adjust imports of an article and its derivatives.  <u>See id.</u> § 1862(c)(1)(A)-(B).

Strict enforcement of Section 232's procedural requirements is particularly important to maintaining constitutional order.  The inclusion of procedural requirements can prevent a statute from suffering separation-of-powers concerns by limiting the discretion granted to the Executive. <u>See</u> <u>Touby v. United States</u>, 500 U.S. 160, 166 (1991).  The procedural requirement that the Secretary must make an affirmative finding of threat pursuant to a report before the President can act was one of the main reasons that the Supreme Court previously concluded that Section 232 did not suffer from a delegation problem.   <u>See</u> <u>Fed. Energy Admin. v. Algonquin SNG, Inc.</u>, 426 U.S. 548, 559 (1976).  The Supreme Court in <u>Algonquin</u>, however, did not address the possibility of stale fact-finding when the President acted outside of the time limits in Section 232 or presidential action that was unrelated to that fact-finding when the President acted on entirely different set of products.  <u>See</u> 426 U.S. at 559-60.  <u>Algonquin</u> addressed Proclamation 4341, 40 Fed. Reg. 3,965 (Jan. 27, 1975), issued by President Ford, a proclamation enacted on the heels of a <u>new</u> Section

232 report by the Secretary.  See id.  Moreover, President Eisenhower's original Proclamation 3279, 49 Fed. Reg. 1,781 (Mar. 12, 1959), which was modified many times leading to Proclamation 4341, from the start covered both crude oil "and the principal crude oil derivatives and products."  Id.  The Supreme Court in Algonquin was not confronted with a situation where affirming the President's actions would conflict with the timing provisions in Section 232 or the underlying threat to national security originally identified in the Secretary's report.

Such a situation exists here.  In PrimeSource IV, the Federal Circuit applied a standard of review that resolved any ambiguity in Section 232 in favor of extending Congress' already expansive delegation of legislative trade powers to the President.  The Federal Circuit's holding that the President may ignore the procedural protections provided for in Section 232 if he announces a "continuing course of action with the statutory time period and then modify the initial implement steps in line with the announced plan of action," PrimeSource IV, 59 F.4th at 1261 (quoting Transpacific II, 4 F.4th at 1318-19), ignores the Supreme Court's premise in Algonquin – that the statute "establishes clear preconditions to the Presidential action," such as the prerequisite report from the Secretary's investigation.  426 U.S. at 559.  As now construed by the Federal Circuit in PrimeSource IV, the President may legislate tariffs against goods that were not the subject of any investigation or recommendation by the Secretary, i.e., steel derivative articles, years after the initial Section 232 steel report, through whatever deliberative process he chooses.  See 59 F.4th at 1261-62.  This interpretation of Section 232 cannot be reconciled with recent cases where the Supreme Court has applied the major questions doctrine to protect the Constitution's division of authority between the political branches.  See West Virginia, 142 S. Ct. at 2609; cf Biden v. Nebraska, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring) (invoking major questions doctrine where agency claimed "virtually unlimited power to rewrite the Education Act"); Ala.

20

<u>Assoc. of Realtors v. DHS</u>, 141 S. Ct. 2485, 2489 (2021) (calling Government's claim of authority "breathtaking" where only limit was that an agency "deem a measure 'necessary'" (citation omitted)).[5]  The Supreme Court need not overrule <u>Algonquin</u> to recognize that Section 232 raises separation-of-powers concerns under the major questions doctrine sufficient to require that courts find clear congressional authorization before construing the statute in ways that expand the scope of the President's delegated authority.

Recently, the Supreme Court has expressed a willingness to "reconsider the approach {it has} taken for the past 84 years" concerning its application of separation-of-powers principles in an appropriate case.  <u>Gundy v. United States</u>, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in the judgment); <u>see also</u> <u>id.</u> (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting) (calling the Supreme Court's modern non-delegation approach "an understanding of the Constitution at war with its text and history"); <u>Paul v. United States</u>, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari) ("Justice Gorsuch's thoughtful <u>Gundy</u> opinion raised important points that may warrant further consideration in future cases.").  The Supreme Court's grant of certiorari to revisit <u>Chevron v. NRDC</u>, 467 U.S. 837 (1984) is an additional indication that the high court is concerned with excessive judicial deference to the Executive Branch.  <u>See</u> <u>Loper Bright Enterprises v. Raimondo</u>, 45 F.4th 359 (D.C. Cir. 2022), <u>cert.</u> <u>granted</u> 91 U.S.L.W. 3277 (U.S. May 1, 2023) (No. 22-451) (granting certiorari to consider the appropriate

---

[5] PrimeSource's focus on recent developments in the major questions doctrine distinguishes its petition for certiorari from past petitions focused on mere delegation doctrine claims that have been rejected by the Supreme Court.  <u>See</u> Petition for Writ of Certiorari, USP Holdings, Inc. v. United States, No. 21-1726 (U.S. Dec. 20, 2022); Petition for Writ of Certiorari, Transpacific Steel LLC v. United States, No. 21-721 (U.S. Nov. 12, 2021); Petition for Writ of Certiorari, Am. Inst. for Int'l Steel, Inc. v. United States, No. 19-1727 (U.S. Mar. 25, 2020).

standard for deferring to an Executive agency's interpretation of its own statutory powers under the <u>Chevron</u> doctrine).

Not only does this case represent a substantial question as demonstrated by the fact that a total of six justices have stated their desire to revisit the Supreme Court's application of separation-of-powers principles, but there is a "fair chance" that the Supreme Court will grant certiorari. The Federal Circuit's latest interpretation of Section 232 provides the President with near unbridled authority over foreign Commerce making this case an ideal vehicle for the Supreme Court to clarify the proper rules for resolving ambiguities in statutes delegating expansive legislative power to the President. By presenting substantial questions in its petition for certiorari to the Supreme Court, combined with the other irreparable harm facing PrimeSource absent a partial stay of the enforcement of this Court's judgment pending appeal, PrimeSource meets the necessary threshold for this Court to grant this motion.

### ii.   There Is a "Fair Chance" that PrimeSource Will Succeed on the Merits at the Supreme Court

Beyond presenting substantial questions leading to a "fair chance" that the Supreme Court will grant PrimeSource's petition for certiorari, there is also a "fair chance" that the Supreme Court will reverse the Federal Circuit's judgment. In <u>PrimeSource II</u>, this Court properly determined that Proclamation 9980 was "invalid as contrary to law" because the President issued Proclamation 9980 outside of the 105-day window for Presidential action. 505 F. Supp.3d at 1357. Relying on its holding in <u>Transpacific II</u>, the Federal Circuit reversed the judgment of this Court and found that the President lawfully implemented a continuing plan of action in Proclamation 9980 that tied back to the original goal of imposing tariffs on steel products to achieve a threshold of 80 percent domestic capacity utilization. <u>See</u> <u>PrimeSource IV</u>, 59 F.4th at 1261-62. There is a "fair chance"

of reversal at the Supreme Court because the Federal Circuit mistakenly found the holding in Transpacific II to be controlling and abandoned the limitations on presidential power identified in Transpacific II that distinguished that case from this appeal.  See PrimeSource IV, 59 F.4th at 1262-63.  By applying the same deferential standard of review applied in Transpacific to also conclude that the President may ignore the timing provisions in Section 232, the Federal Circuit treaded upon the separation-of-powers principles central to our constitution.  When the proper standard of review is applied, it is clear that the procedural preconditions in Section 232 serve as mandatory limits on the President's authority to act to adjust imports.

The Federal Circuit incorrectly relied on the holding in Transpacific II that Section 232 permits the President to "announce{} a continuing course of action with the statutory time period" and then "modify{} the initial implementing steps in line with the announced plan of action." PrimeSource IV, 59 F.4th at 1261 (quoting Transpacific II, 4 F.4th at 1318-19).   Transpacific II was not controlling because the facts in that case are distinguishable from this appeal.  The President justified imposing additional tariffs on steel derivative articles because the current duties on steel articles had not resulted in meeting the goal identified in Proclamation 9705 of adjusting imports of steel to reach an 80 percent domestic capacity utilization threshold.  See Proclamation 9980, 85 Fed. Reg. at 5,281.  In holding that Proclamation 9980 represented a modification of the announced plan of action in Proclamation 9705, the Federal Circuit confused the identified goal of reaching an 80 percent domestical capacity utilization with the President's identified plan of action to conduct further negotiations with other countries to reach this goal.  See PrimeSource IV, 59 F.4th at 1261-62.  In Proclamation 9705, as part of his plan of action, the President also tasked the Secretary with "monitor{ing} imports of steel articles."  Proclamation 9705, 83 Fed. Reg. at 11,628 (emphasis added).  The President did not adjust the tariff imposed by Proclamation 9705

on primary steel articles, but instead imposed tariffs in Proclamation 9980 on derivative steel articles.  See Proclamation 9980, 85 Fed. Reg. at 5,283.  There is no reasonable reading of the record that Proclamation 9980 represents a continuing course of action because the President's imposition of tariffs on steel derivative articles was unrelated to ongoing negotiations or the threat to national security posed by articles of steel as identified in Proclamation 9705.

The holding in Transpacific II was also not controlling on this appeal because the President's imposition of tariffs on steel derivative articles under Proclamation 9980 falls under the staleness and "other reasons" exceptions identified by the Federal Circuit in Transpacific II where Presidential action outside of the 105-day window may be unlawful.  See 4 F.4th at 1323. The record contains no evidence to support the President's statement that he acted in Proclamation 9980 based on the Secretary informing him that imports of steel derivative articles had increased, and that domestic capacity had not stabilized at the 80 percent domestic capacity utilization threshold.  See Proclamation 9980, 85 Fed. Reg. at 5,281-5,283; see also PrimeSource II, 505 F. Supp. at 1355 (stating that the Government's position was the "procedural preconditions" were met by the Steel Report).  That Proclamation 9980 pursued the same 80 percent domestic capacity utilization goal listed in Proclamation 9705 begs the question whether that goal, grounded on fact-finding from the 2018 Steel Report where capacity utilization was based on 2017 demand levels, was still fresh two years later in January 2020.  See Steel Report at 8-9 (demonstrating that the Steel Report relied on data from 2017).  The President's reliance on outdated information from the Steel Report untethered his action from the Secretary's underlying threat finding.   In terms of "other reasons," Proclamation 9980 was also untethered from the Secretary's finding because the President departed from the key findings in the Steel Report by applying duties for the first time against an entirely different set of products not previously subject to the original Section 232

24

investigation.  See Proclamation 9980, 85 Fed. Reg. at 5,282.  There is a "fair chance" of reversal because the Federal Circuit unlawfully abandoned the limitations in Transpacific II that are applicable to this appeal where the President cannot take action to adjust imports outside of the 105-day window mandated in Section 232.

Not only is Transpacific II not controlling, but more broadly, the deferential standard of review applied by the Federal Circuit in Transpacific II and this appeal provides the President with almost unbridled authority over a tariff power that is reserved to Congress by the Constitution.  Instead of resolving any ambiguity in Section 232 in favor of limiting the already expansive authority delegated to the President, the Federal Circuit instead relied on the holding in Transpacific II and deferred to the President's interpretation of his own authority.  See PrimeSource IV, 59 F.4th at 1261-62.  Such a standard of review conflicts with the Supreme Court's recent application of the major questions doctrine that is designed to protect the separation-of-powers principles that are central to our constitution.  See West Virginia, 142 S. Ct. at 2609.  As Section 232 represents a vast delegation of Congress' legislative powers to the President, the President's claimed authority to legislate tariffs on steel derivative articles in this case should not have been accepted absent "clear congressional authorization."  Id.

Section 232 lacks such "clear congressional authorization."  The plain language and legislative history of Section 232, as this Court correctly held, mandate that the President may not act outside of the 105-day window provided for in Section 232.  See PrimeSource I, __ CIT at __, 497 F. Supp. 3d at 1347-57.  Concerning the plain language of the statute, Section 232 specifically contemplates the possibility that the President might decide later that some "other actions" or "additional actions" are needed to achieve his objectives if he negotiates an agreement that limits or restricts imports or exports with another country.  19 U.S.C. § 1862(c)(3)(A)(ii).  As this Court

concluded, by expressly providing for one circumstance in which the President was not required to repeat the investigation before imposing an alternative action, Congress made clear no other exception was contemplated.  See PrimeSource I, __ CIT at __, 497 F. Supp. 3d at 1351-53. Concerning the legislative history of Section 232, the Federal Circuit brushed aside the 1988 amendments, which were added after Algonquin, that removed the President's continuing authority to act outside of mandatory time constraints.  See PrimeSource IV, 59 F.4th at 1263.  The Federal Circuit's reliance in PrimeSource IV on its prior holding in Transpacific II, where it construed the 1988 amendments as effecting "a withdrawal of previously existing presidential power" absent "a clear indication from Congress," 4 F.4th at 1329, is incompatible with the proper standard for interpreting a statute delegating vast legislative powers to the Executive.  This Court once again correctly held "the 1988 amendments unambiguously placed time limits on the President's authority to adjust imports of derivatives as well as the imports of the investigated article." PrimeSource I, __ CIT at __, 497 F. Supp. 3d at 1354.  Both the plain language and legislative history of Section 232 mandate that the President cannot adjust imports outside of the 105-day window.

For these reasons, there a "fair chance" of reversal by the Supreme Court because the Federal Circuit incorrectly determined that the Court's holding in Transpacific II was controlling on this appeal and there was no clear indication that Congress intended to provide the President with continuing authority to act outside of the 105-day window.  The Federal Circuit wrongly reversed this Court's holding that the President acted unlawfully when he imposed tariffs on steel derivative articles under Proclamation 9980 outside of the mandatory time constraints present in Section 232.

**C. A Partial Stay of the Enforcement of this Court's Judgment Pending Appeal Will Not Substantially Injure the Government**

PrimeSource's motion for partial stay of the enforcement of this Court's judgment pending appeal is narrowly crafted such that it will not substantially injure the Government. Cf <u>in re Section 301 Cases</u>, __ CIT at __, 524 F. Supp. 3d at 1370 (finding that the balance of the equities "tips in Plaintiffs' favor" when they "seek narrow relief"). Specifically, PrimeSource seeks a continuation of the suspension on liquidation of its entries as well as a stay on payment of duties owed by PrimeSource for its past imports that are already fully secured by PrimeSource's existing continuous and supersedes bonds as discussed below. PrimeSource, however, agrees to pay cash deposits of the estimated Section 232 duties on its entries going forward from the date of this Court's July 13th Order. PrimeSource's requested relief simply preserves the status quo pending appeal with respect to its past imports and at most delays the potential payment by PrimeSource to the Government of any fully secured duties that PrimeSource may ultimately owe on its past imports.

In granting PrimeSource's motion for a preliminary injunction, this Court ordered that PrimeSource "terminate its existing continuous bond and replace it with a continuous bond with a total limit of liability . . . to reflect the additional Section 232 duties PrimeSource anticipates it would otherwise have had to deposit over the next prospective six month period." Order at 2 (Feb. 13, 2020), ECF No. 40 (Nonconfidential Version). Pursuant to this order, PrimeSource has put in place a new bond on numerous occasions to fully secure the Government's interest. <u>See, e.g.</u>, Joint Status Report at 2 (Aug. 12, 2020), ECF No. 95 (Nonconfidential Version). Although the injunction terminated after this Court's initial judgment in favor of PrimeSource in <u>PrimeSource II</u>, this Court subsequently granted the Government's motion for partial stay of judgment to

27

maintain the status quo pending appeal before the Federal Circuit.  See PrimeSource III, __ CIT at __, 535 F. Supp. 3d at 1330.  In enjoining the Government from liquidating entries affected by this litigation, this Court required that PrimeSource and the Government reach an agreement on a monitoring system to secure the Government's interest in any future duty payments that PrimeSource may owe.  See id.  PrimeSource and the Government came to an agreement whereby PrimeSource would put in place a new continuous bond to "secure the total amount of foregone duty deposits plus lawful interest entries of its merchandise within the scope of Proclamation 9980 that have occurred, and will occur, on and after {the Court granted the motion for partial stay}" and a "supersedeas bond" to cover entries between the termination of the preliminary injunction and subsequent order granting the motion for partial stay.  Joint Notice Regarding Court's Order Concerning Monitoring and Continuous Bonding at 2 (Oct. 25, 2021), ECF No. 128.  The Government's interest in any duties owed by PrimeSource on past imports is fully secured by PrimeSource's continuous bond and supersedes bond.  See id.[6]

Granting this motion, therefore, will not harm the Government because the Government's interest in any revenue that it may be owed by PrimeSource is fully secured by PrimeSource's bonds and the cash deposits that PrimeSource will tender on its future entries.

---

[6] USCIT Rule 62(d) requires that this Court can only grant a stay "on terms for bond or other terms that secure the opposing party's rights."  This requirement has already been met for PrimeSource's past imports and is not necessary for any future entries as PrimeSource agrees to pay cash deposits of Section 232 duties on its entries going forward from the date of this Court's Order.

### D. The Public Interest Favors a Partial Stay of the Enforcement of this Court's Judgment Pending Appeal

The public interest favors a partial stay of the enforcement of this Court's judgment pending appeal to ensure the Government's proper compliance with the law and to preserve PrimeSource's right to appeal.

Public interest favors that "governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." Am. Signature, 598 F.3d at 830; see also Nat'l Ass'n of Mfrs., 2020 Ct. Intl. Trade LEXIS 68, at *9 (finding that public interest is "also served by the timely execution and adherence to our laws."). The Government's concerns for the revenue in this matter flow directly from the authority to impose import duties delegated by Congress to the President – authority that Congress cabined with explicit time requirements that the Government here violated. Any interest that the Government may assert in protecting its revenue in this context is secondary to the interest of the public in ensuring the lawful operation of the separation-of-powers principles that are central to our Constitution. The Government's interest in any revenue from PrimeSource is fully protected, as detailed above, and granting a partial stay of the enforcement of this Court's judgment pending appeal will at most delay the Government's receipt of any potential revenue from PrimeSource.

Further, "{s}hort-circuiting judicial review violates the public interest." In re Section 301 Cases, __ CIT at __, 524 F. Supp. 3d at 1372 (citing Neo Solar Power Corp. v. United States, __ CIT __, __, slip op. 2016-58, at 5-6 (June 9, 2016)); see also Sunpreme, 2017 Ct. Intl. Trade LEXIS 1 at *15 (holding that "the preservation of a right to appellate review unquestionably is in the public interest"). Absent a partial stay of the enforcement of this Court's judgment pending appeal, the liquidation of PrimeSource's entries may moot its potential appeal to the Supreme Court. The

29

public interest is best served by allowing PrimeSource's appeal to proceed before the Supreme Court if it grants certiorari.

For these reasons, the public interest favors granting PrimeSource's motion for a partial stay of the enforcement of this Court's judgment pending appeal.

## CONCLUSION

For the forgoing reasons, PrimeSource respectfully requests that this Court grant this motion for a partial stay of the enforcement of this Court's judgment pending the final disposition of PrimeSource's petition for writ of certiorari at the Supreme Court.

Respectfully submitted,

July 21, 2023                                    /s/ Jeffrey S. Grimson

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
jsg@mowrygrimson.com
202-688-3610 (ph)

*Counsel for PrimeSource Building Products, Inc.*

30

# ATTACHMENT 1

No. 23-___

IN THE

# Supreme Court of the United States

PRIMESOURCE BUILDING PRODUCTS, INC.,

*Petitioner*,

v.

UNITED STATES, ET AL.,

*Respondents*.

On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Federal Circuit

**PETITION FOR A WRIT OF CERTIORARI**

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON,
  PLLC
5335 Wisconsin Ave.,
  NW
Suite 810
Washington, DC 20015

Kevin K. Russell
  *Counsel of Record*
GOLDSTEIN, RUSSELL &
  WOOFTER LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
kr@goldsteinrussell.com

i

## QUESTIONS PRESENTED

The Trade Expansion Act of 1968 delegates Congress's constitutional power to set import duties and regulate foreign trade to the President whenever the President declares that imports "threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii), (d). The only real constraints on the delegation are procedural: the President can only act in response to a public investigation and report by the Secretary of Commerce, and he must "determine the nature and duration of the action" he will take "[w]ithin 90 days after receiving [that] report." *Id*. § 1862(b), (c)(1)(A), (c)(2), (d). In 2018, President Trump invoked the Act to impose tariffs on imports of "steel mill products" (such as steel plate and pipe). Two years later, he imposed tariffs on certain products made from steel (*e.g.*, nails) without undertaking any of the Act's required procedures. Applying a deferential standard of review, the Federal Circuit found the action lawful. The questions presented are:

1. Whether separation of powers principles require courts to resolve ambiguity in statutory limits on delegations of vast legislative power to the Executive in a way that constrains the delegation or, as the Federal Circuit holds, courts must uphold the President's actions absent "a clear misconstruction of the governing statute."

2. Whether, under the proper standard of review, the Trade Expansion Act of 1968 permitted the President to impose tariffs on steel derivatives without complying with the statute's procedural prerequisites.

ii

## PARTIES TO THE PROCEEDING

Petitioner PrimeSource Building Products, Inc., was the plaintiff in the Court of International Trade and appellee in the court of appeals.

Respondents the United States, Joseph R. Biden, Jr., President of the United States, Gina M. Raimondo, Secretary of Commerce, Christopher Magnus, Commissioner of U.S. Customs and Border Protection, and United States Customs and Border Protection, Department of Commerce, were defendants in the Court of International Trade and appellants in the court of appeals.

Respondents Oman Fasteners, LLC, Huttig Building Products, Inc., and Huttig, Inc., were plaintiffs in the Court of International Trade and appellees in the court of appeals.

## CORPORATE DISCLOSURE STATEMENT

Petitioner is owned by PriSo Acquisition Corporation and no other publicly held company owns 10 percent or more of stock in petitioner.

## RELATED PROCEEDINGS

Petitioners' appeal in the Federal Circuit was consolidated with *Oman Fasteners, LLC, et al v. United States, et. al*, No. 21-2252 (Fed. Cir.).

iii

**TABLE OF CONTENTS**

QUESTIONS PRESENTED........................................ i

PARTIES TO THE PROCEEDING ........................... ii

CORPORATE DISCLOSURE STATEMENT............ ii

RELATED PROCEEDINGS ...................................... ii

TABLE OF AUTHORITIES........................................v

PETITION FOR A WRIT OF CERTIORARI..............1

OPINIONS BELOW ....................................................1

JURISDICTION ..........................................................1

RELEVANT CONSTITUTIONAL AND STATUTORY
PROVISIONS ..............................................................1

INTRODUCTION.......................................................2

STATEMENT OF THE CASE ....................................4

I.   Legal Background................................................4

II.  Factual Background ............................................7

   A. President Trump's Initial Steel Tariffs .........7

   B. The President's Ad-Hoc Alteration Of Tariff
      Levels Outside The Statutory Process ........11

   C. The President's Imposition Of Tariffs On
      Steel Derivatives ...........................................14

III. Procedural History ...........................................16

REASONS FOR GRANTING THE PETITION........18

iv

I.   The Court Should Grant Certiorari To Make Clear That Courts Must Resolve Ambiguity In Statutes Delegating Vast Legislative Power To The Executive In Favor Of Restraining The Delegation. ........................................................20

II.  The Federal Circuit Could Not Have Upheld The President's Actions Applying Appropriate Separation Of Powers Principles. ....................25

III. This Case Presents An Ideal Vehicle For Resolving Questions Of Great Doctrinal And Practical Significance. .......................................30

IV.  At The Very Least, This Petition Should Be Held For *Loper*. ..................................................34

CONCLUSION ........................................................35

APPENDIX

Appendix A, Court of Appeals Decision
    (Feb 7, 2023) ..................................................... 1a

Appendix B, Court of International Trade Decision
    (April 5, 2021).................................................. 19a

Appendix C, Court of International Trade Decision
    (January 27, 2021)........................................... 32a

Appendix D, Order Denying Rehearing En Banc
    (June 22, 2023) .............................................. 151a

Appendix E, Statutory Appendix ......................... 154a

v

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935) .................................... 21

*Ala. Assoc. of Realtors v. DHS*, 141 S. Ct. 2485 (2021) ............................................ 22

*Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982 (Fed. Cir.), *cert. denied* 141 S. Ct. 133 (2020) ......................................... 7, 11

*Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d. 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020) AIIS ................................................. 10, 11, 23

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ....................................... 4, 22

*Chevron v. NRDC*, 467 U.S. 837 (1984) ............................................... 34

*Federal Energy Administration. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976) ........... 10, 11, 19, 21, 23, 24, 29

*Gonzalez v. Oregon*, 546 U.S. 243 (2006) .............................................. 22

*Gundy v. United States*, 139 S. Ct. 2116 (2019) .......................... 22, 23, 25, 33

*Loper Bright Enterprises v. Raimondo*, No. 22-451 .............................................................. 34

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ................. 3, 16, 20, 31

vi

*Paul v. United States*,
    140 S. Ct. 342 (2019).........................................3, 23

*Touby v. United States*,
    500 U.S. 160 (1991)................................................24

*Transpacific Steel LLC v. United States*,
    466 F. Supp. 3d 1246 (CIT 2020)...........................13

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (2021), *cert. denied*, 142 S. Ct.
    1414 (2022)...................12, 13, 16, 17, 19, 28, 29, 30

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)................................................28

*US Airways, Inc. v. McCutchen*,
    569 U.S. 88 (2013).................................................31

*Util. Air Regul. Grp v. EPA*,
    573 U.S. 302 (2014)..............................................22

*Wayman v. Southard*,
    23 U.S. 1 (1825)....................................................22

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)................................21, 24, 30

## Constitution and Statutes

U.S. Const. art. 1, § 1 ..................................................1

U.S. Const. art. 1, § 8 ................................1, 2, 13, 18

19 U.S.C. § 1862 ........................................................1

19 U.S.C. § 1862(b)(2)................................................5

19 U.S.C. § 1862(b)(2)(A).....................................12, 14

19 U.S.C. § 1862(b)(3)(A)...........................................5

19 U.S.C. § 1862(c)(1)................................................5

19 U.S.C. § 1862(c)(1)(A) ....................2, 4, 5, 6, 19, 25

vii

19 U.S.C. § 1862(c)(1)(A)(ii)................... 2, 9, 18, 22, 27

19 U.S.C. § 1862(c)(1)(B) ............................................. 25

19 U.S.C. § 1862(c)(1)(B)(2) ....................................... 25

19 U.S.C. § 1862(c)(2) ................................................. 25

19 U.S.C. § 1862(c)(3)(A) ...................................... 27, 28

19 U.S.C. § 1862(d) ............................................. 4, 5, 18

19 U.S.C. § 1865(c)(1)(B) ............................................. 6

19 U.S.C. § 1865(c)(2) ................................................. 6

19 U.S.C. § 1865(c)(3)(A) ........................................ 6, 7

28 U.S.C. § 1254(1) ...................................................... 1

28 U.S.C. § 1295(a)(5) ................................................ 20

28 U.S.C. § 1581(i) ..................................................... 20

Pub. L. No. 87-794, 76 Stat. 872 ................................. 2

## Regulations

Notice Request for Public Comments and
    Public Hearing on Section 232 National
    Security Investigation of Imports of Steel,
    82 Fed. Reg. 19,205 (Dep't Com. Apr. 26,
    2017) ................................................................. 7, 8, 9

Proclamation No. 9705, 83 Fed. Reg. 11,625
    (Mar. 15, 2018) ................................................. 10, 17

Proclamation 9772, 83 Fed. Reg. 40,429
    (2018) ..................................................................... 12

Proclamation 9980, 85 Fed. Reg. 5281
    (2020) ..................................................... 9, 12, 14, 15

viii

U.S. Dep't Commerce, Bureau of Indus. &
    Sec., The Effects of Imports of Steel on the
    National Security, 85 Fed. Reg. 40,202
    (2018)...................................................................... 8, 9

## Other Authorities

Donald J. Trump (@realDonaldTrump),
    TWITTER (Aug. 10, 2018, 5:47 A.M.),
    http://twitter.com/realdonaldtrump/status/
    1027899286586109955 .......................................... 12

Megan Hogan & Yilin Wang, To fight
    inflation, cutting tariffs on China is only
    the start, Peterson Institute for
    International Economics (June 3, 2022),
    https://www.piie.com/ blogs/realtime-
    economic-issues-watch/fight-inflation-
    cutting-tariffs-china-only-start ............................. 33

Https://taxfoundation.org/tariffs-trump-trade-
    war/#:~:text=
    Tariffs%20on%20steel%20.................................... 32

Https://www.washingtonpost.com/business/20
    19/05/07/ trumps-steel-tariffs-cost-us-
    consumers-every-job-created-experts-say/ ............ 33

Dan Pearson, Ending tariffs would curb
    inflation — but why ignore the main
    benefits?, The Hill (July 18, 2022),
    https://thehill.com/opinion/international/35
    63911-ending-tariffs-would-curb-inflation-
    but-why-ignore-the-main-benefits/ ....................... 32

ix

Public Comments,
   https://www.bis.doc.gov/index.php/documen
   ts/section-232-investigations/1726-merged-
   public-comments/file ................................................. 9

Kadee Russ & Lydia Cox, *Steel Tariffs and
   U.S. Jobs Revisited*,
   https://econofact.org/steel-tariffs-and-u-s-
   jobs-revisited (Feb. 6, 2020).................................... 32

Cass R. Sunstein, *Nondelegation Canons*, 67
   U. Chi. L. Rev. 315 (2000) .............................. 20, 21

U.S. BIO 7, *Yang v. United States*, No. 02-136 ........ 34

United States Trade Commission, Economic
   Impact of Section 232 and 301 Tariffs on
   U.S. Industries (March 2023).................... 15, 16, 32

1

## PETITION FOR A WRIT OF CERTIORARI

Petitioner PrimeSource Building Products, Inc. respectfully petitions this Court for a writ of certiorari to review the judgment of the U.S. Court of Appeals for the Federal Circuit.

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a–18a) is reported at 59 F.4th 1255. The Court of International Trade's decisions (Pet. App. 19a–31a, 32a-150a) are reported at 505 F. Supp. 3d 1352 and 520 F. Supp. 3d 1332.

## JURISDICTION

The Federal Circuit issued its decision on February 7, 2023. Pet. App. 1a. The court denied a timely petition for rehearing en banc on June 22, 2023. Pet. App. 152a. This Court has jurisdiction under 28 U.S.C. § 1254(1).

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

Article I, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Article I, Section 8 of the Constitution provides in relevant part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations . . . ."

The relevant portions of 19 U.S.C. § 1862 are reproduced in Appendix E to this petition (Pet. App. 154a-161a).

2

## INTRODUCTION

The Constitution assigns Congress the power and responsibility to regulate trade with foreign nations and to set "Duties, Imposes and Excises" on foreign imports. U.S. Const. art. 1, § 8. The Trade Expansion Act of 1962 delegated a substantial portion of that power to the President to exercise largely as he sees fit in the name of protecting national security and economic welfare. *See* Pub. L. No. 87-794, 76 Stat. 872. In particular, the statute authorizes the President to take such "action that, in the judgment of the President, must be taken to adjust the imports" when he determines that those imports "threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(ii). The constraints on the President's delegated authority are procedural—the President can act only after receiving a report from the Secretary of Commerce finding a threat to national security and must "determine the nature and duration of the action" he will take to restrict imports "[w]ithin 90 days after receiving" that report. *Id*. § 1862(c)(1)(A).

In this case, the President followed that process before imposing tariffs on imports of "steel mill products," that is, raw steel as opposed to products *made from* raw steel, *i.e.*, steel derivatives such as nails or car parts. Two years later, without undertaking any of the statutory procedures, the President imposed tariffs on an assortment of steel derivatives as well. The Federal Circuit ultimately sustained the new tariffs, applying circuit precedent that required the court to uphold the President's exercise of his immense delegated authority unless "there has been a clear misconstruction of the statute."

3

Pet. App. 11a (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)).

This case presents the question whether that method of judicial review is consistent with bedrock separation of powers principles. Recognizing the risk to our constitutional order posed by congressional delegations of expansive legislative powers to the Executive, this Court has established interpretative principles, such as the major questions doctrine, designed to ensure that at the very least, extreme delegations of power are clearly intended by Congress. There can be no question that the President's exercise of delegated authority in this case warrants that kind of special separation of powers scrutiny — the statute delegates unprecedented power to the Executive, with virtually no guidance on how to use it. One might think that courts would strictly construe the statutory conditions on such extraordinary delegations lest the judiciary permit an even greater injury to separation of powers than Congress intended. But the Federal Circuit applies the opposite rule, deferring to the Executive's view of the statutory limits on its own authority unless it is clearly wrong.

This petition provides the Court an opportunity to take the next step in its major-questions and related separation of powers jurisprudence. The Court should use it to make unmistakably clear that when confronted by a statute delegating vast legislative power to the Executive, courts must resolve ambiguity in favor constraining the delegation, unless Congress clearly provided otherwise. *Cf. Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of cert.) (noting the need for further

4

consideration of constitutional and "statutory interpretation doctrine" to limit on congressional delegation of "major national policy decisions" to the Executive); *cf. also Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring) (noting the "ongoing debate about [the] source and status" of the major questions doctrine); *id*. at 2378 (noting lack of clarity in Court's decisions).

## STATEMENT OF THE CASE

### I.   **Legal Background**

Section 232 of the Trade Expansion Act provides that if the President determines that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," he shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A). The phrase "national security" is broadly defined to include not only "national defense requirements" but also the "economic welfare of the Nation." *Id*. § 1862(d). In considering the nation's economic welfare, the President is directed to take into account a variety of factors that tend to expand what counts as an import threatening national security: "the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic

5

products by excessive imports." *Ibid*. The President's national security determination is not subject to judicial review. *See* Pet. App. 16a-17a.

Section 232 includes little guidance on what the President should do in response to the threat posed by imports. Instead, Congress enacted important procedural constraints on the delegation. Section 232 permits the President to take action only after the Secretary of Commerce conducts an investigation and submits a formal report on the imports' effects on national security. 19 U.S.C. § 1862(c)(1). In conducting the investigation, the Secretary must consult with the Secretary of Defense and "appropriate officers of the United States." *Id*. § 1862(b)(2). If "appropriate," the Secretary must "hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation." *Ibid*.

The Act contemplates the investigation will be a serious undertaking, giving the Secretary 270 days to complete it. *Id*. § 1862(b)(3)(A). By that deadline, the Secretary must publish a report in the Federal Register describing his findings "with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, the recommendations of the Secretary for action or inaction." *Ibid*.

The President's authority to exercise his delegated powers is contingent on the Secretary conducting this investigation and finding a national security threat. *Id*. § 1862(c)(1)(A). The statute

6

further limits the time in which the President may exercise those powers, providing that "[w]ithin 90 days after receiving [the] report" finding a security threat, "the President shall —"

> (i) determine whether the President concurs with the finding of the Secretary, and

> (ii) if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.

*Ibid*. The statute then requires that if the President determines to take action, he "shall implement that action" within 15 days of his determination. *Id*. § 1865(c)(1)(B). And within 30 days of the determination, he "shall submit to the Congress a written statement of the reasons why the President has decided to take action, or refused to take action." *Id*. § 1865(c)(2).

Section 232 then identifies a single circumstance in which the President can take a *different* action than the one he chose within the 90-day deadline without a new investigation from Commerce. Paragraph 3 of subsection (c) provides that if the "action taken by the President . . . is the negotiation of an agreement" to limit imports, and either "no such agreement is entered into" within 180 days or an agreement is reached but "is not being carried out or is ineffective," then the President "shall take such *other* actions as the President deems necessary." *Id*. § 1865(c)(3)(A) (emphasis added). If that happens, then the

7

"President shall publish in the Federal Register notice of any *additional* actions being taken under this section by reason of this subparagraph."   *Ibid*. (emphasis added).

Beyond this provision, nothing in the Act authorizes the President to take any actions other than the ones decided upon within the 90-day period and reported to Congress.   However, if other or additional action seems appropriate, nothing in the statute prevents the President from requesting the Secretary to conduct a renewed, expedited investigation that would authorize the President to determine whether the risk to national security still exists and what actions would be appropriate in light of the updated data and advice from the Secretary of Defense.

## II.  Factual Background

### A.  President Trump's Initial Steel Tariffs

1.   In the Spring of 2017, the Secretary of Commerce opened an investigation into steel imports.[1] In its response to the investigation, the Department of Defense informed the Secretary that "U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production."[2] Therefore, the Department of Defense did not believe that the levels of foreign steel and aluminum imports

---

[1] *See* Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205 (Dep't Com. Apr. 26, 2017).

[2] *Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x. 982, 985-86 (Fed. Cir. 2020) (quoting letter).

8

documented by the Secretary "impact the ability of DoD programs to acquire steel or aluminum necessary to meet national defense requirements." *Ibid*. The Secretary of Defense further stressed his "concern[] about the negative impact" of the measures being contemplated "on our key allies." *Ibid*.

On January 11, 2018, the Secretary issued a report finding that imports of "steel mill products," such as flat steel, steel pipe, and steel slabs threatened national security. *See* U.S. Dep't Commerce, Bureau of Indus. & Sec., The Effects of Imports of Steel on the National Security, 85 Fed. Reg. 40,202, 40,203-40,204, 40,209, 40,224 (2018). The Report explained that regardless of any impact those imports may have on military readiness, they "have adversely impacted the steel industry" and thereby "are weakening our internal economy." *Id*. at 40,204. The Secretary then recommended that the President impose measures sufficient to "reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity." *Ibid*.

Throughout the report the Secretary examined only the effect of imports of "steel mill products," not the effect of imports of derivative products made from steel, such as nails, wire, or auto parts. *See id.* at 40,203. Thus, the initial request for public comments did not mention derivatives or request any information about the quantity of derivative imports

9

or their effect on domestic steel production.[3] Virtually none of the more than 1,500 pages of public comments addressed the question either.[4] The Report itself conducted no analysis, and made no findings, regarding the effects of derivatives on the domestic steel industry. *See* 85 Fed. Reg. at 40,203-40,226. And although the statute expressly authorizes the President to take action to "adjust the imports of the article *and its derivatives*," the Secretary did not propose any actions to reduce imports of steel derivatives. *See* 19 U.S.C. § 1862(c)(1)(A)(ii) (emphasis added); 85 Fed. Reg. at 40,226. Unsurprisingly, then, when the President issued Proclamation 9705 accepting the report's findings on March 8, 2018, he imposed tariffs only on imports of steel mill products and did not exercise his authority to also limit imports of steel derivatives. *See*

---

[3] *See* Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg at 19,205-07.

[4] The public comments are collected online at https://www.bis.doc.gov/index.php/documents/section-232-investigations/1726-merged-public-comments/file. A handful of comments advocated for duties on specific derivative products – flanges, transmission and windmill towers, and circular steel sawblades with diamond tips – without providing any analysis. *See* Public Comments at 300, 397, 1359, 1594 (cites to pagination in pdf file). None of those products was included in the eventual order imposing tariffs on some steel derivatives. *See* Proclamation 9980, Annex II.

10

Proclamation No. 9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018).

The tariffs the President did impose were substantial—25% on all imported steel mill articles from every country except Canada and Mexico, for which he proposed to continue ongoing trade negotiations. *See id*. at 11,626. As required by the statute, the President's proclamation was published in the Federal Register and delivered to Congress. *See ibid*.

2. Certain steel importers challenged the tariffs in the Court of International Trade (CIT), arguing that the Trade Expansion Act effected an unconstitutional delegation of power to the President. *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d. 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020) (*AIIS*). The CIT rejected the facial challenge, finding itself bound by this Court's 1976 decision in *Federal Energy Administration. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976). In that case, this Court concluded that a prior version of the Act provided an adequate "intelligible principle to which the President is directed to conform," pointing to, among other things, the statutory "preconditions to Presidential action." *See* 426 U.S. at 559.

The CIT expressed some discomfort with that result, noting that the statute "seem[s] to invite the President to regulate commerce by way of means reserved for Congress, leaving very few tools beyond his reach." *AIIS*, at 1344. Judge Katzmann wrote separately to voice his "grave doubts" about the constitutionality of the Act in its present form and

11

under this Court's modern precedents. *Id*. at 1347. He noted that although this Court has sometimes upheld statutes conferring significant trade authority on the President, those statutes all "provided ascertainable standards to guide the President." *Id*. at 1351-52. "What we have come to learn is that section 232, however, provides virtually unbridled discretion to the President with respect to the power over trade that is reserved by the Constitution to Congress." *Id*. at 1352. He urged this Court to "revisit [the] assumptions" underpinning *Algonquin*. *Ibid*. "If the delegation permitted by section 232, as now revealed, does not constitute excessive delegation in violation of the Constitution," he asked, "what would?" *Ibid*.

The Federal Circuit affirmed, agreeing that *Algonquin* precluded the plaintiffs' facial challenge. *See AIIS*, 806 F. App'x 982, 989 (Fed. Cir.), *cert. denied* 141 S. Ct. 133 (2020). The court acknowledged, however, that "[f]ive members of the Court have recently expressed interest in at least exploring a reconsideration of" the "intelligible principle" standard. *Id*. at 990.

## B. The President's Ad-Hoc Alteration Of Tariff Levels Outside The Statutory Process

Although the statute required the President to identify the "nature and duration of the action" he would take in a written determination issued within 90-days of receiving the Secretary's report, President Trump repeatedly and dramatically changed his response to steel imports long after the statutory 90-day period expired.

12

1.    Throughout 2018 and 2019, the President issued a series of proclamations, altering or eliminating the tariffs for particular countries and products already subject to the actions.  *See Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1314-15 (2021), *cert. denied*, 142 S. Ct. 1414 (2022).

For example, on August 10, 2018, the President doubled the tariffs on steel and aluminum imports from Turkey.  *See* Proclamation 9772, 83 Fed. Reg. 40,429 (2018).  The Proclamation gave no reason for singling out Turkey for increased tariffs, *see ibid*., but in a tweet, the President implied that it was in retaliation for Turkey allowing its currency to "slide[] rapidly downward against our very strong Dollar! . . . . Our relations with Turkey are not good at this time!"[5]

In none of these cases did the Secretary of Commerce conduct a renewed investigation, solicit public comment, or issue a formal report.[6]  Moreover, as far as was publicly disclosed, neither the Secretary nor the President consulted with the Department of Defense or any other agencies or officials.  *Cf*. 19 U.S.C. § 1862(b)(2)(A).

2.  In 2020, the CIT invalidated the Proclamation singling out Turkey for increased tariffs.  *See*

---

[5] Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 10, 2018, 5:47 A.M.), http://twitter.com/realdonaldtrump/status/1027899286586109955.

[6] Some Proclamations asserted that "the Secretary has informed" the President of certain facts.  *See, e.g.*, Proclamation 9772, 83 Fed. Reg. at 40,429; Proclamation 9980, 85 Fed. Reg. at 5281.  But to the extent those representations were made in writing, those documents have never been made public.

13

*Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246 (CIT 2020). The court majority explained that "the temporal restrictions on the President's power to take action pursuant to a report and recommendation by the Secretary is not a mere discretionary guideline, but a restriction that requires strict adherence." *Id*. at 1252.

A divided panel of the Federal Circuit reversed. *Transpacific*, 4 F.4th at 1310. The majority concluded that all the President must do within the statutory 90-day period is adopt a "plan of action or course of action," with "choices to impose particular burdens in the carrying out of the plan permissibly made later in time." *Id*. at 1321. The court acknowledged that the "timing provisions were meant to prevent the President from acting on stale information." *Id*. at 1332. But it believed that "[c]oncerns about staleness of findings are better treated in individual applications of the statute," suggesting courts would develop their own time limits independent of those Congress enacted. *Ibid*. The court found no staleness problem in the case before it, however, because the increased duties on Turkish steel were imposed "only months after the initial announcement." *Ibid*.

Judge Reyna dissented. In his view, the majority's interpretation "expands Congress's narrow delegation of authority, vitiating Congress's own express limits, and thereby effectively reassigns to the Executive Branch the constitutional power vested in Congress to manage and regulate the Tariff." *Id.* at 1336. (citing U.S. Const. art. I, § 8).

14

## C.  The President's Imposition Of Tariffs On Steel Derivatives

On January 24, 2020—more than two years after the Secretary's Steel Report—the President went a significant step further, imposing a 25% tariff on certain steel derivatives.  *See* Proclamation 9980, 85 Fed. Reg. 5281 (2020).  The Proclamation did not purport to be based on the original Steel Report findings (which, as noted, said nothing about steel derivatives' effect on national security and was based on market data from 2017).  *See id*. at 5281-82.[7]  To the contrary, the President justified the new tariffs on developments occurring after the tariffs on steel mill products went into effect.  *See id*. at 5281.

In particular, the President reported that the "Secretary has informed me that . . . imports of certain derivatives of steel articles have significantly increased since imposition of the tariffs and quotas" and that these imports were "erod[ing] the customer base for U.S. producers" of steel.  *Id*. at 5282.  In response, the Secretary recommended reducing imports of an eclectic mix of seven steel derivatives: "nails, tacks (other than thumb tacks), drawing pins, corrugated nails, staples (other than of heading 8305) and similar articles," as well as "bumper stampings of steel" used in certain vehicles and "for tractors suitable for agricultural use" (but not bumper

---

[7]  In the courts below, the Government disavowed any argument that the Secretary's informal findings and recommendations relating to steel derivatives could satisfy the "essential requirements of . . . 19 U.S.C. § 1862(B)(2)(A)."  Pet. App. 25a (citation omitted).

15

stampings for other kinds of tractors or construction equipment). 85 Fed. Reg. at 5285. The proposal omitted the vast majority of steel derivative products, such as home appliances, factory equipment, and most car parts. *See ibid*.

Although the Secretary made representations about the amount and effects of derivative imports, those findings were not the result of the statutory investigative process and were made without the benefit of any public input. There was no notice of the investigation, no request for public comment, and no public hearings. Moreover, for all that can be told, there was no interagency consultation or input from the Department of Defense. In addition, because the Secretary's findings were not memorialized in any public report, its details were not subject to public or congressional scrutiny. Accordingly, it is impossible to tell, for example, whether the Secretary even considered whether imports of this ad-hoc subset of steel derivatives comprised a sufficient portion of the demand for U.S. steel to make any meaningful difference to the domestic steel industry. *See id*. at 5282; *cf.* United States Trade Commission, *Economic Impact of Section 232 and 301 Tariffs on U.S. Industries* 21-22 (March 2023) ("*Economic Impact*") (finding that the "defined derivative products represent a small share of total imports," accounting for 2.3 percent of steel imports by value in 2021).[8]

---

[8] A*vailable at* https://www.usitc.gov/publications/332/pub5405. pdf.

16

Nonetheless, the President accepted the Secretary's recommendation and imposed 25% tariffs on the steel derivates the Secretary identified. *Id*. at 5283.

## III. Procedural History

1. Petitioner is an importer and reseller of steel derivatives such as steel nails and fasteners for the homebuilding industry. Petitioner and others filed suit challenging the validity of the steel derivative tariffs in cases later consolidated before the CIT. Pet. App. 3a-4a. In 2021, that court held the tariffs unauthorized by statute because they were imposed without compliance with Section 232's process and deadlines. *Id*. 4a.

2. The United States appealed, and the Federal Circuit reversed. *Id*. 5a.

The court explained that under circuit precedent, review of the President's compliance with the Trade Expansion Act is "available, but it is limited." *Id*. 11a. Specifically, "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Ibid*. (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)). The panel emphasized that "[t]his court has repeatedly relied on the *Maple Leaf* formulation to indicate the 'limited' scope of review of non-constitutional challenges to presidential action." *Ibid*. (collecting examples).

The panel then upheld the President's interpretation of the statute, relying in large part on its prior decision in *Transpacific*. The panel again

17

held that the only instance in which the President requires an investigation and report from the Secretary of Commerce is when he first announces his decision to take some kind of action; after that, he can make "adjustments of specific measures. . . in carrying out the plan over time." Pet. App. 12a (quoting *Transpacific*, 4 F.4th at 1319). The court further concluded that the original study and proclamation's failure to "address the effect of imports of derivatives is immaterial." *Id*. 15a. It was sufficient that applying the tariff to these derivatives was "*in line* with the announced plan of action . . . . to achieve the stated implementation objective," something the President "*could have* used in the initial set of measures." *Id*. 14a (emphasis added, citation omitted). Allowing the President to make such alterations outside the statutory process, the panel believed, "serv[es] the 'evident purpose' of § 232." *Ibid*. (quoting *Transpacific*, 4 F.4th at 1323).

The court again recognized that refusing to apply the statutory time limits to new actions could risk the President acting on stale information. *Id*. 14a. And it did not dispute that in this case, the new action in 2020 occurred more than two years after the conclusion of the Secretary's investigation, and nearly two years after the President's initial action against steel mill products, far longer than the several months the court found acceptable in *Transpacific*. *See id*. at 9a-10a. It nonetheless concluded that there was no staleness problem here because the new action was taken "in pursuit of the same goal first articulated in Proclamation 9705" and because it purported to be "in response to the 'current information' provided to the

18

President by the Secretary." *Id*. at 16a. The court acknowledged that the Government "declin[ed] to put into the record the updated data the Secretary conveyed to the President," which remains undisclosed to the public to this day. *Ibid*. But the panel concluded that nothing in the statute required the President to base his decision on information gathered through the statutory process or to disclose the details of the information he was acting on or how it was gathered. *Id*. at 18a.

3. On June 22, 2023, the Federal Circuit denied the challengers' joint petition for rehearing en banc. Pet. App. 151a.

## REASONS FOR GRANTING THE PETITION

The Constitution addresses the power to regulate foreign commerce and set import duties with unusual precision, assigning both responsibilities to Congress, not the President. U.S. Const. art. 1, § 8. Yet, the Trade Expansion Act delegates the entirety of that legislative power to the Executive whenever the President declares that action "must be taken" to ensure that "imports will not threaten to impair national security." 19 U.S.C. § 1862(c)(1)(A)(ii). If there is an intelligible principle for the President to apply in making those determinations, it could hardly be less constraining. The statute defines "national security" with surpassing breadth and malleability. *See id*. § 1862(d). And Congress provided essentially no guidance at all regarding what actions the President should take in response to a threat. The constraints on the delegation are procedural requirements designed to ensure that the President

19

acts on the basis of a public investigation and informed advice from relevant government officials.

In *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976), this Court pointed to those procedural prerequisites as essential to the statute's constitutionality. *See id*. at 559. Yet, the Federal Circuit has now held that once the Executive goes through the statutory process once, for years thereafter the President may take any "action that, in the judgment of the President, must be taken to adjust imports" without any statutory constraint. 19 U.S.C. § 1862(c)(1)(A). This now includes the power to dramatically change the amount of duties imposed,[9] to abandon import duties altogether in favor of a completely different response,[10] to change the countries subject to the action,[11] and to extend the restrictions to products that were not the subject of the initial investigation and Presidential action.[12]

In reaching these conclusions, the Federal Circuit has resolved every potential ambiguity in the statute in favor of broadening the delegation and minimizing the statutory limits on the Executive's exercise of legislative powers. This case provides the Court an opportunity to make clear that separation of powers principles require the opposite approach, one that resolves ambiguity in favor of restraint. And because the Federal Circuit's interpretation of the Act cannot

---

[9] *See Transpacific*, 4 F.4th at 1310.

[10] *See id*. at 1314-15.

[11] *See id*. at 1315

[12] Pet. App. 14a-15a.

20

be upheld under that standard, the Court should reverse and hold that the steel derivatives tariff is unlawful.[13]

## I. The Court Should Grant Certiorari To Make Clear That Courts Must Resolve Ambiguity In Statutes Delegating Vast Legislative Power To The Executive In Favor Of Restraining The Delegation.

The Federal Circuit applies an interpretive standard that resolves ambiguity in favor of expanding delegation of legislative trade powers to the President. As the panel explained below, the Federal Circuit only grudgingly permits *any* review of the President's compliance with the statutory limits on his delegated trade powers. Pet. App. 11a (explaining such review is "available, but it is limited"). What review is provided defers to the President's interpretation of his own authority: "For a court to interpose, there has to be a *clear misconstruction of the governing statute*, a *significant* procedural violation, or action outside delegated authority." *Ibid*. (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)) (emphasis added).

That standard cannot be reconciled with the family of doctrines this Court has adopted to protect the Constitution's division of authority between the branches. *See generally*, Cass R. Sunstein,

---

[13] Because the Federal Circuit has exclusive jurisdiction over appeals under the Trade Expansion Act, a circuit split on the proper construction of that Act could not arise. *See* 28 U.S.C. §§ 1295(a)(5), 1581(i).

21

*Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000). In the most extreme cases, a transfer of legislative power to the Executive may be so expansive and unguided that the courts are compelled to directly declare it an unconstitutional delegation. *See, e.g.*, *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935). Courts also must construe statutory delegations "narrowly in order to avoid a serious question of unconstitutional delegation of legislative power." *Algonquin*, 426 U.S. at 558-59 (internal quotation marks and citation omitted).

More recently, the Court has applied the "major questions" doctrine to cases "in which the history and the breadth of the authority that [the Executive] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (cleaned up). In those "extraordinary cases," the Executive's claim of power can prevail only if it can "point to clear congressional authorization." *Id*. at 2608-09.

Thus far, the Court has applied the major questions doctrine principally to decide whether Congress has delegated to the Executive power to regulate a particular subject matter at all—*e.g.*, student loan forgiveness, cigarettes, greenhouse gases, assisted suicide, etc. Here, there is no doubt that Congress intended to delegate the President power to regulate international trade. The interpretative question, instead, concerns the *scope* of that power and, in particular, the meaning of the

22

statutory restrictions placed on the Executive's exercise of that authority.

While the precise question may be different, the underlying constitutional considerations are the same. The President's attempts to legislate the terms of international trade in a product deemed essential to national security is a question of "vast economic and political significance." *Util. Air Regul. Grp v. EPA*, 573 U.S. 302, 324 (2014). The scope of the delegation is enormous, allowing the President to respond to the perceived threat with whatever "action that, in the judgment of the President, must be taken to adjust imports." 19 U.S.C. § 1862(c)(1)(A)(ii); *see Biden v. Nebraska*, 143 S. Ct. at 2373 (invoking major questions doctrine where agency claimed "virtually unlimited power to rewrite the Education Act"); *Ala. Assoc. of Realtors v. DHS*, 141 S. Ct. 2485, 2489 (2021) (calling Government's claim of authority "breathtaking" where only limit was that an agency "deem a measure 'necessary'"). There can be no claim that Congress made the principal policy decisions itself, leaving it to the President to "fill up the details." *Wayman v. Southard*, 23 U.S. 1, 31 (1825). The only choice Congress made was to direct the President to make the relevant policy decisions.

Under the Act, then, significant matters of national trade law are "nothing more than the will of the current President." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting); *see also Gonzalez v. Oregon*, 546 U.S. 243, 262 (2006) (applying major-questions doctrine where Attorney General claimed power to prohibit drug uses "he deems illegitimate"). That is the opposite of the liberty-preserve process Congress

23

ordained for the creation of law. *See Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting).

To be sure, in the 1970s, this Court found no delegation problem with a prior version of the Trade Act. *See Algonquin*, 426 U.S. at 559. But the Court's premise — that the statute "establishes clear preconditions to the Presidential action," such as the prerequisite report from the Secretary's investigation, *ibid.* — has been undermined by the Federal Circuit's repeated untethering of the President's action from those procedural prerequisites. *See AIIS*, 376 F. Supp. 3d at 1351-52 (Katzmann, J., concurring). As now construed, the President may legislate tariffs against goods that were not the subject of any investigation or recommendation by the Secretary, years after the initial investigation, through whatever deliberative process he chooses.

Moreover, in more recent times, members of this Court have drawn precedents like *Algonquin* into question, expressing a willingness to "reconsider the approach we have taken for the past 84 years" in an appropriate case. *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Alito, J., concurring in the judgment); *see also ibid.* (Gorsuch, J., joined by Robert, C.J., and Thomas, J., dissenting) (calling Court's modern non-delegation approach "an understanding of the Constitution at war with its text and history"); *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari) ("Justice Gorsuch's thoughtful *Gundy* opinion raised important points that may warrant further consideration in future cases.").

24

The Court should use this case to begin reconsidering its approach to nondelegation. It need not overrule *Algonoquin* in order to recognize that the Act raises separation of powers concerns sufficient to require that courts find clear congressional authorization before construing the statute in ways that expand the scope of the President's delegated authority. Both "separation of powers principles and a practical understanding of legislative intent" suggest that when Congress delegates broad, unguided legislative power to the Executive, it intends for the conditions on that authority to be strictly construed and enforced. *West Virginia*, 142 S. Ct. at 2609. Only that approach is consistent with constitutional avoidance principles and the judiciary's obligation to view the Executive's claims of "extravagant statutory power over the national economy" with "skepticism." *West Virginia v. EPA*, 142 S. Ctr. 2587, 2609 (2022) (cleaned up).

Accordingly, the President's claimed authority to legislate tariffs on steel derivatives in this case should not have been accepted absent "clear congressional authorization." *Ibid*. That includes clear authorization to excuse the President from complying with the statutory procedures for taking actions to reduce imports. Strict enforcement of the Trade Act's procedural requirements is particularly important to maintaining the constitutional order. *See Touby v. United States*, 500 U.S. 160, 166 (1991) (holding that "procedural requirements," including a time requirement, created a lawful delegation because they "meaningfully constrain[ed] the Attorney General's discretion"). The Constitution assigns legislative

25

power to Congress in part because "Article I's detailed process of new laws were . . . designed to promote deliberation." *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting). The procedural requirements of the Trade Act are designed to replicate at least some portion of that deliberation when trade policy is made by the Executive rather than Congress. Courts should be especially hesitant before adopting an interpretation of the statute that eliminates those safeguards.

## II. The Federal Circuit Could Not Have Upheld The President's Actions Applying Appropriate Separation Of Powers Principles.

The Federal Circuit could not have reached its expansive interpretation of the President's powers if it had applied the proper interpretative standard.

1. The plain text of the statute is clear and straightforward: the President is empowered to take a trade "action" only if, "[w]ithin 90 days after receiving a report" from the Secretary of Commerce, he "determines the nature and duration of the action" he proposes to take." 19 U.S.C. § 1862(c)(1)(A), (B)(2). He is then required to implement that "action" within 15 days of his determination and to report to Congress within 30 days why he decided to take that "action." *Id*. 19 U.S.C. § 1862(c)(1)(B), (2).

The Federal Circuit countenanced the President's claimed authority to impose measures other than those determined through this statutory process by giving the word "action" an extraordinarily expansive reading. An "action," it held, can consist of nothing more than "a plan of action that allows adjustments to

26

specific measures . . .  in carrying out the plan over time." Pet. App. 12a (citation omitted).  The court thus defined an "action" as the equivalent of a general "plan" and used words like "measures" and "implementing steps" to describe specific actions like imposing tariffs, erecting import quotas, or negotiating a trade agreement. *Id*. at 1261.  Even that gloss uses the word "plan" loosely.  There was no argument, for example, that the President's initial plan included contingencies to extend tariffs to derivatives on certain conditions.  *Cf. id.* at 1321 (stating that an "action" might include "options for contingency-dependent choices").  Indeed, neither the investigation, the Secretary's report, nor the President's Proclamation even mentioned derivatives. *See supra at* 14-15.  The only way to claim that the original "plan of action" included steel derivatives would be if the plan were simply to "fix the problem somehow" or "impose these initial measures and see how it goes."

That definition of "action" cannot be squared with the rest of the text.  For one thing, the statute requires the President to "implement that action" within 15 days of the determination, making clear that an "action" is concrete and specific, something that can actually be implemented, not just a general "plan of action" whose "implementing steps" will be decided later.  Pet. App. 12a.

Likewise, requiring the President to determine, and report to Congress, "the *nature* and *duration* of the action," confirms that an "action" is something more concrete than a simple resolution to suppress imports in some unspecified way over some

27

indeterminate period of time. *Id*. § 1862(c)(1)(A)(ii) (emphasis added). After all, the statute separately requires the President to "determine" whether he "concurs with the finding of the Secretary" that imports are threatening to impair national security. *Id*. § 1862(c)(1)(A)(i). There would be no point in requiring him, in the next subparagraph, to also "determine the nature and duration of the action" if all that required was reiterating his view that imports posed a threat that needed to be dealt with through "specific measures" that would be determined later and changed at will for years on end.

Nor would there be any point in requiring the President to determine that his "action" will "adjust the imports . . . so that such imports will not threaten to impair national security," if by "action," Congress simply meant a general "plan of action" that contained no specific measures whose efficacy could be predicted.

If that were not enough, paragraph 3 of subsection (c) specifically contemplates the possibility that the President might decide later that some *other* actions" or *"additional* actions" are needed to achieve his objectives, *id*. § 1862(c)(3)(A), yet authorizes him to do so without undertaking the statutory process in only one limited circumstance: if the "action taken by the President under paragraph (1)" – that is, the action determined within 90 days of the Secretary's report – "is the negotiation of an agreement which limits or restricts" imports or exports, and either no agreement is achieved within 180 days or the agreement "is not being carried out or is ineffective." *Id*. § 1862(c)(3)(A). In those circumstances, the statute requires the President to "take such other actions as the President

28

deems necessary" and to "publish in the Federal Register notice of any additional actions being taken." *Ibid*.

By expressly providing for one circumstance in which the President is not required to repeat the investigation before imposing an alternative action, Congress made clear it contemplated no other exception. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). Moreover, paragraph 3 would have been unnecessary if, as the Federal Circuit insists, the President's initial "action" included any "additional impositions on imports" he later determined necessary "to achieve the stated implementation objective." *Transpacific*, 4 F.4th at 1319. Nor would this provision's use of the phrases "other actions" and "additional actions" make any sense if "action" meant a general "plan of action" sufficiently broad to encompass any other or additional action the President might take in response to a failed negotiation.

The Federal Circuit's interpretation of "action" also makes inexplicable Congress's requirement that the President publish a notice of his decision to take other action when negotiations failed, but not when he changes course for any other reason (*e.g.*, because initial import quotas proved ineffective). The Federal Circuit could not explain why Congress would have expressly authorized and regulated alternative actions when the initial action was a negotiation, but not when the initial action was something else.

29

Unable to convincingly account for the text, the Federal Circuit has resorted to general statutory purposes and an incomplete reading of the legislative history.  For example, the panel believed that freeing the President from the procedural conditions "furthers [the Act's] evident purpose," which is to "enable and obligate the President . . . to effectively alleviate the threat to national security."  4 F.4th at 1323.   In *Transpacific*, the court also found support in prior instances of Presidents modifying their responses under the Trade Expansion Act without a new investigation or report from the Secretary of Commerce.  *Transpacific*, 4 F.4th at 1326-1329.[14]  The panel majority recognized that its historical examples largely predated Congress' material revision of the statute in 1988 which, among other things, added the 90-day time limit for the President to determine the "nature and duration" of his proposed action and convey that decision to Congress.  *Id.* at 1329.  But the court brushed the amendments aside, refusing to

---

[14] Although this Court noted that practice in *Algonquin*, it did not pass on its consistency with the statute, perhaps because the specific modification before it was the product of a renewed formal investigation by the Secretary of Commerce.  426 U.S. at 553-54.  Nor did the Court consider the circumstances under which the President can extend tariffs to a new category of products, such as derivatives.  *Cf. id.* at 552 (noting that presidential orders regarding oil imports had always addressed both "crude oil and the principal crude oil derivatives").  Instead, the only question before the Court was whether the Act allowed the President to control oil imports "by imposing on them a system of monetary exactions in the form of licensing fees" as opposed, for example, to "imposing quotas on such imports."  *Id.* at 551-52.

30

construe them as enacting significant constraints on presidential authority absent a "clear indication from Congress of a change in policy," which it found lacking based principally on its reading of the legislative history. *Transpacific*, *id*. at 1329-31.

As Judge Reyna explained in his *Transpacific* dissent, this reasoning fails on its own terms. *See id*. at 1341-42. But more importantly, every aspect of that analysis — the reliance on generalized legislative purpose, the debatable inferences drawn from executive practice and congressional silence, the refusal to construe the 1988 amendments as effecting "a withdrawal of previously existing presidential power" absent "a clear indication from Congress," *id*. at 1329 — is incompatible with the proper standard for interpreting a statute delegating vast legislative powers to the Executive. None of it constitutes the "clear congressional authorization" that separation of powers principles require. *West Virginia*, 142 S. Ct. at 2609.

## III. This Case Presents An Ideal Vehicle For Resolving Questions Of Great Doctrinal And Practical Significance.

Accordingly, this case presents the Court an ideal vehicle for deciding the proper rules for resolving ambiguities in statutes delegating expansive legislative power to the Executive Branch — the

31

question is squarely posed by the case and its answer is outcome determinative.[15]

The question is also undeniably important. For the reasons already discussed, the proper standard of review is of vital doctrinal significance. The major question doctrine can protect against agencies making unwarranted claims of extravagant delegated powers, but it does not directly address what should happen when Congress clearly intends to give away broad swaths of its constitutional responsibilities to the Executive branch, often with limited substantive or procedural conditions attached. As this case shows, how courts interpret those limitations is of great significance to maintaining the constitutional plan.

The scope of the President's authority under the Trade Expansion Act is also of immense practical consequence. Almost by definition, the statute governs imports of products that are vital to our economy, steel and steel derivatives being a prime example. Any tariff on such a product necessarily has radiating effects throughout the economy. Here, the steel tariffs have dramatically increased the price of imported steel and steel derivatives by approximately

---

[15] Petitioner also adequately preserved the argument below. *See, e.g.*, Pet'r. C.A. Br. 27 (Heading III.B: "Outer Boundaries on the President's Authority to Act Outside the Time Constraints in Section 232 Are Necessary to Avoid Separation-of-Powers Concerns"). To be sure, petitioner did not directly ask the panel to overrule the Circuit's deferential standard of review under *Maple Leaf Fish*. But the panel had no authority to grant such a request, so petitioner's failure to make it is no impediment to review. *See, e.g.*, *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 n.7 (2013).

32

$3 billion per year. [16]   They also allow domestic manufacturers to raise their prices, with domestic consumers bearing the brunt of the price increases.[17]  As a consequence, steel prices in the United States are up to "40 percent higher even than in high-cost Western Europe."[18] Unsurprisingly, then, downstream industries that rely on steel inputs— which "employ 46 times more people and add 35 times more to GDP than do steel producers" [19] —saw an "average annual decrease in production values" of "$3.4 billion during 2018-21"[20] and the loss of approximately 75,000 jobs (compared to the estimated 1,000 jobs created or saved in the steel industry) in the first few years of the tariffs.[21]

---

[16] Https://taxfoundation.org/tariffs-trump-trade-war/#:~:text= Tariffs%20on%20steel%20and%20aluminum%20and%20derivat ive%20goods%20currently%20remain,based%20on%202018%20i mport%20values.

[17] *See Economic Impact*, *supra*, at 21-22.

[18] *See* Dan Pearson*, Ending tariffs would curb inflation — but why ignore the main benefits?*, The Hill (July 18, 2022), *available at* https://thehill.com/opinion/international/3563911-ending-tariffs-would-curb-inflation-but-why-ignore-the-main-benefits/.

[19] *Ibid*.

[20] *Id*. at 22.

[21] Kadee Russ & Lydia Cox, *Steel Tariffs and U.S. Jobs Revisited*, https://econofact.org/steel-tariffs-and-u-s-jobs-revisited (Feb. 6, 2020) (citing study by researchers at the Federal Reserve Board of Governors).

33

The resulting higher prices have propagated through the economy, contributing to inflation.[22] The result has been an increase in costs of materials essential to a variety of domestic industries, including homebuilding.  By one estimate, the additional cost to the economy has been approximately $11.5 billion a year, working out to over $900,000 for every job saved or created in the steel industry.[23]

Ordinarily, those bearing the brunt of the tariffs could turn to their local members of Congress to seek relief.  But because the tariffs were imposed by presidential proclamation rather than through the constitutional process for imposing taxes and regulating international commerce, Congress has excused itself from the debate and escaped political accountability for the pain the tariffs have inflicted. *See Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting).

This Court should intervene to restore the constitutional balance.  The Federal Circuit has steadfastly refused to provide a significant check on the President's exercise of his delegated powers.  No other circuit has jurisdiction to do so. *See supra* n.13.

---

[22] *See, e.g.*, Megan Hogan & Yilin Wang, To fight inflation, cutting tariffs on China is only the start, Peterson Institute for International Economics (June 3, 2022), https://www.piie.com/blogs/realtime-economic-issues-watch/fight-inflation-cutting-tariffs-china-only-start.

[23] Https://www.washingtonpost.com/business/2019/05/07/trumps-steel-tariffs-cost-us-consumers-every-job-created-experts-say/.

34

And there is no indication that the tariffs will be lifted anytime soon.

## IV.  At The Very Least, This Petition Should Be Held For *Loper*.

At the very least, the Court should hold this case pending its decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451.  There, the Court will consider the appropriate standard for deferring to an executive agency's interpretation of its own statutory powers, in the process deciding whether to modify or overrule *Chevron v. NRDC*, 467 U.S. 837 (1984).  Here, the Federal Circuit invoked its particularly robust form of *Chevron*-style deference for reviewing the Executive's claimed power under the Trade Expansion Act.  Pet. App. 11a.  The Court's decision in *Loper* could shed important light on whether that standard is consistent with the Constitution's division of powers among the branches.  *See, e.g.*, U.S. BIO 7, *Yang v. United States*, No. 02-136 (Solicitor General explaining that a hold is appropriate when the Court's decision in a pending case "could affect the analysis of [the] question" presented by the petition or if "it is possible that the Court's resolution of the question presented in [the pending case] could have a bearing on the analysis of petitioner's argument," even if the cases do "not involve precisely the same question").

35

## CONCLUSION

The petition for certiorari should be granted.

Respectfully submitted,

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON,
  PLLC
5335 Wisconsin Ave.,
  NW
Suite 810
Washington, DC 20015

Kevin K. Russell
  *Counsel of Record*
GOLDSTEIN, RUSSELL &
  WOOFTER LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
kr@goldsteinrussell.com

July 21, 2023

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this response complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this response is 9,535 words.


Dated: July 21, 2023

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW
Suite 810
Washington, DC 20015
(202) 688-3610
trade@mowrygrimson.com
*Counsel to PrimeSource Building Products, Inc.*